IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| LAWRENCE FAULKENBERRY, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 1:15-cv-01089 |
| | § | |
| CALDWELL COUNTY, TEXAS | § | |
| CALDWELL COUNTY SHERIFF'S | § | |
| OFFICE, SERGEANT YOST, | § | |
| DEPUTY M. TAYLOR, | § | |
| DEPUTY HOUSETON, AND | § | |
| CAPTAIN JESSE HERNANDEZ | § | |
| Defendants. | § | |

## DEFENDANTS' OPPOSED MOTION TO EXCLUDE
## THE TESTIMONY OF KEVIN MILLS

TO THE HONORABLE JUDGE OF THIS COURT:

Defendants Caldwell County, Sergeant Yost, Deputy Taylor, Deputy Houseton, and Captain Jesse Hernandez (hereinafter "Defendants") file this Motion to Exclude the Testimony of Kevin Mills under Federal Rule of Civil Procedure 702. Defendant offers the following:

### FACTS

This case arises out of the arrest of Plaintiff, Lawrence Faulkenberry (hereinafter "Plaintiff"), and medical damages he claims to have suffered as a result of that arrest. As part of his claim, Plaintiff designated his accountant, Kevin Mills, CPA, as an expert witness to support his claim for lost wages and business income. Plaintiff owns a motorcycle parts business called Richardson Chop Shop, Inc. Plaintiff acquires and resells motorcycle parts online, on websites such as eBay. Richardson Chop Shop, Inc. is an S corporation ("S-corp"), which is a type of entity where profits and losses can pass through to your personal tax return. As such, Plaintiff is self-employed but enjoys certain tax advantages allowed by S-corps, such as Richardson Chop Shop,

Inc. renting its office (that Plaintiff personally owns) from Plaintiff. Richardson Chop Shop pays Plaintiff a salary and also depreciates assets that are tax advantageous to the Plaintiff. These facts are necessary for the Court to understand the lost wages arguments made by Plaintiff and Kevin Mills, and why those arguments fail.

Undersigned counsel conferred with Plaintiff's counsel, Karl Seelbach, by email on May 3, 2017, concerning this motion pursuant to Local Rule CV-7(i). Mr. Seelbach advised that Plaintiff agrees to not offer Mr. Mills at trial regarding the following: (1) the business value of Richardson Chop Shop, Inc.; (2) injuries Mr. Faulkenberry sustained; and (3) that Mr. Mills has audited Mr. Faulkenberry or his business. Mr. Seelbach stated that Plaintiff was otherwise opposed to this motion.

Therefore, Defendants file his Motion to Exclude Kevin Mills based on the remaining issues about which Mr. Mills will testify.

## LEGAL STANDARD

A Court should allow the testimony of an expert witness who is well qualified by knowledge, skill, experience, training or education to render an opinion based on scientific, technical, or other specialized knowledge. Fed. R. Evid. 702. A court should exclude the testimony of an expert if it is not reliable. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999); *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592-93 (1993). An expert witness may be qualified and highly credible, but his or her conclusions may be based on unreliable methodology. Scientific evidence that is not grounded in the "methods and procedures of science" is no more than "subjective belief or unsupported speculation." *Daubert*, 509 U.S. at 590.

The party offering the expert testimony must establish that it is admissible. *Moore v. Ashland Chem. Co.*, 11 F.3d 269, 276 (5th Cir.1998). Expert testimony is admissible if the

proponent demonstrates that: (1) the expert is qualified; (2) the evidence is relevant to the case; and (3) the evidence is reliable. *Bocanegra v. Vicmar Servs., Inc.*, 320 F.3d 581, 584 (5th Cir.2003). The Court "is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.W. 137, 152 (1999). The Court "must ensure the expert uses reliable methods to reach his opinions; and those opinions must be relevant to the facts of the case." *Guy v. Crown Equip. Corp.*, 394 F.3d 320, 325 (5th Cir.2004).

"Reliability" requires some objective, independent validation of the expert's methodology. *Moore, 11 F.3d 269, 276.* The expert's assurances that he has utilized generally accepted scientific methodology are insufficient. *Id.* (*citing Daubert v. Merrell-Dow Pharmaceuticals, Inc.,* 43 F.3d 1311, 1316 (9th Cir.1995) (on remand)). While he need not prove to the court that the expert's testimony is correct, the Plaintiff must prove by a preponderance of the evidence that the testimony is reliable. *Id.* (citing *In re Paoli R.R. Yard PCB Litigation,* 35 F.3d 717 (3d Cir.1994); 2 Stephen A. Saltzburg et al., Federal Rules of Evidence Manual 1229-40 (7th ed.1998)).

For the expert's testimony to be reliable, the following requirements must be met: (1) the testimony must be based on sufficient facts or data, (2) the testimony must be the product of reliable principles and methods, and (3) the expert must apply the principles and methods reliably to the facts of the case. FED. R. EVID. 702 (2010).

The non-exclusive factors that should be considered when evaluating reliability are the following:

     a.   whether the expert's theory can be or has been tested;

     b.   whether the theory has been subject to peer review and publication;

     c.   the known or potential existence and maintenance of standards and controls;

d.   the existence and maintenance of standards and controls; and

e.   the degree to which the technique or theory has been generally accepted in the scientific community.

*Moore* 151 F.3d at 275 (citing *Daubert*, 509 U.S. at 593-95).

<u>**LIST OF EXHIBITS**</u>

Exhibit A: Plaintiff's Designation of Expert Witnesses

Exhibit B: Deposition of Kevin Mills (April 25, 2017)

Exhibit C: Report of Kevin Mills

<u>**ARGUMENT**</u>

Plaintiff designated Kevin Mills ("Mills") as an expert witness who "will testify concerning the economic impact of the Defendants' conduct on Plaintiff's income and business." Exhibit A, Plaintiff's Designation of Expert Witnesses. On April 25, 2017, Mills was deposed by both Plaintiff and Defendant. According to his deposition testimony, Mills is a Certified Public Accountant and has a bachelor's degree in accounting from Texas State University. Exhibit B, Deposition of Kevin Mills, 6:17-7:16 (April 25, 2017). Defendants file this motion to exclude the testimony of Mills because Mills' opinions are not reliable and are not based on a reliable methodology, are based on unsupported speculation, will not assist the trier of fact, and violate Federal Rule of Civil Procedure 26.

A.   <u>Mills' testimony is not reliable and is not based on a reliable methodology</u>

Mills testified that Plaintiff would lose $570,000 in lost income over 19 years. Exhibit B, 27:13-28:2. The basis for the $570,000 figure was simple math: $12,000 per year in lost income that Faulkenberry paid to himself as a salary; plus $8,000 per year in lost rent that Faulkenberry paid, through his business, to lease his office space; plus $12,000 per year in lost depreciation

deductions. *Id.* at 28:15-29:8. Mills added those numbers to conclude $30,000 per year in lost income. Mills testified that, under current Social Security law, Plaintiff could retire at age 67, or 19 years from the present date. *Id.* at 27:3-12. $30,000 per year, times 19 years, equals $570,000 (29:9-12)—a "rough estimate" of the Plaintiff's lost income. *Id.* at 38:8-11; 39:21-24.

However, Mills was not asked to complete a discounted cash flow analysis or to determine the present value of the future lost wages. *Id.* at 41:4-6. *Sheshunoff & Co., Inc. v. Scholl*, 564 S.W.2d 697, 698 (Tex. 1978) (holding that the Plaintiff's remaining unaccrued salary should have been discounted to its present value at the legal rate of interest); *Culver v. Slater Boat Co.*, 722 F.2d 114, 122 (5th Cir. 1983) ("We hold that fact-finders in this Circuit must adjust damage awards to account for inflation according to the below-market discount rate method."). Mills stated that it was possible to calculate the present value of $570,000 using a discounted cash flow analysis, but that was not his area of expertise. Exhibit B, 45:1-46:10; 73:5-15. In fact, the day of his deposition was the first-time Mills was asked to calculate Plaintiff's projected lost income. *Id.* at 46:11-15. Therefore, this calculation was not part of Mills' report or his scope of work. *Id.* at 65:3-14. Plaintiff has offered Mills to testify about future lost wages that he will suffer, but did not employ him to do that analysis. *Id.* at 77:13-78:6.

Furthermore, Mills does not use Plaintiff's individual tax returns to determine his $570,000 figure, he uses the corporate tax return for Richardson Chop Shop, Inc. *See* Exhibit C; Exhibit B, 27:13-28:2. While Richardson Chop Shop, Inc. is an S-corp with pass through taxation (Exhibit B, 49:8-50:8), it does not include any other income Plaintiff may receive. Exhibit B, 40:6-17. Mills testified about income the Plaintiff lost based on income the Plaintiff's business lost. *Id.* These are not the same thing.

In his Accountant's Compilation Report dated January 10, 2017, Mills repeatedly circumscribes his scope of work. *See* Exhibit C, at 2. Mills states that:

- He has not audited or reviewed the accompanying State of Income and does not express an opinion or provide any assurance about whether it is in accordance with the income tax basis of accounting.
- He has not undertaken to obtain or provide any assurance that there are no material modifications that should be made to the financial statements.
- That if the omitted disclosures ordinarily included in financial statements were included, they might influence the uses conclusions about the entity's revenues and expenses.
- He is not independent with respect to Richardson Chop Shop, LLC.

*Id*. By his own disclaimers, Mills states that he does not provide any assurances that his opinions are accurate. *See id*. Asked in his deposition about these statements, Mills stated that he is required to provide these disclaimers unless he performs a full audit. Exhibit B, 57:16-58:1. However, Mills cannot perform a full audit in this case because he is not independent with respect to Richardson Chop Shop. *Id. at* 61:4-19. Mills' testimony is unreliable because his scope of work was limited and, even if he was asked to perform a full audit, he is ethically barred from doing so. *Id. at* 61:20-24.

B. <u>Mills will not assist the trier of fact</u>

Mills assumed in his calculations that Plaintiff will live until he is 67 years old. *Id. at* 42:1-24. However, Mills did not use a work-life actuarial chart. *Id*. Nor did Mills determine whether Mr. Faulkenberry could work at another job for similar or less pay. *Id. at* 42:25-43:4. "It is a basic concept of damages that they must be proved by the party seeking them." *Barto v. Shore Const., L.L.C*., 801 F.3d 465, 476 (5th Cir. 2015), quoting *Servicios–Expoarma, C.A. v. Indus. Mar. Carriers, Inc*., 135 F.3d 984, 995 (5th Cir.1998). In this case, Plaintiff has not proven that he will suffer lost wages, nor has he proven what his expected work-life would be; Mills assumes that Plaintiff will live and work until age 67, but he has no data to support that assumption. Exhibit B,

70:1-19. This is not sufficient evidence to support an award of damages for lost income for 19 years. *Barto v. Shore Const., L.L.C.*, 801 F.3d 465, 475 (5th Cir. 2015) ("*wanting* to work until age 67 is not the only or even the most significant factor in determining whether someone actually *will* work until age 67").

Mills also stated that he was not an expert in determining lost wages. Exhibit B, 77:13-78:6. Nor is he an expert in determining business value. *Id. at* 74:7-13. Mills was not asked to determine the business value of Richardson Chop Shop. *Id. at* 75:19-24. Mills does not know the day to day operations of Plaintiffs business. *Id. at* 67:20-68:13. The question remains, what exactly will Mills offer to the jury in this case? If Mills' expert testimony is to prove-up tax returns, that can be done by affidavit. If Mills' testimony will be that $30,000 times 19 years is $570,000, he is not needed to perform simple math for the jury. Mills should be excluded as a witness because he will not assist the jury in determining any fact at issue in this case. "Rule 702's 'helpfulness' standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 591–92 (1993). There is no connection between Mills' expertise and a question of fact in this case.

C.  Mills' testimony violates Federal Rule of Civil Procedure 26

The fact that Plaintiff elicited expert testimony from Mills (Exhibit B, 27:13-28:2) regarding something that was not within Mills' scope of work (*Id. at* 65:3-14) violates Federal Rule of Civil Procedure 26, which states, in part:

> (B) Witnesses Who Must Provide a Written Report. Unless otherwise stipulated or ordered by the court, this disclosure must be accompanied by a written report--prepared and signed by the witness--if the witness is one retained or specially employed to provide expert testimony in the case or one whose duties as the party's employee regularly involve giving expert testimony. The report must contain:
> > (i) a complete statement of all opinions the witness will express and the basis and reasons for them;
> > (ii) the facts or data considered by the witness in forming them;

(iii) any exhibits that will be used to summarize or support them;
(iv) the witness's qualifications, including a list of all publications authored in the previous 10 years;
(v) a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition; and
(vi) a statement of the compensation to be paid for the study and testimony in the case.

Fed. R. Civ. P. 26. Plaintiff failed to disclose Mr. Mill's opinions about lost wages, other than to state that Mills "will testify concerning the economic impact of the Defendants' conduct on Plaintiff's income and business." Mills did not disclose his opinion of the total lost wages until his deposition. Exhibit B, 46:11-15. Nowhere in Mills' report does he discuss a lost income figure of $570,000, nor does he disclose his methodology. *See* Exhibit C, Mills Report. Therefore, Plaintiff violated Rule 26(B)(i) and (ii).

<u>**PRAYER**</u>

WHEREFORE, Defendants pray that this Court grant this Motion to Exclude Kevin Mills because his report and opinions are unreliable, based on unsupported speculation, and will not assist the trier of fact.

Respectfully submitted,

/s/ Philip B Arnold
J. Eric Magee
SBN: 24007585
e.magee@allison-bass.com

Philip B. Arnold
SBN: 24044710
p.arnold@allison-bass.com

ALLISON, BASS & MAGEE, L.L.P.
A.O. Watson House
402 W. 12th Street
Austin, Texas 78701
(512) 482-0701 telephone
(512) 480-0902 facsimile

## <u>CERTIFICATE OF CONFERENCE</u>

Undersigned counsel conferred with Plaintiff's counsel, Karl Seelbach, by email on May 3, 2017, concerning this motion pursuant to Local Rule CV-7(i). Mr. Seelbach advised that Plaintiff agrees to not offer Mr. Mills at trial regarding the following: (1) the business value of Richardson Chop Shop, Inc.; (2) injuries Mr. Faulkenberry sustained; and (3) that Mr. Mills has audited Mr. Faulkenberry or his business. Mr. Seelbach stated that Plaintiff was otherwise opposed to this motion.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 4th day of May, 2017, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following:

Trek Doyle
Doyle & Seelbach
7500 Rialto Blvd., Bldg. 1, Ste. 250
Austin, Texas 78735
trek@doyleseelbach.com

Malcolm S. Nettles
The Law Offices of Malcolm S. Nettles, P.C.
2909 Riviera Road
Austin, Texas 78733
malcolmnettles@gmail.com

*Attorneys for Plaintiff*

/s/ Philip B Arnold
Philip B. Arnold

# EXHIBIT A

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| LAWRENCE FAULKENBERRY | § | |
| | § | |
| V. | § | |
| | § | CAUSE NO. 1:15-cv-01089-SS |
| CALDWELL COUNTY, TEXAS | § | |
| CALDWELL COUNTY SHERIFF'S | § | |
| OFFICE, SERGEANT YOST, | § | |
| DEPUTY M. TAYLOR, AND | § | |
| DEPUTY HOUSESTON. | § | |

## PLAINTIFF'S DESIGNATION OF EXPERT WITNESSES

Pursuant to Federal Rule of Civil Procedure 26(a)(2) and the Court's Joint Scheduling Order of March 14, 2016, Plaintiff designates witnesses as follows:

## I. RETAINED EXPERTS

Pursuant to Rule 26(a)(2)(B), Plaintiff designates the following retained experts:

| **NAME** | **EXPERT TESTIMONY** |
|---|---|
| **Dr. George Kirkham**<br>Dr. George Kirkham and Associates, Inc.<br>1402 James Bay Rd.<br>Palm Beach Gardens, FL 33410<br>800.488.9231<br>Gkirkham@krimedr.com | Dr. Kirkham will testify that the Defendants are liable to Plaintiff for using excessive force, conducting an illegal search, and prosecuting baseless charges as alleged in Plaintiff's First Amended Complaint. Plaintiff produces Dr. Kirkham's written report and other materials as bates numbers Faulkenberry 000590 - 621. Dr. Kirkham's materials contain the information responsive to Rule 26(a)(2)(B)(i)-(vi). Plaintiff and Dr. Kirkham reserve the right to supplement his report as discovery in this matter is ongoing. |

| **Kevin Mills, CPA**<br>1015-A West San Antonio St.<br>Lockhart, TX 78644<br>512.376.421 | Mr. Mills is a CPA and the accountant for Mr. Faulkenberry and his business. Mr. Mills will testify concerning the economic impact of the Defendants' conduct on Plaintiff's income and business. Plaintiff produces Mr. Mills' written report and other materials as bates numbers Faulkenberry 000575 - 000589. Mr. Mills' materials contain the information responsive to Rule 26(a)(2)(B)(i)-(vi). Plaintiff and Mr. Mills reserve the right to supplement his report as discovery in this matter is ongoing. |
|---|---|

## II. NON-RETAINED EXPERTS

Pursuant to Rule 26(a)(2)(C), Plaintiff designates the following non-retained experts:

| <u>NAME</u> | <u>SUBJECTS OF POSSIBLE</u><br><u>DISCOVERABLE INFORMATION</u> |
|---|---|
| **Trek Doyle**<br>trek@doyleseelbach.com<br>Doyle & Seelbach PLLC<br>7500 Rialto Blvd., Building 1, Suite 250<br>Austin, Texas 78735<br>512.480.4892 | Trek Doyle will testify regarding the amount, reasonableness, and necessity of attorneys' fees. Redacted time entries supporting Plaintiff's claim of attorney's fees have been produced to Defendants. Defendants are referred to those materials for additional information concerning the attorney's fees incurred to date. As of this filing, Plaintiff's reasonable attorney's fees, as calculated pursuant to the lodestar method approved by the federal courts, exceed $140,000. Plaintiff's reasonable attorney's fees continue to grow and Plaintiff will supplement. |

| **Karl Seelbach** | Karl Seelbach will testify regarding the amount, reasonableness, and necessity of attorneys' fees. Redacted time entries supporting Plaintiff's claim of attorney's fees have been produced to Defendants. Defendants are referred to those materials for additional information concerning the attorney's fees incurred to date. As of this filing, Plaintiff's reasonable attorney's fees, as calculated pursuant to the lodestar method approved by the federal courts, exceed $140,000. Plaintiff's reasonable attorney's fees continue to grow and Plaintiff will supplement. |
| --- | --- |
| karl@doyleseelbach.com<br>Doyle & Seelbach PLLC<br>7500 Rialto Blvd., Building 1, Suite 250<br>Austin, Texas 78735<br>512.480.4892 | |
| **Malcolm Nettles**<br>Law Office of Malcolm S. Nettles, P.C.<br>2909 Riviera Road<br>Austin, Texas 78733<br>512.472.7578 | Malcolm Nettles will testify regarding the amount, reasonableness, and necessity of attorneys' fees. Redacted time entries supporting Plaintiff's claim of attorney's fees have been produced to Defendants. Defendants are referred to those materials for additional information concerning the attorney's fees incurred to date. As of this filing, Plaintiff's reasonable attorney's fees, as calculated pursuant to the lodestar method approved by the federal courts, exceed $140,000. Plaintiff's reasonable attorney's fees continue to grow and Plaintiff will supplement. In addition, Mr. Nettles represented Plaintiff in connection with the false charges brought against him by Defendants and has knowledge of Plaintiff's wrongful arrest and incarceration. Mr. Nettles can also authenticate the video of events at issue in this lawsuit. |

| **Sergeant Dustin Yost**<br>c/o J. Eric Magee<br>ALLISON, BASS and MAGEE, LLP<br>402 W. 12th Street<br>Austin, TX 78701<br>512.482.0701 Telephone<br>512.480.0902 Fax<br>e.magee@allison-bass.com | To the extent his testimony may be considered opinion testimony admissible pursuant to Federal Rule of Evidence 702, Plaintiff designates Sergeant Yost as a non-retained expert. Sergeant Yost claims to be a trained member of law enforcement and is employed by the Caldwell County Sheriff's Office as a Sergeant. Sergeant Yost has been deposed in this matter and Defendants are referred to his deposition and the exhibits attached thereto for additional information. With this designation, Plaintiff does not express agreement with Sergeant Yost's testimony, including his opinions, and reserves the right to object to some or all of his testimony and opinions. |
|---|---|
| **Deputy Michael Taylor**<br>c/o J. Eric Magee<br>ALLISON, BASS and MAGEE, LLP<br>402 W. 12th Street<br>Austin, TX 78701<br>512.482.0701 Telephone<br>512.480.0902 Fax<br>e.magee@allison-bass.com | To the extent his testimony may be considered opinion testimony admissible pursuant to Federal Rule of Evidence 702, Plaintiff designates Deputy Taylor as a non-retained expert. Deputy Taylor claims to be a trained member of law enforcement and is employed by the Caldwell County Sheriff's Office as a Deputy. Deputy Taylor has been deposed in this matter and Defendants are referred to his deposition and the exhibits attached thereto for additional information. With this designation, Plaintiff does not express agreement with Deputy Taylor's testimony, including his opinions, and reserves the right to object to some or all of his testimony and opinions. |

| | |
|---|---|
| **Deputy Galen Houseston**<br>c/o J. Eric Magee<br>ALLISON, BASS and MAGEE, LLP<br>402 W. 12th Street<br>Austin, TX 78701<br>512.482.0701 Telephone<br>512.480.0902 Fax<br>e.magee@allison-bass.com | To the extent his testimony may be considered opinion testimony admissible pursuant to Federal Rule of Evidence 702, Plaintiff designates Deputy Houseston as a non-retained expert. Deputy Houseston is ostensibly a trained member of law enforcement and is employed by the Caldwell County Sheriff's Office as a Deputy. Deputy Houseston has not yet been but will be deposed in this matter. Defendants are referred to his deposition and the exhibits attached thereto for additional information. With this designation, Plaintiff does not express agreement with Deputy Houseston's testimony, including his opinions, and reserves the right to object to some or all of his testimony and opinions. |
| **Captain Jesse Hernandez**<br>c/o J. Eric Magee<br>ALLISON, BASS and MAGEE, LLP<br>402 W. 12th Street<br>Austin, TX 78701<br>512.482.0701 Telephone<br>512.480.0902 Fax<br>e.magee@allison-bass.com | To the extent his testimony may be considered opinion testimony admissible pursuant to Federal Rule of Evidence 702, Plaintiff designates Captain Hernandez as a non-retained expert. Captain Hernandez claims to be a trained member of law enforcement and is employed by the Caldwell County Sheriff's Office as a Captain. Captain Hernandez has been deposed in this matter and Defendants are referred to his deposition and the exhibits attached thereto for additional information. With this designation, Plaintiff does not express agreement with Captain Hernandez's testimony, including his opinions, and reserves the right to object to some or all of his testimony and opinions. |

| | |
|---|---|
| **Fred Weber**<br>District Attorney Caldwell County<br>c/o J. Eric Magee<br>ALLISON, BASS and MAGEE, LLP<br>402 W. 12th Street<br>Austin, TX 78701<br>512.482.0701 Telephone<br>512.480.0902 Fax<br>e.magee@allison-bass.com | Mr. Weber is the District Attorney of Caldwell County. He declined to prosecute Plaintiff for the fabricated charges brought by Defendants. To the extent his testimony may be considered opinion testimony admissible pursuant to Federal Rule of Evidence 702, Plaintiff designates Mr. Weber as a non-retained expert. |
| **Dr. Robert Josey and staff**<br>Orthopedic Specialists of Austin<br>Austin Office<br>4611 Guadalupe St<br>Ste 200<br>Austin, TX 78751<br>512.476.2830<br><br>Texas Spine Consultants, P.A.<br>715 Discovery Blvd. Suite 102<br>Cedar Park, TX 78613<br><br>Hyde Park Surgery Center<br>4611 Guadalupe Street<br>Austin, TX 78751<br><br>Westlake Hospital<br>5656 Bee Cave Road<br>West Lake Hills, TX 78746<br>(512) 327-0000 | Dr. Josey has provided medical treatment necessitated by the conduct of Defendants. Dr. Josey will testify as to the reasonableness of the fees charged as well as the medical necessity of the treatment he provided. Dr. Josey will testify that Defendants' conduct caused Plaintiff's need for medical treatment. Dr. Josey's records to date have been provided to Defendants and contain the details of his treatment and a summary of his opinions. |
| **Carlos Perez, M.D.**<br>Texas Spine Consultants, P.A.<br>715 Discovery Blvd. Suite 102<br>Cedar Park, TX 78613<br><br>Orthopedic Specialists of Austin<br>Austin Office<br>4611 Guadalupe St<br>Ste 200<br>Austin, TX 78751<br>512.476.2830 | Dr. Perez has provided medical treatment necessitated by the conduct of Defendants. Dr. Perez will testify as to the reasonableness of the fees charged as well as the medical necessity of the treatment he provided. Dr. Perez will testify that Defendants' conduct caused Plaintiff's need for medical treatment. Dr. Perez's records to date have been provided to Defendants and contain the details of his treatment and a summary of his opinions. |

| | |
|---|---|
| **Gregg Vagner, M.D.**<br>Orthopedic Specialists of Austin<br>Austin Office<br>4611 Guadalupe St<br>Ste 200<br>Austin, TX 78751<br>512.476.2830 | Dr. Vagner has provided medical treatment necessitated by the conduct of Defendants. Dr. Vagner will testify as to the reasonableness of the fees charged as well as the medical necessity of the treatment he provided. Dr. Vagner will testify that Defendants' conduct caused Plaintiff's need for medical treatment. Dr. Vagner's records to date have been provided to Defendants and contain the details of his treatment and a summary of his opinions. |
| **Andrew Ebert, M.D**<br>Texas Spine Consultants, P.A.<br>715 Discovery Blvd. Suite 102<br>Cedar Park, TX 78613 | Dr. Ebert has provided medical treatment necessitated by the conduct of Defendants. Dr. Ebert will testify as to the reasonableness of the fees charged as well as the medical necessity of the treatment he provided. Dr. Ebert will testify that Defendants' conduct caused Plaintiff's need for medical treatment. Dr. Ebert's records to date have been provided to Defendants and contain the details of his treatment and a summary of his opinions. |
| **Juan Davila, M.D.**<br>Seton Healthcare Family<br>300 S Colorado St<br>Lockhart, TX 78644-2707<br>512.376.9690 | Dr. Davila has provided medical treatment necessitated by the conduct of Defendants. Dr. Davila will testify as to the reasonableness of the fees charged as well as the medical necessity of the treatment he provided. Dr. Davila will testify that Defendants' conduct caused Plaintiff's need for medical treatment. Dr. Davila's records to date have been provided to Defendants and contain the details of his treatment and a summary of his opinions. |

| | |
|---|---|
| **Dr. Jeffrey Fluitt, Alicia Poche, PT and Alyssa Templain, PTA other providers**<br>Austin Preferred Integrative Medicine<br>4316 James Casey St., Bldg. B, #201<br>Austin, Texas 78745<br>512.442.2727 | Dr. Fluitt and other providers, including physical therapists Alicia Poche and Alyssa Templain and others have provided medical treatment necessitated by the conduct of Defendants. Dr. Fluitt will testify as to the reasonableness of the fees charged as well as the medical necessity of the treatment he provided. Dr. Fluitt will testify that Defendants' conduct caused Plaintiff's need for medical treatment. Dr. Fluitt's records to date have been provided to Defendants and contain the details of his treatment and a summary of his opinions. |
| **Dr. James Smith Jr., MD**<br>Texas Orthopedics<br>4700 Seton Center Parkway, Ste. 200<br>Austin, Texas 78759<br>512.439.1002<br><br>**Leah Wakefield**<br>Patient Collection Manager | Dr. Smith has provided medical treatment necessitated by the conduct of Defendants. Dr. Smith or Leah Wakefield will testify as to the reasonableness of the fees charged as well as the medical necessity of the treatment he provided. Dr. Smith will testify that Defendants' conduct caused Plaintiff's need for medical treatment. Dr. Smith's records to date have been provided to Defendants and contain the details of his treatment and a summary of his opinions. |
| **Roxanne Ramirez, LPC Intern**<br>Therapy Austin<br>1415 West 51st Street, Unit 1<br>Austin, Texas 78756<br>512.201.4501 | Ms. Ramirez has provided psychological and emotional counseling services to Plaintiff pertaining to the incident at issue. Ms. Ramirez will testify as to the reasonableness of the fees charged as well as the medical necessity of the treatment she provided. Ms. Ramirez will testify that Defendants' conduct caused Plaintiff's need for medical treatment. |

| | |
|---|---|
| **Jerel Wottrich, DC**<br>First Chiropractic<br>2121 W. Oltorf St.<br>Austin, Texas 78741<br>512.201.2567<br><br>**Nora Martinez**<br>Medical Assistant | Dr. Wottrich has provided medical treatment necessitated by the conduct of Defendants. Dr. Wottrich or Nora Martinez will testify as to the reasonableness of the fees charged as well as the medical necessity of the treatment he provided. Dr. Wottrich will testify that Defendants' conduct caused Plaintiff's need for medical treatment. Dr. Wottrich's records to date have been provided to Defendants and contain the details of his treatment and a summary of his opinions. |
| **Don Perez, DC**<br>First Chiropractic<br>2121 W. Oltorf St.<br>Austin, Texas 78741<br>512.201.2567<br><br>**Nora Martinez**<br>Medical Assistant | Dr. Perez has provided medical treatment necessitated by the conduct of Defendants. Dr. Perez or Nora Martinez will testify as to the reasonableness of the fees charged as well as the medical necessity of the treatment he provided. Dr. Perez will testify that Defendants' conduct caused Plaintiff's need for medical treatment. Dr. Perez's records to date have been provided to Defendants and contain the details of his treatment and a summary of his opinions. |
| **Dr. Edward C. Fritsch**<br>River Ranch Radiology<br>711 W. 38th Street, Suite B-7<br>Austin, Texas 78705<br>512.454.9597<br><br>**Eva Hernandez**<br>Health Information Coordinator | Dr. Fritsch and River Ranch Radiology have provided medical treatment necessitated by the conduct of Defendants. Dr. Fritsch or Eva Hernandez will testify as to the reasonableness of the fees charged as well as the medical necessity of the treatment provided. Dr. Fritsch will testify that Defendants' conduct caused Plaintiff's need for medical treatment. Dr. Fritsch's records to date have been provided to Defendants and contain the details of his treatment and a summary of his opinions. |

| | |
|---|---|
| **Debbie Frizzell**<br>Insurance Billing Specialist<br>**City of Lockhart EMS**<br>214 Bufkin Lane<br>Lockhart, Texas 78644<br>512.398.7320 | The City of Lockhart EMS provided medical treatment necessitated by the conduct of Defendants. Its records have been produced. They contain the details of Plaintiff's treatment and a summary of any pertinent expert opinions relating to same.  Ms. Frizzell will testify as to the reasonableness of the fees charged as well as the medical necessity of the treatment provided. |
| **Clyde Houston, OD**<br>Master Eye Associates<br>9600 S. I-35, Suite 225A<br>Austin, Texas 78748<br>512.290.0876 | Dr. Houston and Master Eye Associates have provided medical treatment necessitated by the conduct of Defendants. Dr. Houston will testify as to the reasonableness of the fees charged as well as the medical necessity of the treatment he provided. Dr. Houston will testify that Defendants' conduct caused Plaintiff's need for medical treatment. Dr. Houston's records to date have been provided to Defendants and contain the details of his treatment and a summary of his opinions. |
| **Linda Stevens**<br>**Custodian of Records**<br>**Visionworks**<br>9600 S I-35<br>Austin, Texas 78748<br>210.245.2200 | Visionworks has provided medical treatment necessitated by the conduct of Defendants. Ms. Stevens will testify as to the reasonableness of the fees charged as well as the medical necessity of the treatment provided. The representative will testify that Defendants' conduct caused Plaintiff's need for medical treatment. Visionworks' records to date have been provided to Defendants and contain the details of his treatment and a summary of any pertinent opinions. |
| **Deborah L. Lukhard**<br>Custodian of Records<br>HMR Funding, LLC<br>2900 Polo Parkway, Suite 200<br>Midlothian, VA 23113 | Ms. Lukhard is the custodian of records for HMR Funding and will testify as to the reasonableness and necessity of the treatment provided to Plaintiff. |

Plaintiff reserves the right to supplement these designations in accordance with the Federal Rules of Civil Procedure as discovery is ongoing. Plaintiff also cross-designates Defendants' designated experts, if any, as Plaintiff's expert witnesses and reserves the right to call such expert(s) as a witness at trial even if Defendants later attempt to de-designate said expert(s). Additionally, to the extent Defendants have not timely produced pertinent information or discovery responses in this lawsuit, Plaintiff reserves the right to designate additional expert witnesses, including rebuttal experts, at a later date if and when such information is produced and/or if Defendants intend to rely on such information at trial.

Respectfully submitted,

By: ___ **/s/ Trek Doyle** _____
Trek Doyle
State Bar No. 00790608
trek@doyleseelbach.com
512.960.4892

Karl Seelbach
State Bar No. 24044607
karl@doyleseelbach.com
512.960.4891

Doyle & Seelbach PLLC
7500 Rialto Blvd.
Building 1, Suite 250
Austin, Texas 78735
doyleseelbach.com

*ATTORNEYS FOR PLAINTIFF*



## CERTIFICATE OF SERVICE

By my signature above, I certify that a true and correct copy of this pleading

was forwarded by facsimile and electronic mail on the 13th day of January, 2017 to:

J. Eric Magee
ALLISON, BASS and MAGEE, LLP
402 W. 12th Street
Austin, TX 78701
512-482-0701 Telephone
512-480-0902 Fax
e.magee@allison-bass.com

ATTORNEY FOR DEFENDANTS

# EXHIBIT B

**In the Matter Of:**

FAULKENBERRY vs CALDWELL COUNTY

1:15-CV-01089-SS

---

**KEVIN  MILLS, CPA**

*April 25, 2017*

---



800.211.DEPO (3376)
EsquireSolutions.com

1                   UNITED STATES DISTRICT COURT
                 FOR THE WESTERN DISTRICT OF TEXAS
2                        AUSTIN DIVISION

3    LAWRENCE FAULKENBERRY,           )
                  Plaintiff,          )
4    vs.                              )  1:15-CV-01089-SS
     CALDWELL COUNTY, TEXAS;          )
5    CALDWELL COUNTY SHERIFF'S        )
     OFFICE; CAPTAIN JESSE            )
6    HERNANDEZ; SERGEANT YOST;        )
     DEPUTY M. TAYLOR; and DEPUTY     )
7    HOUSESTON,                       )
                  Defendants.         )
8
                  ORAL AND VIDEOTAPED DEPOSITION OF
9                       KEVIN MILLS, CPA
                         April 25, 2017
10

11        ORAL AND VIDEOTAPED DEPOSITION OF

12   KEVIN MILLS, CPA, produced as a witness at the

13   instance of the Plaintiff and duly sworn,

14   was taken in the above-styled and numbered

15   cause on April 25, 2017, from 10:12 a.m. to

16   11:37 a.m., before KATRINA FAITH WRIGHT, Certified

17   Shorthand Reporter in and for the State of Texas,

18   reported by machine shorthand, at 7500 Rialto

19   Boulevard, Building I, Suite 250, Austin, Texas

20   78735, pursuant to the Federal Rules of Civil

21   Procedure and the provisions stated on the record

22   or attached hereto.

23

24

25



KEVIN MILLS, CPA                                    April 25, 2017
FAULKENBERRY vs CALDWELL COUNTY                              2

```
 1                      APPEARANCES

 2

 3

 4   FOR THE PLAINTIFF:

 5

 6            MR. KARL SEELBACH

 7            DOYLE & SEELBACH, PLLC

 8            7500 Rialto Boulevard

 9            Building I, Suite 250

10            Austin, Texas 78735

11            512-960-4892

12            karl@doyleseelbach.com

13

14   FOR THE DEFENDANTS:

15

16            MR. PHILIP ARNOLD

17            ALLISON, BASS & MAGEE, LLP

18            402 West 12th Street

19            Austin, Texas 78701

20            512-482-0701

21            p.arnold@allison-bass.com

22

23

24

25
```



1                        STIPULATIONS

2

3          The attorneys for all parties present

4    stipulate and agree to the following items:

5

6          That the deposition of KEVIN MILLS, CPA is

7    being taken pursuant to Notice;

8

9          That the deposition is being taken pursuant

10   to the Federal Rules of Civil Procedure;

11

12         That the original transcript will be

13   submitted Mr. Karl Seelbach;

14

15         That signature to the deposition transcript

16   was reserved;

17

18         That the witness or the Plaintiff's attorney

19   will return the signed transcript to the court

20   reporter within 30 days of the date the transcript

21   is provided to the Plaintiff's attorney.  If not

22   returned, the witness may be deemed to have waived

23   the right to make the changes, and an unsigned copy

24   may be used as though signed.

25



KEVIN MILLS, CPA                                    April 25, 2017
FAULKENBERRY vs CALDWELL COUNTY                                  4

1                          I N D E X

2    WITNESS                               EXAMINATION
     KEVIN MILLS
3    By Mr. Seelbach                                    5
     By Mr. Arnold                                     31
4

5                       E X H I B I T S

6

     EXHIBIT NUMBERS                  PAGE MARKED FOR ID
7
     Exhibit 27                                        5
8    Documents Bates-stamped
     Faulkenberry 000575-000589
9
     Exhibit 28
10   S Corporation Five Year Tax History             5

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



```
 1                    (Exhibit Nos. 27 and 28 premarked.)

 2           THE VIDEOGRAPHER:   This is Disk 1 to the

 3    video deposition of Kevin Mills in the matter of

 4    Lawrence Faulkenberry versus Caldwell County Texas,

 5    et al, being heard before the United States

 6    District Court for the Western District of Texas,

 7    Austin Division.   The cause number is

 8    1:15-CV-01089-SS.   This deposition is being held in

 9    Austin, Texas, on April 25th, 2017, and the time is

10    10:12 a.m.

11               Will counsel, please, identify

12    themselves for the record, after which the

13    court reporter will swear in the witness.

14           MR. SEELBACH:   Karl Seelbach for the

15    Plaintiff, Lawrence Faulkenberry.

16           MR. ARNOLD:   Philip Arnold for the Defendants.

17                    KEVIN MILLS, CPA,

18    having been first duly sworn, testified as follows:

19                    EXAMINATION

20           Q.    (Question By Mr. Seelbach)   Mr. Mills,

21    would you please state your full name for the

22    record.

23           A.    My name is Kevin Mills.

24           Q.    And where do you live?

25           A.    In Lockhart, Texas.
```



```
1          Q.    And do you have any family there in
2     Lockhart?
3          A.    I have a wife and two daughters.
4          Q.    How old are your kiddos?
5          A.    Twenty-one and sixteen.
6          Q.    All right.  Where did you go to
7     high school, Mr. Mills?
8          A.    Elgin High School, about 30 miles
9     southeast of Austin.
10         Q.    And what year did you graduate from
11    high school?
12         A.    1986.
13         Q.    And following high school, did you go
14    directly to college or work a little bit?
15         A.    Went directly to college.
16         Q.    And where was that?
17         A.    It was at Southwest Texas State, which
18    is now Texas State University.
19         Q.    And is that in San Marcos, Texas?
20         A.    San Marcos, Texas.
21         Q.    And what was your undergraduate training
22    in?
23         A.    In accounting.
24         Q.    And did you get a bachelor's degree in
25    accounting?
```



1        A.     Bachelor's degree in accounting and then

2    sat for the CPA exam after that.

3        Q.     And can you explain to the ladies and

4    gentlemen of the jury kind of how that works.  You

5    get your bachelor's degree, and then you have to do

6    a little something extra?

7        A.     You have your bachelor's degree, and

8    then at that point, you had to have two years of

9    experience working under a CPA, and I worked at a

10   savings and loan under a CPA for a number of years

11   before that, and then you sit for the CPA exam,

12   which is a four-part -- at that point, was a

13   four-part exam over multiple days, so it's a

14   rigorous exam.

15       Q.     And you ultimately passed that exam?

16       A.     Yes.

17       Q.     And during your training -- describe to

18   me, you know, what type of training did you get as

19   far as was it tax returns or preparing income

20   statements?  Give me -- give me a flavor what type

21   of training.

22       A.     It's a mixture of all of those.  You

23   know, financial statements was part of it.  Tax

24   returns would be a part of it, your basic, you

25   know, beginning and intermediate accounting, the



1   debits and the credits of it all.  It's a broad

2   coverage.  And then I'd also worked in the industry

3   prior to 2008 in various roles, so I have a pretty

4   broad background in accounting.

5        Q.    Would you agree that you were trained in

6   calculating past and future lost profits during

7   that time frame?

8        A.    Yes.

9        Q.    And is one method of calculating lost

10  profits the before-and-after method?

11       A.    Yes.

12       Q.    What does that mean, the

13  before-and-after method?

14       A.    Well, you're going to look at the trend

15  before from a financial statement standpoint or a

16  profit and loss standpoint and then see what

17  happened to that trend after a certain event or a

18  certain time period.

19       Q.    Okay.  Give me just a quick list of your

20  job experience post college, after college.  Where

21  all have you worked since then?

22       A.    Worked through college at a savings and

23  loan business taken over by the Resolution Trust

24  Corp. back in the 80s during the S&L crisis, stayed

25  there for a while.  Briefly worked at the State.



1   Been an accounting manager at a real estate company
2   in downtown Austin years back, and then went to
3   Whole Foods Market and kind of transitioned into
4   systems, if you will, but always had the accounting
5   duties during that time period because I was a CPA,
6   worked at a semiconductor company, and then went
7   into -- opened an office part-time in 2002 and went
8   into it full-time in 2008 from a CPA standpoint.
9        Q.    And just so we're specific and the
10  record is clear on this, can you just kind of give
11  me a list of the names of those companies and then
12  roughly what years you worked for them?
13       A.    Yeah.   The last company I worked at was
14  Zarlink, and that was from 2002 to 2009.   It was
15  formerly called Legerity, and it was a
16  semiconductor company that changed ownership a
17  couple of times.   It was actually an AMD spinoff.
18       Q.    And what was your role at that company
19       A.    I was a systems analyst, did the cost
20  accounting from a systems standpoint and then
21  eventually took over and ran kind of the inventory
22  control group.   We tracked variances from product
23  that we built offshore through data feeds, and we
24  had very detailed tracking of yield lost -- yield
25  loss and what we paid the vendor for each step that



1    they performed on the product.

2        Q.    What about immediately before that?  Did

3    you say it was Whole Foods?

4        A.    I worked at Whole Foods Market from '97

5    to 2000.  I was also on their accounting systems

6    team initially and then their warehouse systems

7    team.

8        Q.    And what did your job duties encompass

9    in those two roles?

10       A.    It was interacting with users and

11   looking at the software and configuring it.  It was

12   on a legacy system that we rolled into a PeopleSoft

13   project.  We were replacing the warehouse systems

14   with the best read application and also replacing

15   the financial system with PeopleSoft, so I kind of

16   interfaced between the warehouse and accounting

17   system at that point.

18       Q.    And then before that, was that your job

19   at the savings and loan company?

20       A.    No.  I was -- before that I was at an

21   accounting -- a real estate company in downtown

22   Austin for a couple years.  It was called Ultra,

23   Inc.

24       Q.    And what were you doing?

25       A.    They service distressed mortgage



 1  portfolios for large companies out of New York.

 2      Q.    Okay.  And then how many years now have

 3  you been running your own business?

 4      A.    I've been practicing -- I've had an

 5  office open since 2002, like I said, part-time from

 6  2002 to 2008; full-time from 2008 to present.

 7      Q.    And describe to me what services your

 8  company offers.

 9      A.    We do a lot of tax returns, a lot of

10  financial statements, a lot of QuickBooks

11  consulting, sales tax, payroll.  We kind of do

12  everything and kind of target a small business that

13  needs payroll, accounting services, and maybe

14  QuickBooks support.

15      Q.    Do you have any employees?

16      A.    I have two full-time employees and two

17  part-time employees.

18      Q.    How long have you worked with Larry

19  Faulkenberry?

20      A.    Probably between seven and eight or nine

21  years, somewhere in that time frame.

22      Q.    And how many years have you worked with

23  Richardson Chop Shop?

24      A.    Probably the same time frame.

25      Q.    And just for the jury's sake, who is



 1   Richardson Chop Shop, or what is Richardson Chop

 2   Shop?

 3        A.    It's an S corp -- it's an LLC taxed as

 4   an S corp that Lawrence Faulkenberry is the sole

 5   member of.

 6        Q.    Mr. Mills, I'm going to hand you what's

 7   been marked as Exhibit No. 27.

 8        MR. SEELBACH:  And I'll state for the record

 9   that this is Mr. Mills' expert report Bates labeled

10   Faulkenberry 0000575 through 0000589 that was

11   previously produced in this case.

12        Q.    (By Mr. Seelbach)  Mr. Mills, is this a

13   true and correct copy of your expert report in the

14   pending lawsuit?

15        A.    Yes.

16        Q.    And in preparing those documents, what

17   did you review to reach your opinions and fill out

18   that -- those documents?  What type of information

19   did you review?

20        A.    It was income and expense information

21   prepared the 2013 through 2015 tax years and then

22   information provided by Mr. Faulkenberry for 2016,

23   and subsequently, did a tax return that would match

24   the 2016 P&L.

25        Q.    Okay.  And would you agree with me that



1    your report regarding Mr. Faulkenberry and his

2    business, Richardson Chop Shop, is to a reasonable

3    degree of accounting certainty?

4         A.    Yes.

5         Q.    Would you agree with me today that all

6    your opinions regarding Mr. Faulkenberry and

7    Richardson Chop Shop are to a reasonable degree of

8    accounting certainty?

9         A.    Yes.

10        Q.    What's your understanding as of

11   January 2015, January 15th, 2015, to be exact, of

12   the ownership of Richardson Chop Shop as far as who

13   owned it?

14        A.    Lawrence Faulkenberry was the sole

15   member of that LLC.

16        Q.    And could you tell the jury a little

17   about the nature of Richardson Chop Shop's

18   business?  What did they do?

19        A.    Yeah.  Basically, bought motorcycles or

20   motorcycle parts in bulk across the country and

21   would strip the product down, if you will, and part

22   it out and sell it as individual parts through an

23   online store, through eBay, I believe.

24        Q.    And other than Richardson Chop Shop, do

25   you have any other customers in that industry?



1        A.    I do.

2        Q.    Approximately how many?

3        A.    Approximately four other customers in

4    that industry.

5        Q.    And what's your understanding of how

6    Richardson Chop Shop acquired the inventory and who

7    did that?

8        A.    Larry would travel and buy, like I said,

9    shops going out of business or buy it in bulk and

10   that -- that happened, from my understanding,

11   throughout the country.  I don't think there is --

12   I don't think there is a tremendous amount of

13   motorcycle parts shops in the Lockhart area, so

14   there was extensive travel, and, again, they bought

15   it in bulk, shipped it back, and stripped it -- I

16   don't want to say stripped it down, but parted it

17   out, if you will.

18       Q.    And do you know one way or another who

19   Richardson Chop Shop's target customers were when

20   it was selling those products?

21       A.    I think it was just guys looking for

22   parts for old bikes across the country and even

23   globally, I think.

24       Q.    So that could be an individual consumer

25   that has a motorcycle in his home garage or a



1  motorcycle shop that is doing repairs?

2       A.    Could be either one.  I thought it was

3  more tailored toward the individual, but I could be

4  wrong on that.

5       Q.    What is a comparative income statement?

6       A.    It's taking a multiyear -- multiple

7  years of the P&L or the income statement and

8  comparing it year by year.

9       Q.    And describe to me, in Exhibit 27, the

10  comparative income statement that you prepared in

11  this case.  And specifically, I want to look at two

12  time frames.  I want you to talk about, first, the

13  performance of Richardson Chop Shop prior to

14  January of 2015, and I want to give you one more

15  document in connection with that analysis.

16           I'm handing you what has been marked

17  Exhibit 28.  This document's Bates labeled

18  Faulkenberry 0000311.  It was previously produced

19  in connection with Plaintiff's document production,

20  if you want to glance at it.  This is my copy.  It

21  just goes a couple of more years.

22       A.    This comes from my tax software.

23       Q.    And I appreciate that.  So is this a true

24  and correct copy of an excerpt from a tax-related

25  document that you prepared for Richardson Chop



1  Shop, LLC?

2       A.    Yes.

3       Q.    Okay.  And so looking at the comparative

4  income statement and the five-year tax history

5  document that I just handed you side by side, can

6  you explain to me what your assessment is of

7  Richardson Chop Shop's performance prior to January

8  of 2015?  Talk to me a little bit about what you

9  see in the numbers.

10      A.    Well, it's a pretty steady income

11  number.  It's between 170 and 186 over a four-year

12  period, and then in 2015 dropped, in 2016 dropped

13  even more so --

14      Q.    Just so the record's clear -- and I'm

15  sorry to interrupt, but if you'll use whole

16  numbers.

17      A.    Sure.

18      Q.    I realize when you say 170, you mean

19  170,000, but just so the record's clear, if you'll

20  state the complete number and not just --

21      A.    Yeah.  Between 2011 and 2014, it

22  averaged between 171,000 and 186,000, and it

23  dropped to 144,792 in 2015, the revenue dropped,

24  and then dropped to 90,912 in 2016.  You'll also

25  see a corresponding drop in the inventory numbers,



1   and I talked with Lawrence about this at one of our

2   meetings.

3            We would meet two to three times a year,

4   probably, and that there wasn't enough product

5   being purchased to generate the sales at a level

6   that they were historically at.  And, you know, in

7   my dealings with small businesses, you have to have

8   inventory to replenish what you're selling to be

9   able to have future sales, so that just didn't

10  happen between 2015 and the end of 2016.

11       Q.    Okay.  Give me just a moment.  So you

12  mentioned a lack of inventory or certainly a drop

13  in inventory in 2015 and '16.  What is your

14  understanding of what caused that?

15       A.    The inability of Mr. Faulkenberry to

16  travel.  Like I said, the trips were long trips or

17  not short trips, out of state trips, and I

18  know that he would -- occasionally, he would fly,

19  and I think they drove -- or would drive some stuff

20  back, so due to his injury, he was unable to

21  travel.  And when we say "inventory," I mean

22  specifically new purchases of product.

23       Q.    And what is your understanding of what

24  caused Larry Faulkenberry's back injury?

25       A.    My understanding was -- was indirect



1  relation to an accident sustained in an incident at

2  his home with one of the local law enforcement

3  agencies.

4       Q.    And can you tell me any more than that

5  as far as what caused his injury?

6       A.    I believe there was a -- that he was

7  taken to the ground quickly, unexpectedly, maybe,

8  and injured some part of his back.

9       Q.    And I realize you're not a doctor --

10      A.    Yeah.

11      Q.    -- and you're not testifying about

12 medical stuff, but as a layperson, what is your

13 understanding of the restrictions that caused on

14 Larry's physical abilities in running his business?

15      MR. ARNOLD:   Objection, form to the -- calls

16 for speculation.

17           Go ahead.

18      Q.    (By Mr. Seelbach)  What has Larry told

19 you?

20      A.    That he was unable to travel and buy

21 more inventory due to the injury.

22      Q.    And are you aware one way or another of

23 any limitation in his ability to -- to lift any of

24 this inventory?

25      A.    Of course, with a back injury -- and I'm



1   no doctor, but I have had one back injury in my

2   lifetime years back, but, you know, range of motion

3   is an issue, probably, the ability to lift, the --

4   again, you're parting out a bike, so you're having

5   to take something heavy and separate it out into

6   small, individual pieces, so I imagine that would

7   be affected.  You know, when you have -- you're

8   probably warehousing that and shelving it, so

9   you're probably lifting to put it up on a shelf.

10        So there are a range of things that

11  would be affected, but I think, primarily, you have

12  to have the inventory to part out and put on a

13  shelf, and when you can't buy that, the rest of it

14  just falls by the wayside, if you will.

15       Q.   And let me focus back in on your

16  expertise, the accounting.  In your opinion as an

17  accountant, did the incident that occurred

18  January 15th of 2015 proximately cause the decline

19  in Larry Faulkenberry's business?

20       A.   Yes.

21       MR. ARNOLD:  Objection, calls for a legal

22  conclusion.

23       Q.   (By Mr. Seelbach)  In your opinion, did

24  the incident that occurred January 15th of 2015

25  proximately cause Richardson Chop Shop's lost



 1 | profits from 2015 to the present?
 2 |     MR. ARNOLD:  Objection.
 3 |     Q.   (By Mr. Seelbach)  You can answer.
 4 |     A.   Yes.
 5 |     Q.   And I understand that -- well, let me
 6 | ask you this.  You mentioned earlier in your
 7 | testimony that you had some other clients --
 8 |     A.   Uh-huh.
 9 |     Q.   -- in a similar industry.  Did you
10 | consider any other potential causes for the decline
11 | in Mr. Faulkenberry's business?
12 |     A.   Yeah.  You have to look at the market
13 | and the market space they're in, and having some
14 | other clients in that space, I didn't see similar
15 | results for those clients.  Those clients, on
16 | average, were probably up from prior years versus
17 | being down close to 50 percent in sales.
18 |     Q.   And so is it fair to say that you're not
19 | aware of any other potential causes for the decline
20 | in Mr. Faulkenberry's business?
21 |     A.   Not that I'm aware of.
22 |     Q.   I understand that Mr. Faulkenberry
23 | acquired some debt in 20 -- I believe it was late
24 | in '15 and early '16.  Without getting into all of
25 | the specifics about that debt, can you tell me just



1   a little bit about what you know about the debt and

2   how that impacted the business?

3        A.    Yeah.  I know there was a significant

4   amount of debt.  I don't know the exact number

5   taken on, and it almost seemed to be what I would

6   call predatory lending that was kind of

7   emergency-based, if you will.

8        Q.    Did Mr. Faulkenberry explain to you why

9   he needed that?

10       A.    He needed it to try and keep the

11  business running was the explanation.  And, again,

12  I don't know the exact amount, but it was something

13  that he did not have in prior years.  It was pretty

14  much a cash -- self-funded, if you will.

15       Q.    And are there any fees or expenses

16  reflected in your comparative income statement that

17  indicate loans were taken out?

18       A.    Yeah.  There are a significant amount of

19  loan fees that was -- that's why I say predatory

20  lending.  There was an enormous amount paid upfront

21  to be able to obtain the loan, and I think that it

22  was one of those loans that it was paid back

23  through a daily deduction from PayPal, which is

24  what processed the eBay transactions, so I believe

25  it was directly paid back, so that immediately



1   affects your cash flow on a daily basis.

2        Q.    And this may or may not be the first

3   time we talked about eBay.  Can you explain to the

4   jury why you're bringing up eBay and how that fits

5   into Mr. Faulkenberry's business?

6        A.    Well, you have a traditional brick and

7   mortar store, and I dealt with this when I worked

8   at Whole Foods.  It was -- online grocery was a big

9   thing at that point.  You have brick and mortar

10  which is your storefront, but you have other

11  clients who have no storefront presence.  You can't

12  walk in the door and buy it.  You buy it on eBay.

13          Well, I buy all my toner for the office

14  on eBay.  You don't go pick it out.  You buy it on

15  eBay, pay through PayPal, and they ship it to you.

16  And, you know, there's probably not a market in

17  Lockhart, Texas, for a brick and mortar motorcycle

18  parts store, but if you open it up worldwide

19  through eBay, there's plenty of demand for it.

20       Q.    And so in reviewing Mr. Faulkenberry's

21  records and preparing his tax returns for both

22  himself and the business over the years, you came

23  to understand that he utilized eBay as a storefront

24  for his business?

25       A.    Correct.



1        Q.    Okay.  I just wanted you to explain the

2    connection of why we're talking about eBay.

3              So in accounting when we're preparing

4    tax returns and things like that, we're looking at

5    the prior year, correct?

6        A.    Correct.

7        Q.    And so, for example, Mr. Faulkenberry's

8    tax returns have not been prepared yet for 2017,

9    have they?

10       A.    They have not.

11       Q.    Okay.  And so as of January 1st, 2017,

12   so basically, all the way through the end of 2016,

13   what was your assessment of Mr. Faulkenberry's

14   business?  Was it financially viable as of

15   January 1st, 2017?

16       A.    No.

17       Q.    And why not?

18       A.    Well, the loans -- the loans had to be

19   paid off, and there wasn't enough profit being

20   generated to pay the loans off and pay it back.  So

21   at that point, the business was put up and, I

22   believe, sold.

23       Q.    And let's rewind a couple of years.  At

24   the end of 2014, December 31st of 2014, before this

25   incident that gave rise to this lawsuit ever



 1   happened, was Mr. Faulkenberry's business,

 2   Richardson Chop Shop, financially viable at that

 3   point in time?

 4        A.    Yes.

 5        Q.    And how can you say that?

 6        A.    Well, if you look --

 7        Q.    Or why do you say that?

 8        A.    You can look at the numbers and

 9   extrapolate that.  I mean, he paid himself

10   approximately 12 in payroll.

11        Q.    And use complete numbers, please.

12        A.    12,000 in payroll.  I'm guessing -- and

13   I don't have the numbers in front of me.  I have

14   them at my office, but there was a significant

15   amount of Section 179 depreciation.  So when you

16   add that all back in, you're probably at a profit

17   level of approximately $30,000 for that year.

18        Q.    Okay.  And we'll get into that in more

19   detail in just a moment.  So your opinion regarding

20   whether or not Richardson Chop Shop is financially

21   viable as of January 1st, 2017, is what?

22        A.    Well, like I said, one of the things you

23   look at -- you know, I performed a compilation, but

24   if you look at a business that has an audit done on

25   it, you have to look at the ability of that



1   business to continue as what they call a going

2   concern, meaning is it likely to be a business in

3   the future, in the near future.

4       Q.    And as of January 1st, 2017, was

5   Richardson Chop Shop able to continue business?

6   Was it a going concern?

7       A.    No.  It would not -- if you were to

8   audit the financial statements, you would have to

9   say that there was a going concern issue, that it

10  would not be in business in the near future.

11      Q.    That was the not financially viable?

12      A.    Correct.

13      Q.    And is that your opinion to a reasonable

14  degree of accounting certainty?

15      A.    Yes.

16      Q.    Did Richardson Chop Shop experience a

17  significant loss of profits from January 15th,

18  2015, to the present?

19      A.    Yes.

20      Q.    How do you know that?

21      A.    Purely from the numbers.

22      Q.    And when you say that, you're referring

23  to the document in front of you?

24      A.    The comparative financial -- or

25  comparative income statement and looking at the



 1   pattern of decline in revenue, decline in

 2   purchases, and then, you know, expenses.  There's

 3   a -- probably a $42,000 swing between 2014 and 2016

 4   from a profitability standpoint.

 5        Q.    And is that significant loss in

 6   profits -- is that your opinion to a reasonable

 7   degree of accounting certainty?

 8        A.    Yes.

 9        Q.    Did Richardson Chop Shop experience a

10   significant decline in procurement of inventory

11   from January 15th, 2015, to the present?

12        A.    Yes.

13        Q.    And why do you say that?

14        A.    Again, the inability to travel and buy

15   new inventory.  That's one of -- one of the

16   components of cost to consult is your -- your

17   purchase for the -- purchases for the year.  So

18   purchases were down in '15 and down in '16 and just

19   not new product to be able to sell to generate

20   revenue.

21        Q.    And is that your opinion to a reasonable

22   degree of accounting certainty?

23        A.    Yes.

24        Q.    According to my records,

25   Mr. Faulkenberry is 48 years old.  Does that sound



1  right?

2      A.    Sounds about right.

3      Q.    And what's your understanding of the

4  social security retirement age for someone his age?

5      A.    Since I'm 49, I believe it's 67, around

6  there.

7      Q.    And based on that retirement age, is it

8  your assumption that Mr. Faulkenberry would have

9  continued to run Richardson Chop Shop for at least

10  another 19 years?

11      A.    I think that's reasonable to say he

12  would have.

13      Q.    And I want to crunch some numbers, and

14  if you need to use your notepad, you're welcome to.

15  Based on your comparative income statement, Exhibit

16  No. 27, if we project out 19 years, what is the

17  total loss of profit, including his salary and rent

18  he was paying himself, that Richardson Chop Shop

19  would have experienced during that 19-year time

20  frame?  And take your time.

21      A.    Around $570,000, and that does not

22  include other things imbedded in the P&L that were

23  business-related but now become personal expenses,

24  such as the travel and the meals and the -- that

25  part of it.  So that's just purely -- that excludes



1  that.  So that would add to it if we added that to
2  it.
3       Q.    And so the $570,000 number you just
4  gave, would you classify that as a conservative
5  figure?
6       A.    I would say that it would only be added
7  to by the other things I referred to, so, yes.
8       Q.    In other words -- in other words, it
9  would only go up?
10      A.    It would only go up if you look -- dug
11  deeper into it.
12      Q.    Okay.
13      A.    It's a high level number, and like I
14  said, it's probably on the conservative side.
15      Q.    And I want to go over two things, one,
16  how you calculated that number; and, two, what
17  other numbers you could go back to your office and
18  look at that would add to it.  And so let's go
19  through each of those.  First, how do you calculate
20  that number?  Can you explain to the jury how you
21  get there?
22      A.    Sure.  I sure can.  We're looking at --
23  and I think we may have left out a little of the
24  profit in 14 in doing that, but he's had a $12,000
25  salary per year.  I believe there is about 8 in



 1  rent he paid himself that's imbedded in the rent

 2  number, and then there's also probably another

 3  $10,000 or so, give or take, on Section 179

 4  deduction, which is accelerated depreciation on

 5  assets, computers, and containers and different

 6  things that would have been bought.  So if you add

 7  the 12,000, 8,000, and the 10, you're at 30,000;

 8  times 19 years would be 570,000.

 9       Q.    And is your assessment of Richardson

10  Chop Shop's lost profits, the calculation you just

11  ran, is that based off of historical data?

12       A.    It is.

13       Q.    And did you assume in running that

14  calculation any growth in Mr. Faulkenberry's

15  business?

16       A.    No.  That -- I mean, that's -- assumes

17  just that things stayed about on average what they

18  were the years before.

19       Q.    In a closely held corporation or

20  business entity like Richardson Chop Shop, is

21  evidence of the owner's salary relevant to

22  determining lost profits like you just did?

23       A.    Yeah.  When you look at an S corp, you

24  look at the -- three or four components.  You look

25  at the owner's salary -- actually four, the owner's



1   salary, any flow-through -- leftover profit that

2   would flow through to the owner.  You look at the

3   rent, and look at adding back in depreciation,

4   whether it's normal depreciation or Section 179.

5          So to get the true picture of what an

6   owner -- an S corp owner is making, you have to

7   look at those four pieces, and like I said, my

8   calculation included three of the four.  It didn't

9   include the profit in 2014 because, like I said, I

10  wanted to be on the conservative side.

11     Q.    Okay.  And another issue that I'd like

12  for you to explain to the jury is how do

13  Mr. Faulkenberry's living expenses -- running that

14  business, how do they factor into his overall

15  financial picture?

16     A.    Well, if you look in 2013, there was

17  about $12,000 in travel that dwindled to about 700.

18  A lot of that travel would have been hotel and

19  gas-related, but a significant portion would have

20  been meals on the road that are a legitimate

21  business deduction, but if you are not traveling,

22  then they become a personal expense.

23     Q.    In other words, we all have to eat?

24     A.    We all have to eat.

25     Q.    And so if he's on company time,



1    traveling for the company, it's a legitimate

2    business expense to charge it like that?

3         A.    Correct.

4         Q.    But when the business declined, based on

5    your knowledge of everything that's happened, he

6    would then need to either buy groceries or find

7    some other way to feed himself out of his own

8    personal pocketbook?

9         A.    You'd still have to eat.  And like I

10   said, there's a significant reduction in the

11   pattern on the travel that would have included the

12   meals.

13        MR. SEELBACH:  I will pass the witness.

14                    EXAMINATION

15        Q.    (Questions By Mr. Arnold)  Mr. Mills, how

16   are you?

17        A.    Good.

18        Q.    You said you had four other customers

19   that were in the same industry as Mr. Faulkenberry.

20   Those are four other clients of yours who live in

21   the Lockhart area who sell motorcycle parts online?

22        A.    One lives approximately an hour away.

23   The other one lives in Austin, but has a facility

24   somewhere near Lockhart, and the other one is

25   basically close to Lockhart.



 1        Q.    And they do the same thing.  They buy

 2    motorcycle parts from around the country and sell

 3    them on eBay?

 4        A.    Yes.

 5        Q.    Sorry.  You have to give verbal answers

 6    for the court reporter.

 7        A.    Yes.

 8        MR. SEELBACH:  Just real quick because I don't

 9    know what direction you're going and I just -- if

10    you'd like me to state an objection, I can, but I

11    think we can do this in a -- just a friendly way.

12    Are you going to try to get into, like, numbers on

13    these companies --

14        MR. ARNOLD:  No.

15        MR. SEELBACH:  -- and who they are?

16            Okay.  I just had a privacy concern that

17    we would just need to paper up something.

18        MR. ARNOLD:  No.

19        MR. SEELBACH:  Okay.

20        Q.    (By Mr. Arnold)  How did you get five

21    clients who all deal in motorcycle parts online?

22        A.    I believe one referred a -- one existing

23    client referred the other ones to come into the

24    office.  So I was already familiar with that

25    business, if you will.  I think it felt it made



1   sense to send the other guys there.

2       Q.    So they were all friends and just word

3   of mouth?

4       A.    I think it's a -- I think it's, yeah, a

5   small community, if you will.

6       Q.    Do you know how they knew each other?

7       A.    No.

8       Q.    Do you ride a motorcycle?

9       A.    No, I do not.  The last time I was on a

10  motorcycle I was 18 years old and fell off of it,

11  took all the skin off my shoulder, and I was on the

12  back.  I wasn't driving.  So I haven't been on one

13  since I was 18.

14      Q.    You talked earlier about a back injury

15  Mr. Faulkenberry sustained.  How do you come about

16  that knowledge?

17      A.    Well, in our discussions of what the

18  numbers are doing, you know, he said, I had a back

19  injury and haven't been able to do the work I used

20  to do.

21      Q.    He, being Mr. Faulkenberry?

22      A.    Mr. Faulkenberry, yes.

23      Q.    Okay.  So it's based on what Lawrence

24  Faulkenberry told you?

25      A.    And I believe it was probably in the



1   local news too, but I'm not sure if I connected it

2   with him when it was in the local news.

3          Q.     But you're not a medical doctor, right?

4          A.     No.

5          Q.     And you haven't reviewed any medical

6   records in this case, correct?

7          A.     No.

8          Q.     Do you have any medical opinions you

9   would offer a jury?

10          A.     No.  I stick to my area of expertise,

11   which is small business, taxes, and that core area.

12   So that's outside my realm of -- area of expertise.

13          Q.     Okay.  Would it be fair to say

14   everything you know about Mr. Faulkenberry's

15   personal or health issues stem from what

16   Mr. Faulkenberry told you?

17          A.     Yes.

18          Q.     Earlier the phrase was used that

19   Mr. Faulkenberry's back injury was the proximate

20   cause of his decline in revenue for the business.

21   Do you know what proximate cause means?

22          A.     I would say the reason for or it

23   happened around the same time period causing, but I

24   do not know the technical definition.

25          Q.     Okay.  Did anybody ever explain to you



 1 | the technical definition of proximate cause?
 2 |       A.    No.
 3 |       Q.    You said that Mr. Faulkenberry sold his
 4 | business; is that right?
 5 |       A.    Correct.
 6 |       Q.    Do you know when he sold his business?
 7 |       A.    In early 2017.  I believe it -- in the
 8 | early part, probably sometime in January.
 9 |       Q.    Do you know what he sold his business
10 | for?
11 |       MR. SEELBACH:  I'll object only to the extent
12 | it calls for speculation.
13 |             Answer if you know.
14 |       A.    I don't know, off the top of my head,
15 | but it was somewhere in the 110 to 115 range, 110
16 | to 115,000 range, I believe.  And I believe that
17 | also included some property.
18 |       Q.    (By Mr. Arnold)  What property?
19 |       A.    The property the business was on.
20 |       Q.    So Mr. Faulkenberry no longer lives at
21 | the property he was on before?
22 |       A.    I don't know where he lives.  I just
23 | know the property was part of the transaction, so
24 | I'm not sure if he remained or if he moved.  I
25 | don't know.



1    Q.    You said Section 179 depreciation

2  several times.  What is that?

3    A.    That's accelerated depreciation.  So

4  using an example would be if you go buy a computer

5  for a thousand dollars, you can take that computer

6  off over a number of years and depreciate it over

7  time, over it's useful life, or you have

8  Section 179 depreciation in which a company can

9  take generally now up to half a million dollars in

10  accelerated depreciation.

11        So that company may elect to take all

12  thousand dollars that first year, and so from a

13  profit standpoint, that flows through on a K1

14  schedule from the S corp and flows through to the

15  owner.  So let's say the K1 schedule had 5,000 in

16  profits; they took a thousand in depreciation.  The

17  net on their tax return is going to be the 4,000.

18  So it's accelerated depreciation.  It's also called

19  Section 179 depreciation.

20    Q.    Okay.  So instead of using a straight

21  line depreciation method, you just depreciate the

22  asset within the first couple years?

23    A.    The first year.

24    Q.    The first year?

25    A.    You make the election the first year.



1      Q.    Okay.

2      A.    It's a very common tool used to try to

3  zero out profit, and I have clients that come in

4  October, November and say, "Hey, I've got about

5  80,000 in profit.  I need to buy a machine.  If I

6  buy an $80,000 machine, I can zero my profit out."

7  And at that point, you're saying, "Okay.  Does it

8  make sense to buy it this year?  What does next

9  year look like?"  So it's used in planning quite a

10  bit.

11      Q.    A good tool to offset profits.  If you

12  have a lot of profits in one year, you could take a

13  bunch of depreciation so you're not paying taxes on

14  the profit that year?

15      A.    And you have to keep in mind that you're

16  robbing from a future year, so you can do that for

17  so long, but you have to -- you have to look at

18  future years too when you're doing that.

19      Q.    Okay.  Let's go to your 570,000 number

20  you calculated.  You wrote it down.  Can I just see

21  your math real quick --

22      A.    Sure.

23      Q.    -- just so maybe I can understand a

24  little better how we got it.

25      A.    I took the $12,000 in salary that was



```
 1   historically what he's paid himself, and I believe
 2   he paid himself that in '14.  I took 8 in what I
 3   think was his rent for that year where he owned the
 4   property and rented -- paid some rent, which is
 5   another tool you use to get the profit down or the
 6   taxes down, and then added in Section 179
 7   depreciation, and, again, that number could be a
 8   little lower; it could be a little higher.  That's
 9   a rough --
10        Q.    Okay.
11        A.    -- rough estimate.
12        Q.    So you did 12,000 plus 8,000 plus 10,000
13   to total 30,000, correct?
14        A.    Uh-huh.
15        MR. SEELBACH:  Answer out loud.
16        A.    And I can go back and look --
17        Q.    (By Mr. Arnold)  You have to say yes or
18   no.
19        A.    Yes, I did.  I could go back and look at
20   more detail in my office and zero in on that, but
21   for the exercise here today, that's what I see from
22   the 2014 P&L.
23        Q.    Okay.  The -- I don't have a copy of
24   that with me.  Can I borrow your --
25        A.    This one?
```



1        Q.    No.   Is that the one you're looking at?

2        A.    I'm looking at --

3        Q.    It's number 577 at the bottom?

4        A.    Correct.

5        Q.    Okay.  Let me give you your notepad

6    back.  I'm sorry.

7              The 2014 years, which you're looking at,

8    where do you get the -- I see a --

9        A.    The 12,000 in payroll is part of the

10   25,650.

11       Q.    Okay.

12       A.    The rent -- and, again, I believe some

13   of that is rent on equipment.  I believe the other

14   8,000 is rent paid to himself from the S corp., and

15   then on depreciation, that 10,000 number's going to

16   be on a K1 schedule that's not part of this

17   exhibit.  I just know historically he's had a

18   substantial number of assets that he's bought over

19   the years that we've used additional depreciation

20   on.

21       Q.    So that leads you to calculate a, would

22   you say, net operating income of $30,000 a year?

23       A.    That was a -- like, the rough estimate,

24   yes.

25       Q.    And that would be -- you're attributing



1   that as Mr. Faulkenberry's gross income on his

2   personal tax return?

3        A.    That would be net profit from the

4   business.  The total amount of income derived from

5   the business is what I would say.

6        Q.    You also do Mr. Faulkenberry's personal

7   income taxes, correct?

8        A.    Correct.

9        Q.    Does he derive income from any other

10  source?

11       A.    I'd have to go back and pull the return

12  and look at that.  I don't believe he has any other

13  taxable income.

14       Q.    He does get income from Social Security

15  Disability, though, right?

16       A.    I believe he does, but I believe that's

17  also -- none of it's taxable on his return.

18       Q.    The -- I understand how you get to the

19  $30,000 here, the 12,000 salary, 10,000 rent, 8,000

20  depreciation, and that's 30,000.  How do we now get

21  to 570,000?

22       A.    That was the projected number of years

23  of continuing to run the business until retirement

24  age of 67.

25       Q.    Okay.  So you just did 30 times 19?



1          A.     Correct.

2          Q.     Okay.   Thirty times 19 years, and that's

3     570.   Gotcha.

4                 Did you do a discounted cash flow

5     analysis to determine the $570,000 number?

6          A.     I did not.

7          Q.     Do you think that that would be an

8     appropriate way to determine a future lost income?

9          A.     It might be.   There are different ways

10    to value a business, and that's a whole other

11    engagement --

12         Q.     Okay.

13         A.     -- if you will.

14         Q.     Does that include any medical expenses

15    in that $570,000 number?

16         A.     I don't believe so, no.

17         Q.     Okay.   Does that include any fringe

18    benefits?

19         A.     No.

20         Q.     Okay.   Or loss of household services?

21         A.     No.

22         Q.     When you calculated that number, you're

23    assuming Mr. Faulkenberry will retire at age 67,

24    correct?

25         A.     That would be the assumption of that.



1        Q.     And part of that assumption is he will

2     be alive at age 67?

3        A.     Correct.

4        Q.     And you didn't look at any life

5     expectancy charts to determine that, did you?

6        A.     No.

7        Q.     Okay.  You're basing the 19 years of

8     additional time Mr. Faulkenberry would work just

9     based on the assumption he's going to retire at

10    age 67 and not that he would physically be able to

11    do the job at age 67, correct?

12       A.     That he would retire at age 67 would be

13    the assumption.

14       Q.     Okay.  Do you have any experience in how

15    many people are 67 years old and are engaged in the

16    motorcycle parts business?

17       A.     No.  I think the client base that I have

18    are all probably between 40 and 55, if I had to

19    guess their age.  I can go back and look at it.

20       Q.     Okay.  So you haven't calculated the

21    work life expectancy of Mr. Faulkenberry?

22       A.     No.  I'm sure you can pull actuarial

23    tables and determine that, but I have not done that

24    as part of this exercise.

25       Q.     Have you investigated any other type of



1  jobs that Mr. Faulkenberry could engage in besides

2  his motorcycle business with his current level of

3  mobility, I guess?

4      A.    No, I have not.

5      Q.    Okay.  So you're not aware -- maybe

6  Mr. Faulkenberry could go get a job doing something

7  else, maybe not making as much money as he was

8  making running his parts business, but possibly

9  doing something else, correct?

10     MR. SEELBACH:  Objection, calls for

11  speculation.

12     Q.    (By Mr. Arnold)  To the extent you can

13  answer the question.

14     A.    Well, I am assuming there are places out

15  there where pretty much anybody can be employed,

16  whether it's taking tickets at a movie theater or

17  anything else so --  but, again, I don't know what

18  the extent of his injuries are.

19     Q.    Okay.  Go ahead.

20     A.    I just know that based on my discussions

21  and -- and the current industry he's in, that

22  it's -- from a numbers standpoint, it's affected

23  the numbers.  So going out into the future and what

24  he can do, I wouldn't be able to comment on.

25     Q.    Okay.  So you haven't -- let me rephrase



1  the question.  The $570,000 number you just

2  calculated assumes that Mr. Faulkenberry will never

3  work again?

4      A.    That would be correct.

5      Q.    And --

6      MR. SEELBACH:  I'm going to object to the

7  extent it mischaracterizes the lost profit

8  calculation.

9          MR. ARNOLD:  Well, okay.

10     Q.    (By Mr. Arnold)  And, again, you haven't

11 done any investigation into Mr. Faulkenberry's

12 capacity to work in some other profession?

13     A.    No.  That's not my area of expertise.

14     Q.    You're aware of the concept of the time

15 value of money, correct?

16     A.    Uh-huh.

17     Q.    In that concept -- could you explain

18 that concept to the jury?

19     A.    Well, money is worth more now than in

20 the future, right?  So a lottery winner is a good

21 example.  They can take periodic payments over

22 20 years or get it all upfront.  There's more value

23 in having the money upfront and being able to do --

24 do with it what you want and earn on it versus

25 having it paid out over a longer period.  So it --



1        Q.    If we wanted to figure out how much

2   $570,000 in 19 years is worth today, how would we

3   do that?

4        A.    That's a calculation.

5        Q.    What is that calculation?

6        MR. SEELBACH:  Objection to the extent it

7   calls for speculation.

8             You can answer.

9        A.    Well, it gets into the time value of

10  money, and it gets into present value -- present

11  value calculations, but, again, that is not my area

12  of expertise.  My area of expertise is a small

13  business, QuickBooks taxes.  I mean, I could go and

14  look it up and calculate it, if we had to, but it's

15  strictly a calculation.  There are probably more

16  than one ways -- more than one way to calculate it.

17       Q.    (By Mr. Arnold)  Would a way to calculate

18  that be a discount in cash flow analysis?

19       A.    That would certainly be one of them.

20       Q.    Okay.  In a discounted cash flow

21  analysis, you look at various factors, but

22  essentially, you're taking -- say I give you

23  $10,000 today, and then in 19 years it's going to

24  be worth X number of dollars, correct?

25       A.    Uh-huh.



1      Q.    And that's with the discounted cash flow

2   analysis.  So you can do the reverse of that.  You

3   can say, Okay, in 19 years, I need $570,000, and

4   then how --  how much money would I need today in

5   order to obtain that $570,000, correct?

6      A.    Correct.

7      Q.    Okay.  And you have not done that?

8      A.    I have not done that.

9      Q.    Have you been asked to do that?

10      A.    No.

11      Q.    The $570,000 number you just came up

12   with, was today the first time you were asked to

13   calculate that?

14      A.    I did calculate it for the first time

15   today.

16      Q.    Okay.  Did anybody talk to you before

17   today about coming up with a number of -- that

18   expresses Mr. Faulkenberry's lost income?

19      A.    No.

20      Q.    How long have you been

21   Mr. Faulkenberry's accountant?

22      A.    Probably seven or eight years, somewhere

23   in that time frame.  I'd have to go back and look.

24      Q.    So around 2010?

25      A.    2010 or maybe before then.  It may have



1   been a little longer.

2        Q.    Do you think --

3        A.    I'd done some work with this industry

4   since 2005, but I believe he came along after that.

5        Q.    Did you do a 2010 tax return for

6   Mr. Faulkenberry?

7        A.    I believe I did.  I'd have to go back

8   and look.  My tax software only prints out a

9   five-year history.  I'd have to go to an earlier

10  version to get that.

11       Q.    Is that why you only use the last five

12  years is because that's --

13       A.    That's what it prints out of the --

14  yeah.  And, of course, now we have '16 so -- but,

15  again, if I printed it from my '16 software, it

16  would only go back to '12, 2012, so I'd have to go

17  to an earlier year to get the rest of the data, but

18  it's obtainable.

19       Q.    Okay.  But you didn't look at 2010 or

20  2011 data for your testimony here today?

21       A.    I looked at 2011 through 2016 data.

22       Q.    2011 through 2016.  Okay.  So the only

23  year that we're missing from the data in front of

24  you is 2010?

25       MR. SEELBACH:  Objection to the extent it



1   calls for speculation.

2             Answer if you know.

3        A.    I again don't remember exactly when I

4   started doing it.  It could have been '10.  It

5   could have been '9.  It could have -- might have

6   been as far back as 2008.  I'm not sure.  I'd have

7   to go back and look.

8        Q.    (By Mr. Arnold)  Okay.  But you didn't

9   look at any data before 2011 --

10       A.    No.

11       Q.    -- for your testimony today, correct?

12       A.    No.

13       Q.    Would it be helpful to you as an

14  accountant to go back and look at, maybe, the last

15  ten years of tax returns, instead of the last five

16  years?

17       A.    You could go back and look at the last

18  ten and see what the pattern is, if you will, but I

19  thought the four years, '10 through -- '10 through

20  '16 are the most relevant, considered the most

21  current, and '11 through -- '11 through '14 are

22  relatively comparable, if you will.

23       Q.    Do you know --

24       A.    I felt like -- I felt like that was a

25  good enough baseline, if you will.



1       Q.    Do you know what Mr. Faulkenberry did

2   before he was in the motorcycle parts business?

3       A.    I do not know.

4       Q.    Part of what Mr. Faulkenberry does with

5   his business, as you said before, is he takes

6   advantage of -- and legitimately --

7       A.    Uh-huh.

8       Q.    -- some tax advantages of being a small

9   business owner, correct?  He -- the business makes

10  the income, Richardson Chop Shop, S corp.  He can

11  then pay himself a salary out of that.  Does he

12  depreciate his -- or he pays rent to his office

13  space on his property, correct?

14      A.    Yeah.  With an S corp, it's like any S

15  corp.  You're trying to not have as much -- an S

16  corp is a flow-through entity from a profit

17  standpoint, just like a partnership.  Any net flows

18  through to the owners, and so on an S corp, you're

19  trying to pay out salary, rent, and use

20  depreciation to get that number as close to zero at

21  the end of the year as you can, so there's no

22  untaxed profit, if you will.

23      Q.    Right.  Because if the S corp -- if

24  Richardson Chop Shop, Incorporated, has a profit at

25  the end of the year, that profit's going to be





1   taxed on Mr. Faulkenberry's gross income?

2        A.    It's going to be on taxed income that

3   flows through to him, yes.

4        Q.    Okay.  And then, he's going to pay that

5   as gross income on his --

6        A.    Yes.

7        Q.    -- personal income tax, right?

8        A.    Correct.

9        Q.    So the idea is to make the business come

10  as close as possible to losing money, at least on a

11  balance sheet?

12       A.    It's to try and zero out the profit, if

13  you will, and there are advantages to paying rent

14  income.  It's not taxed for self-employment taxes,

15  so any reasonable rent you can pay yourself you do

16  with an S corp., and you generally own properties

17  individually and have the S corp rent it from you.

18       Q.    Okay.  So he owned his office, which was

19  next to his house, and then Richardson Chop Shop

20  rented that from him?

21       A.    Yes.

22       Q.    Correct?  And that's the rent you see on

23  your comparative income statement?

24       A.    Correct.

25       Q.    Okay.  And then the payroll number --




1   you said he pays himself $12,000 a year.  I see a
2   $25,000 number and a $30,000 number from 2014 and
3   2013, respectively.  Was he paying other people
4   those years?
5        A.    He had other people on the payroll.  You
6   will also notice the contract labor number above
7   that where people were paid to come -- people were
8   paid contract labor work too, so there's two
9   components, and I don't remember who was -- I don't
10  know his employees.  We do the payroll.  We do
11  process payroll for him, so I have those records.
12  I just don't know -- we do payroll for 70
13  companies, so I don't know who that includes.  I
14  just know on his return it's normally around
15  $12,000 is his payroll.
16       Q.    Okay.  But that -- he's basically paying
17  him -- paying himself a rent to use the office
18  space.  He's deducting his telephone, I see --
19       A.    Yeah.
20       Q.    -- and other expenses like that,
21  correct?
22       A.    And you have to keep a -- you have to
23  pay yourself a reasonable amount as an S corp
24  owner, and you have keep that as 60 percent salary,
25  and any other money you take out would be 40



```
 1   percent in distribution, so there's a -- there's a
 2   method that you use for that.  But, yeah, he does
 3   have his other expenses on here also.
 4        Q.   Okay.  And don't get me wrong.  I'm not
 5   saying he's doing anything wrong.
 6        A.   Yeah.  No.  It's a planning tax
 7   strategy.  You know, you try and pay as little as
 8   possible legally within the tax code, and the
 9   reason the S corp was set up was for those very
10   reasons.
11        Q.   Okay.  So based on your experience doing
12   Mr. Faulkenberry's personal tax returns, he makes
13   approximately $12,000 a year in gross income?
14        MR. SEELBACH:  Objection to the extent it's
15   vague and ambiguous.
16             Answer as best you can.
17        A.   He has around 12,000 in W-2 income.  I'd
18   have to go back and pull his personal returns to
19   see if there were anything else on there.  I'd --
20   you'd have to look and see what adjusting gross
21   income was, I guess.
22        Q.   (By Mr. Arnold)  Okay.
23        A.   And I don't -- I don't have that figure.
24        Q.   But his W-2 from Richardson Chop Shop is
25   $12,000 a year?
```



1    A.    It's averaged around 12.

2    Q.    Okay.  Do you have this, the

3  accountant's compilation report?

4    A.    I do.

5    Q.    If you could look at that with me, it's

6  Bates 576, and I'm going to kind of read through

7  this with you and then ask some questions.  You say

8  in here, the second sentence, "I have not audited

9  or reviewed the accompanying statement of income

10  and, accordingly, do not express an opinion or

11  provide any assurance about whether the income

12  statement is in accordance with the income tax

13  basis of accounting."

14        I think I know what you mean by saying

15  you haven't audited or reviewed the accompanying

16  statement of income?

17    A.    Yeah.  Reviewing and audit have higher

18  levels of responsibilities and procedures, so

19  that's the paragraph that clarifies my role, I

20  guess, if you will, and my level of responsibility.

21    Q.    Okay.  And if you did an audit, it would

22  require more work on your part?

23    A.    You would do field procedures.  You

24  would do different testing and different things

25  like that.



1      Q.    Okay.  So you don't have an -- I mean,

2   this, what this says, you do not have an -- you do

3   not express an opinion or provide an assurance

4   about whether the income statement is in accordance

5   with the income tax basis of accounting, correct?

6      MR. SEELBACH:  Objection, the document speaks

7   for itself.

8      A.    Yeah.  That's the standard language that

9   you have to put as part of the requirements of

10  issuing and compiling financial statements.

11     Q.    (By Mr. Arnold)  Okay.  And what income

12  statement are you referring to in this letter?

13     A.    The comparative income statement

14  attached to it.

15     Q.    Okay.  The Bates label 577?  Sorry.  We

16  called that --

17     A.    Yes, 577.

18     Q.    Yeah.  Bates label Faulkenberry 577?

19     A.    Yes.

20     Q.    Okay.  So part of what you're saying

21  here is that you're not professionally giving an

22  opinion about whether the comparative income

23  statement is in accordance with the income tax

24  basis of accounting?

25     A.    It's just clar --



1          MR. SEELBACH:   Objection, the document --

2     objection, the document speaks for itself.

3               You can answer.

4          A.    Yeah.   It's clarifying my role and

5     the role of management.   The next paragraph is the

6     role of management and what their requirements are.

7          Q.    Okay.   And management is

8     Mr. Faulkenberry?

9          A.    Correct.

10         Q.    Okay.   What are the income tax basis of

11    accounting?   What do you mean by that?

12         A.    It's the cash basis.   He's a cash basis

13    taxpayer versus an accrual basis taxpayer.

14         Q.    Okay.   What does that mean?

15         A.    That means you take the income and

16    deductions when you receive them versus accruing

17    it.  So if I bill you December 31st and I didn't

18    receive the cash, I don't count it from a cash

19    basis.  You pay me January 8th, from an accrual

20    basis, it would still count as income, but from a

21    cash basis, it doesn't.  Your income and expenses

22    are recorded when actually paid.

23         Q.    Okay.   So what are you saying here?

24    That this is not in accordance with the income tax

25    basis of accounting, what does that mean to a



 1 | layperson?

 2 |      A.   It's not saying -- it is in accordance

 3 | with the income tax basis of accounting.  It's I

 4 | don't provide any assurance.  It's a legal -- a

 5 | legal term that has to be put in there on the

 6 | compilation report.

 7 |      Q.   Okay.  The next paragraph you say,

 8 | "Management is responsible for the preparation and

 9 | fair presentation of the financial statements in

10 | accordance with the income tax basis of accounting

11 | and for designing, implementing, and maintaining

12 | internal control relevant to the preparation and

13 | fair presentation of the financial statements,"

14 | correct?

15 |      A.   Uh-huh.

16 |      Q.   And that means that management, being

17 | Mr. Faulkenberry, is responsible for making sure

18 | the data on your comparative income statement is

19 | accurate?

20 |      A.   That's correct.

21 |      Q.   Okay.  And that's an assumption you make

22 | as an accountant --

23 |      A.   That's an assumption.

24 |      Q.   -- that it is correct?

25 |      A.   And that's something you have them sign



1  and say it's correct; they're providing all the

2  information.

3      Q.    Okay.  The next paragraph -- and I'm

4  going to jump to the second sentence.  You say,

5  "The objective of a compilation is to assist

6  management in presenting financial information in

7  the form of the income statements without

8  undertaking to obtain or provide any assurance that

9  there are no material modifications that should be

10  made to the financial statements," correct?

11      A.    Correct.

12      Q.    Okay.  And that means that this document

13  is just to assist management, but you're not going

14  in depth and saying everything on here is

15  completely accurate?

16      A.    You're not going into procedures that

17  prove the accuracy of it like you would a review or

18  an audit.

19      MR. SEELBACH:  And I'm just going to object to

20  the extent the disclaimer speaks for itself.

21      A.    And in my client base, a business this

22  size, it's almost cost prohibitive to have a

23  full-blown audit just because of the fees involved

24  because there's a high level of assurance.  There's

25  a lot more work.  So, yeah, this -- this is the



 1   standard CPA letter, if you will.

 2        Q.    (By Mr. Arnold)  Okay.  In the last

 3   paragraph, you say, "Management has elected to omit

 4   substantially all of the disclosures ordinarily

 5   included in financial statements prepared on the

 6   income tax basis of accounting."  What does that

 7   mean?

 8        A.    You have your three basic statements,

 9   balance sheet, income statement -- some people call

10   it a profit and loss statement.  Then you have a

11   statement of cash flows that reconciles your

12   beginning cash, your end cash, and whether it was

13   used for investing, financing, the different

14   categories it was used for.

15             In the market I'm in, banks don't

16   require that one, and it, again, is a higher level

17   of service I have to charge more for, so I

18   generally omit the statement of cash flows on any

19   financials we do out of the office.

20        Q.    Do you have these disclosures ordinarily

21   included in financial statements?

22        A.    No.  That would be notes to the

23   financial statements, and we don't -- since we've

24   admitted them, we don't prepare them.

25        Q.    Okay.  So that's something



1   Mr. Faulkenberry has?

2          A.    You don't have to have them notes if you

3   omit them.  So the notes would be on a full-blown

4   set of financial statements that had the statement

5   of cash flows and the notes, and then you would

6   have them, but there was no undertaking to prepare

7   that for this or really any other of the work I've

8   done.

9          Q.    Why not?

10         A.    Again, it's a higher level of service.

11  I'm reviewed on the -- I have a peer review every

12  three years on the work I do on financial

13  statements, so it puts me into a higher risk pool,

14  if you will.  It costs more for the client.

15  There's no need.  In the market I'm in, there's

16  generally no need for those two things.  All the

17  local banks accept what we currently have here.

18         Q.    Okay.  The next sentence is, "If the

19  omitted disclosures were included in the financial

20  statements, they might influence the user's

21  conclusions about the entity's revenues and

22  expenses."  Does that mean that these numbers could

23  change if you had more information?

24         A.    It means that the user's opinion might

25  be changed.  So if you're looking at buying a



1  company and you have more information, that might

2  change your opinion on buying it or not, I mean,

3  that kind of thing.  So it's -- again, this is

4  standard language.  It's not that I put it in there

5  for any reason, other than I'm required to put it

6  in there.

7        Q.    Okay.  Who is the user that you refer to

8  in your letter?

9        A.    The user in this case would be everybody

10 in the room.  Normally -- normally, it's a bank.

11 Normally, I have clients going to a bank to obtain

12 a loan.  It's a normal user, but it's any end user

13 in the financial statements.

14       Q.    Okay.  So in this case, presumably, it'd

15 be the jury because they're the ones who are going

16 to rely on your information?

17       A.    Uh-huh.

18       Q.    And then the last one you say, "This

19 income statement is not designed for those who are

20 not informed about such matters."  What do you mean

21 by "such matters"?

22       A.    Again, that's the -- the legal language

23 I'm required to put in there.  I don't really mean

24 anything necessarily by it myself, but people who

25 are not versed in reading financial statements,



1   that's what it's referring to.  It's not designed

2   to teach somebody how to read some financial

3   statements.  It's presenting historical data.

4        Q.    And then finally, you say, "I'm not

5   independent with respect to Richardson Chop Shop,

6   LLC."  Does that have a technical meaning?

7        A.    That probably means I set the LLC up for

8   Mr. Faulkenberry.  If I do that, it impairs my

9   independence.  So I don't have to be independent to

10  do a set of compiled financial statements, but you

11  would for a review or an audit, and since I stick

12  to compilations, I'm okay doing that, so I just

13  have to disclose it.

14       Q.    Okay.  So that means if Mr. Faulkenberry

15  wanted you to do an audit, you might not be able

16  to?

17       A.    I couldn't.  I couldn't.

18       Q.    You couldn't do it?

19       A.    Correct.

20       Q.    That is part of, I guess, an ethical

21  requirement of being a CPA?

22       A.    It means -- yeah.  It's -- you have

23  different requirements.  Independence is one of

24  them for certain levels of service.

25       Q.    Okay.



1    A.    Yeah.   And I'm pretty sure that's why

2    that's in there.   I'm pretty sure I set that LLC up

3    for him.

4         Q.    Do you think the data in the comparative

5    income statement that you prepared is reliable?

6         A.    Do I think it's reliable?   From a

7    standpoint of what I put on the comparative income

8    statement or from a standpoint of management

9    providing me that data?

10        Q.    Well, I mean, I guess in kind of -- I

11   mean, we went through -- I know these are some --

12        A.    Yeah.

13        Q.    -- legal things --

14        A.    You're kind of --

15        Q.    -- you need to put in there

16   professionally.

17        A.    You're kind of asking me to go beyond

18   what I've done here and give some other form of

19   verification that I'm not comfortable giving

20   because I didn't perform that level of service on

21   it.

22        Q.    Okay.   So what level of verification are

23   you comfortable with giving or were you -- did you

24   give?

25        MR. SEELBACH:   Objection, vague and ambiguous.



1    A.   Again, it's all in the compilation
2    report, what my responsibility is, and I have to be
3    careful here for obvious reasons and what
4    management's responsibility is, so you're asking me
5    something -- a question I can't answer.
6    Q.   (By Mr. Arnold)  Okay.  Well, I mean,
7    there's a jury who is going to rely on your
8    testimony.
9    A.   Uh-huh.
10   Q.   And I believe you to be a truthful
11   person, so I guess I need to know how much can a
12   jury rely on your comparative income statement,
13   given all the qualifications you have in your
14   preceding letter with it?  Is this reliable enough,
15   in your professional opinion, for a jury to trust
16   it as evidence?
17        MR. SEELBACH:  Object to the extent it calls
18   for a legal conclusion.
19            You can answer.
20   A.   I guess I'm not -- again, you're asking
21   me to step over the line and do something that this
22   wasn't required to do.  Assuming the information I
23   received was correct, the answer would be yes.
24   Q.   (By Mr. Arnold)  So that -- I guess
25   that's kind of what I am getting at.



1          A.    Yeah.

2          Q.    That assumes that the information given

3     to you by Mr. Faulkenberry is correct?

4          A.    Yeah.  And that's -- those have all been

5     used to prepare tax returns and signed off on, so I

6     would assume he's been forthcoming with all the

7     information.

8          Q.    So what is your opinion in this case?

9     What are you going to testify to the jury about?

10         MR. SEELBACH:  Objection to the extent it

11    calls for a narrative.

12         A.    I am not sure what I'm -- I mean, I've

13    been asked to prepare the -- prepare the financial

14    statements and interpret data at this point.  I

15    haven't gone beyond that.

16         Q.    (By Mr. Arnold)  And I get this chart,

17    and I compared the chart to all the numbers in the

18    income tax statements you included, and I mean, the

19    numbers obviously match up.  So this comparative

20    income statement is really just a different way of

21    viewing these various tax returns, correct?

22         A.    Correct.  It puts them all on one page.

23         Q.    Right.  So you can kind of compare

24    apples to apples over a period of time?

25         A.    You can see a trend -- a trend in



1  certain accounts probably, yeah.  I think that's
2  fair.
3       Q.    Okay.  Did you do any more work than
4  just create the comparative income statement -- can
5  I call it a chart?
6       A.    I would just say comparative income
7  statement, yeah.
8       Q.    Okay.  Did you do anything additional
9  besides that, other than take the numbers from the
10  tax return and put it into the comparative income
11  statement?
12      A.    No.  I do have backup to support numbers
13  on the tax return, but that's filed away.  I'd have
14  to pull that.
15      Q.    I'm gathering what you expect to testify
16  to at trial, if called as a witness, would be
17  really just that your comparative income statement
18  reflects the numbers that are in the tax return?
19      A.    Well, I would --
20      MR. SEELBACH:  Hold on.  Objection to the
21  extent it omits prior testimony regarding
22  Mr. Mills' expert opinions regarding the decline of
23  the business and lost profit analysis.
24      A.    I would anticipate looking at the
25  numbers, interpreting the numbers, and explaining



1   the things that declined over that period as

2   compared to the three or four years before that,

3   just what we're -- what I'm doing here today.  I

4   would expect it to be -- to be that.

5        Q.    (By Mr. Arnold)  Could you explain to

6   me -- I see in 2015, on your comparative income

7   statement, Mr. Faulkenberry sold $144,792 worth of

8   goods, correct?

9        A.    Uh-huh.

10       Q.    And then the cost of those goods was

11  $76,460, correct?

12       A.    Correct.

13       Q.    And I did the math.  I used a

14  calculator, so you might want to trust me, but feel

15  free to do it yourself.  That -- that leads to a

16  gross income of $68,332.

17       A.    Okay.

18       Q.    And that was the year that you

19  understand Mr. Faulkenberry was injured on

20  January 15 of 2015, correct?

21       A.    Uh-huh.

22       Q.    Okay.  So how do you explain that year

23  seems to be a decent year for Mr. Faulkenberry?

24       A.    If you look at the calculation of cost

25  of goods sold, it's beginning inventory plus



1  purchases less ending inventory.  I would have

2  expected him to have sold out of existing inventory

3  for a big portion of 2015.  I would expect

4  inventory based on '16 numbers to have been bled

5  down.  So it's still showing, you know, more sales

6  compared to 2016, but still selling out of existing

7  inventory would be the explanation for that,

8  probably.  You're basically costing that inventory

9  as you sell it.  So as any inventory goes down,

10  it's an inverse relationship.  Costing of some goes

11  up.  So that's what I would expect to see there.

12       Q.    Okay.  So you're saying he already had

13  the stuff in his warehouses?

14       A.    Yeah.

15       Q.    And he was just selling it out of there?

16       A.    He was selling existing inventory.

17       Q.    Okay.

18       A.    More so than new things that he

19  purchased, probably.

20       Q.    Well, it seems to me to indicate that

21  his -- his ability to run his business profitably

22  related more to his ability to travel than his

23  ability to actually sell the items out of his

24  house?

25       MR. SEELBACH:  Objection, argumentative.



 1       A.    Yeah.   I don't know enough about that

 2   business.   Like I said, I'm sure there is some

 3   amount of work once you get a motorcycle then to

 4   breaking it down because I know sometimes they

 5   bought parts.   Sometimes they bought motorcycles,

 6   so, of course, you have to have the work of

 7   stripping it down and cataloging and putting it on

 8   eBay and stuff.   So I know that a significant

 9   portion of it is probably, based on my discussions

10   with them, based on the inability to travel and

11   bring in new parts.   I don't know from there how

12   much things are affected because I don't know the

13   day-to-day operations of it.

14       Q.    (By Mr. Arnold)   What instructions were

15   given to you in this case when you created the

16   comparative income statement?

17       A.    I would have to go back and look.   I

18   think it was basically go back over a certain

19   number of years and put together and compare the

20   income statements and see what the trend is.

21       Q.    And who asked you to put together the

22   comparative income statement?

23       A.    Probably -- I don't know if it came from

24   the original attorney or if it came from Lawrence

25   himself.   I don't remember who brought that to my



1    attention.

2         Q.    Do you know how much Mr. Faulkenberry

3    can lift?

4         A.    No idea.

5         Q.    How much weight?

6         A.    No idea.

7         Q.    Do you know if Mr. Faulkenberry

8    currently rides his motorcycle?

9         A.    No idea.

10        Q.    Do you know if Mr. Faulkenberry has had

11   back surgery?

12        A.    I do not know.

13        Q.    Do you know if Mr. Faulkenberry's back

14   has improved in the last year?

15        A.    I have no idea.

16        Q.    You may not be able to answer this

17   question, but I think you can as an accountant.  If

18   your testimony is that Mr. Faulkenberry is going to

19   lose $570,000 in income over the next 19 years

20   because of his back injury -- is that correct?  Let

21   me just ask that first.

22        MR. SEELBACH:  Objection to the extent it

23   misstates his prior testimony.

24             You can answer.

25        A.    Could you repeat the question?



1    Q.    (By Mr. Arnold)  Yeah.  Is your

2   testimony that Mr. Faulkenberry should be paid

3   $570,000 in this case because he has lost income

4   over the next 19 years?

5    MR. SEELBACH:  Objection to the extent it

6   calls for a legal conclusion and invades the

7   province of the jury.

8    A.    Again, my task is to look at the numbers

9   and identify the trends and also see what the lost

10  income might be from year to year.  So, again,

11  there are a lot of variables in that.  You know, we

12  said 19 years until he's full retirement age.  He

13  could retire two years early.  He could retire four

14  years later.  You know, the laws tend to change on

15  social security.  So, you know, I'm purely going at

16  the high level numbers, and we came to about 30 --

17  about 30 grand a year times 19 years, so I'm going

18  to limit it to that.  I mean, that's what I would

19  testify for.

20   Q.    (By Mr. Arnold)  Okay.  Let's assume

21  Mr. Faulkenberry will ask a jury to award him lost

22  wages, to compensate him for not being able to

23  work.  Do you think it's, from an accounting

24  standpoint, fair for Caldwell County, who's the

25  Defendant in this case -- one of the defendants in

 1 | this case, to pay Mr. Faulkenberry $570,000 today
 2 | in order to compensate him for that lost income you
 3 | calculated?
 4 |     MR. SEELBACH:  Objection to the extent it
 5 | calls for a legal conclusion and also calls for
 6 | speculation.
 7 |     A.    Yeah.  I would leave that to the jury to
 8 | decide.  That's not my -- I'm not saying -- I'm not
 9 | saying he needs to be paid this.  We're simply
10 | saying what we're projecting the lost -- profit
11 | loss to be --
12 |     Q.    (By Mr. Arnold)  Okay.
13 |     A.    -- for that period.
14 |     Q.    Okay.  Can you do a discounted cash flow
15 | analysis as we sit here today to figure out how
16 | much $570,000 in 19 years is worth today?
17 |     MR. SEELBACH:  Objection to the extent it
18 | calls for speculation.
19 |     A.    A discounted cash flow could be done.
20 | I'm not -- I would say I wouldn't do it here.  If I
21 | need to do it, I can do it.  I'm not going to do it
22 | on the fly.  It's something I would do and review,
23 | and there's not time in this proceeding to do that.
24 |     Q.    (By Mr. Arnold)  Okay.  I don't blame you
25 | there.



1    A.    It's like tax returns.  I don't do tax

2    returns with people sitting there watching me.

3    There is too much room for error, so I do it and

4    then meet with them after that.

5    Q.    Okay.  But you would agree with me that

6    a -- if you're looking to be compensated for future

7    lost wages, the proper way of doing it would be to

8    determine through a discounted cash flow analysis

9    the present value of, in this case, $570,000?

10   MR. SEELBACH:  Objection to the extent it

11   calls for speculation.

12   A.    Again, if I need to be engaged to come

13   up with what I think the different methods are and,

14   you know, the highs and lows, that could be done,

15   but I haven't gotten that far into the thought

16   process of discounted cash flows.  I'm simply

17   looking at the numbers and interpreting them at

18   this point.

19   Q.    (By Mr. Arnold)  Okay.  So you haven't

20   been asked to do that.  I get that.  So let's back

21   away from this case a little bit.  Let's just go

22   into your experience as a CPA.

23   A.    Yes.

24   Q.    You're qualified to do a discounted cash

25   flow analysis, correct?



1      A.     (Witness nods head affirmatively.)

2      Q.     Okay.  You haven't been asked to do it

3   in this case, correct?

4      A.     Right.

5      Q.     If someone wanted to be compensated for

6   a future loss, in your opinion as a CPA, would the

7   proper way to do that would be to do a discounted

8   cash flow analysis to determine the present value

9   of the future income?

10     MR. SEELBACH:  Objection to the extent it

11  calls for speculation.

12     A.     If I were engaged to look at what

13  somebody should be paid, I would step back and look

14  at the different ways to calculate it and look at

15  all the variables.  That would be one of them, yes.

16     Q.     (By Mr. Arnold)  Okay.  What would be the

17  other ways of doing it?

18     A.     There are different ways to look at

19  businesses.  I mean, there are -- you have to look

20  at -- you have to look at different things that are

21  intangibles, the customer base that's built up.

22  Are those same customers coming back, coming back,

23  coming back?  For a CPA practice, that's 1.2 times

24  your annual revenue.  It's pretty easy.  But for

25  other businesses, you get a lot deeper into what's



 1  the value of that business going forward.  So at

 2  the end of the 19 years, not only would he have had

 3  that revenue, what would he have sold it for?  So

 4  there's too many moving parts to try and answer

 5  those kind of questions.  There are different ways

 6  to value it.

 7       Q.    Okay.

 8       A.    I'm not an expert in business

 9  valuations, by any means, but there are multiple

10  ways to value a business --

11       Q.    Okay.

12       A.    -- not just the discounted cash flow

13  stuff.

14       Q.    Okay.  One of those ways might be like

15  using a capitalization rate, correct?

16       A.    Yeah.

17       Q.    Okay.  And that's where you would take

18  net operating income and divide by a percentage?

19       A.    That's not my area of expertise.  I

20  could do it.

21       Q.    Okay.

22       A.    But like I said, I don't do a lot of

23  business valuations.

24       Q.    Okay.

25       A.    So I'd rather stick to what I'm



 1  comfortable with.

 2      Q.   Sure.  And that's probably maybe more of

 3  an appraisal thing than a CPA thing, so I don't

 4  want to get you off into the appraisal world but --

 5      A.   I see businesses bought and sold and I

 6  deal with people buying and selling them.

 7      Q.   Okay.

 8      A.   I've bought businesses myself, so I know

 9  there are a lot of factors that factor into buying

10  a business, not just the cash flow.

11      Q.   And I've talked to a lot of people who

12  have done it before as well, and some of them just

13  do times two, times three, times four, kind of

14  thing depending on how much they like it, but that

15  could be a gas station or Wendy's or whatever so...

16      A.   Different industries have different

17  methods.  Like I said, CPA practice, 1.2 your

18  annual sales is the general valuation.

19      Q.   Okay.  And I'm not asking you to do that

20  here because clearly you weren't asked to do that

21  and determine what Mr. Faulkenberry's business was

22  worth, right?

23      MR. SEELBACH:  Objection.

24      A.   I appreciate that.

25



1    Q.    (By Mr. Arnold)  And so let me just

2  clarify that.  You were not asked to determine what

3  Mr. Faulkenberry's business was worth, correct?

4    MR. SEELBACH:  Objection.

5    A.    I have not done a business valuation on

6  the business, no.

7    Q.    (By Mr. Arnold)  Okay.  Your testimony is

8  about Mr. Faulkenberry's personal income, correct?

9    MR. SEELBACH:  Objection to the extent it

10 misstates his testimony.

11   A.    Again, I've stated this probably three

12 times.  My task was to come in and look at the

13 numbers over a certain period, look at the trend,

14 and see approximately what the drop in -- whether

15 its profit to the business or profit to him, would

16 have been.

17   Q.    (By Mr. Arnold)  Okay.

18   A.    It's no more than that; no less than

19 that.

20   Q.    Okay.  So let's just assume the $570,000

21 number you came up with is a number

22 Mr. Faulkenberry is losing over 19 years, okay?

23 What do you think is a proper way of calculating

24 what Mr. Faulkenberry should be paid today in order

25 to obtain that total amount?



1   MR. SEELBACH:  Objection, asked and answered.

2   He's already stated he hasn't run a net present

3   value discount calculation.

4       A.    Yeah.  I mean, I wish I could answer the

5   question differently, but I feel like I'm answering

6   it consistently and it's being rephrased and

7   rephrased, and I'm going to be consistent and have

8   the same answer.

9       Q.    (By Mr. Arnold)  Just you weren't asked

10  to do it?

11      A.    I wasn't asked to do it.  It's not my

12  area of expertise.

13      Q.    Okay.  Okay.  Do you feel comfortable

14  giving an opinion about how much Mr. Faulkenberry

15  should be compensated in this case for his lost

16  wages?

17      MR. SEELBACH:  Objection to the extent it

18  invades the province of the jury and asked and

19  answered.

20      A.    I can say what the lost -- what I think

21  the lost -- the profit loss is of what a -- what

22  somebody is compensated or paid.  I think there are

23  a lot of things that go into that.  It's not --

24  probably not just this.  So I assuming that's

25  something more for the attorneys or somebody else



```
 1    to answer.

 2         Q.    (By Mr. Arnold)  Okay.

 3         A.    I've got a component of it, if you will,

 4    but that's not the whole picture.  So when you're

 5    asking me to say what he should be compensated, I'm

 6    not -- that's not, again, my area of expertise.

 7         Q.    Okay.  And I know I'm beating a dead

 8    horse a little bit.

 9         A.    Yeah.

10         Q.    But I'm trying to get, like, an answer

11    for me because I think I know what you're saying,

12    but the problem is, is that in this case, at some

13    point, we're going to go before a jury, and the

14    jury is going to be asked to compensate

15    Mr. Faulkenberry for different things, right?

16         A.    Uh-huh.

17         Q.    One of those would be lost income.

18    Okay.  And if your testimony is that he's losing

19    $570,000 in income over a period of 19 years, I

20    understand your calculation there.  But part of

21    what the jury has to do is figure out where these

22    numbers are coming from and how reliable they are,

23    right?  So how comfortable are you in telling the

24    jury, yes, this $570,000 number is very reliable?

25         MR. SEELBACH:  Objection, asked and answered.
```



1        A.    Again, I feel like I'm going through

2   a -- going in circles here.  The answers are

3   reliable based on the engagement I've performed

4   based on the information I've been given.  There

5   are variables in there that you'd have to go back

6   into and dig into a little deeper probably because

7   there could be more depreciation.  Like I said, the

8   19 years is a best guess based on retirement age,

9   so there's a lot -- there's too many variables in

10  that to answer any more than I have.

11             I'm comfortable that there is a

12  significant amount of profit loss.  I have said

13  it's in the $30,000 range per year.  However many

14  years that covers, we're just going out to

15  retirement age.  I mean, it's no more complicated

16  math than that.  So I'm sure the deliberations and

17  negotiations would be a lot more complex than that.

18       Q.    (By Mr. Arnold)  Okay.

19       A.    I think mine -- mine, I think, is a

20  component of that so...

21       Q.    Okay.  And I get that.  This kind of

22  seems like kind of back of the napkin sort of math

23  to me, though.

24       MR. SEELBACH:  Objection, argumentative.

25             You don't have to answer that.



1        A.    I won't answer that.  It's a little

2   bit -- a little bit insulting.

3        Q.    (By Mr. Arnold)  Well, I don't mean it to

4   be insulting but what -- I mean, you took three

5   round numbers, added them up, and multiplied by 19.

6        A.    On a client that I'm intimately familiar

7   with the numbers on and I know what he does on a

8   year over year basis.

9        Q.    Okay.

10        A.    So if that's back of the napkin math,

11   then --

12        MR. SEELBACH:  Objection.

13            Don't answer the question any more than

14   you already have.

15            Are we going to move on to a different

16   area?  You've asked the question about five to ten

17   times now.

18        Q.    (By Mr. Arnold)  If you think

19   Mr. Faulkenberry is losing $570,000 in gross

20   income --

21        MR. SEELBACH:  Objection, misstates his prior

22   testimony.

23        Q.    (By Mr. Arnold)  What do you think

24   Mr. Faulkenberry is losing in income over the next

25   19 years?



1        MR. SEELBACH:  Objection, vague and ambiguous.

2   Gross or net?

3            Don't answer if you can't.

4        A.    If you want to zero in on a much more

5   accurate number, that can be done.  That was not

6   asked for in this deposition today, but that can

7   absolutely be done.  I have all the numbers to do

8   it.  I just don't have them in front of me.

9        Q.    (By Mr. Arnold)  Okay.  That's what I'm

10  trying to get at here, is to me, I feel like

11  there's -- there's a way to get a much more

12  accurate number than this number, correct?

13       MR. SEELBACH:  Objection -- objection,

14  argumentative.

15       A.    I think there is a way to get a more

16  accurate number, and I think the number is going to

17  go up from there, to be honest.  I'm being

18  conservative on it.  There are other -- many other

19  factors there, so --

20       Q.    (By Mr. Arnold)  Okay.

21       A.    I see this all the time in businesses

22  so...

23       Q.    Okay.  I get that, and I know you weren't

24  asked to do an in-depth analysis in this case, and

25  I'm not trying to beat you up on it because I know



 1   that's not what you came here today to talk about.

 2       A.    Correct.

 3       Q.    But that's what I'm trying to ask you,

 4   is there is a more in-depth way of analyzing these

 5   numbers, correct?

 6       A.    There would be a more in-depth way of

 7   analyzing it.

 8       MR. SEELBACH:  Objection, argumentative, asked

 9   and answered.

10       Q.    (By Mr. Arnold)  Okay.  And there is also

11   a way --

12       A.    Like I said -- I'll state it again.  I

13   think you're probably going to come out to where

14   this is a conservative number based on the

15   additional things you would do to it.

16       Q.    Okay.  And that may very well be.  I'm

17   not going to fight you there.  There is also a way

18   of taking that more in-depth analysis, determining

19   a final number, and translating that back into

20   present value, correct?

21       A.    Correct.

22       Q.    Okay.  And that would be if I was going

23   to pay you for lost wages, I would not pay you

24   $570,000.  I would pay you some factor less than

25   that, correct?



1          MR. SEELBACH:  Objection, asked and answered.

2          A.    If you were paying me, I wouldn't only

3    be looking at lost wages.  I would be looking at

4    the business, what I would have sold it for in

5    19 years versus what I sold it for now.

6          Q.    (By Mr. Arnold)  Okay.

7          A.    So there'd be another -- if it were me

8    personally, there would be another component.  It

9    wouldn't just be looking at the lost wages.

10         MR. ARNOLD:  Okay.  I don't have any other

11   questions.

12         MR. SEELBACH:  No other questions.

13         THE VIDEOGRAPHER:  This concludes the

14   deposition of Kevin Mills.  Going off the record,

15   the time is 11:37.

16              (Deposition concluded at 11:37 a.m.)

17

18

19

20

21

22

23

24

25



```
1                  UNITED STATES DISTRICT COURT
               FOR THE WESTERN DISTRICT OF TEXAS
2                       AUSTIN DIVISION

3    LAWRENCE FAULKENBERRY,            )
                Plaintiff,             )
4    vs.                              )  1:15-CV-01089-SS
     CALDWELL COUNTY, TEXAS;          )
5    CALDWELL COUNTY SHERIFF'S        )
     OFFICE; CAPTAIN JESSE            )
6    HERNANDEZ; SERGEANT YOST;        )
     DEPUTY M. TAYLOR; and DEPUTY     )
7    HOUSESTON,                       )
                Defendants.           )
8
                    REPORTER'S CERTIFICATION
9          ORAL AND VIDEOTAPED DEPOSITION OF
                        KEVIN MILLS
10                    APRIL 25, 2017

11         I, Katrina Faith Wright, Certified Shorthand

12   Reporter in and for the State of Texas, hereby

13   certify to the following:

14

15         That the witness, KEVIN MILLS, was duly sworn

16   by the officer and that the transcript of the oral

17   and videotaped deposition is a true record of the

18   testimony given by the witness;

19

20         That the original deposition will be

21   delivered to Mr. Karl Seelbach;

22

23         I further certify that pursuant to FRCP Rule

24   30 (f) (1) that the signature of the deponent:

25
```



1        Was requested by the deponent or a party

2    before the completion of the deposition and that

3    the signature is to be before any notary public and

4    returned within 30 days from date of receipt of the

5    transcript. If returned, the attached Changes and

6    Signature Pages contain any changes and reasons

7    therefore;

8

9        I further certify that I am neither counsel

10   for, related to, nor employed by any of the parties

11   or attorneys in the action in which this proceeding

12   was taken, and further that I am not financially or

13   otherwise interested in the outcome of the action.

14

15       Certified to by me this 1st day of May, 2017.

16

17

18

19

20

21   _____
     KATRINA FAITH WRIGHT, Texas CSR 9220
22   CSR Expiration:  12/31/18
     ESQUIRE DEPOSITION SOLUTIONS
23   Firm Registration No. 283
     9901 IH. 10 West
24   Suite 800
     San Antonio, TX 78230
25   Telephone 210-331-2280



1   COUNTY OF TRAVIS )

2   STATE OF TEXAS   )

3        I hereby certify that the witness was

4   notified on _____, that the

5   witness has 30 days after being notified by the

6   officer that the transcript is available for review

7   by the witness and if there are changes in the form

8   or substance to be made, then the witness shall

9   sign a statement reciting such changes and the

10  reasons given by the witness for making them;

11       That the witness' signature was/was not

12  returned as of _____.

13       Subscribed and sworn to on this _____ day of

14  _____, 20____.

15

16

17

18

19

20  _____
    KATRINA FAITH WRIGHT, Texas CSR 9220
21  CSR Expiration:  12/31/18
    ESQUIRE DEPOSITION SOLUTIONS
22  Firm Registration No. 283
    9901 IH. 10 West
23  Suite 800
    San Antonio, TX 78230
24  Telephone 210-331-2280

25



1                    CHANGES AND SIGNATURE

2                        KEVIN MILLS

3                      April 25, 2017

4        PAGE/LINE        CHANGE                        REASON

5        _____

6        _____

7        _____

8        _____

9        _____

10       _____

11       _____

12       _____

13       _____

14       _____

15       _____

16       _____

17       _____

18       _____

19       _____

20       _____

21       _____

22       _____

23       _____

24       _____

25       _____



SIGNATURE

1          I, KEVIN MILLS, have read the foregoing

deposition and hereby affix my signature that the

same is true and correct, except as noted on the

previous page.



_____

KEVIN MILLS

THE STATE OF _____)

COUNTY OF _____)

     Before me, _____, on this day

personally appeared KEVIN MILLS, known to me (or

proved to me under oath or through _____)

(description of identity card or other document) to

be the person whose name is subscribed to the

foregoing instrument and acknowledged to me that he

executed the same for the purposes and

consideration therein expressed.

     Given under my hand and seal of office this

_____ day of _____, 20_____.



_____

NOTARY PUBLIC IN AND FOR

THE STATE OF _____

COMMISSION EXPIRES: _____



```
Exhibits

529720 MILL
S.KEVIN.
EXHIBIT27
66:16

529720 MILL
S.KEVIN.
EXHIBIT28
66:11
```

**$**

**$10,000**
29:3
45:23

**$12,000**
28:24
30:17
37:25
51:1,15
52:13,25

**$144,792**
66:7

**$25,000**
51:2

**$30,000**
24:17
39:22
40:19
51:2
79:13

**$42,000**
26:3

**$570,000**
27:21
28:3
41:5,15
44:1 45:2
46:3,5,11
69:19
70:3
71:1,16

```
72:9
76:20
78:19,24
80:19
82:24

$68,332
66:16

$76,460
66:11

$80,000
37:6
```

**0**

0000311
15:18

0000575
12:10

0000589
12:10

**1**

**1.2**
73:23
75:17

**10**
29:7
48:4,19

**10,000**
38:12
39:15
40:19

**11**
48:21

**110**
35:15

**115**
35:15

**115,000**

```
35:16

11:37
83:15,16

12
24:10
47:16
53:1

12,000
24:12
29:7
38:12
39:9
40:19
52:17

14
28:24
38:2
48:21

144,792
16:23

15
20:24
26:18
66:20

15th
13:11
19:18,24
25:17
26:11

16
17:13
20:24
26:18
47:14,15
48:20
67:4

170
16:11,18

170,000
16:19

171,000
16:22
```

**179**
24:15
29:3 30:4
36:1,8,19
38:6

**18**
33:10,13

**186**
16:11

**186,000**
16:22

**19**
27:10,16
29:8
40:25
41:2 42:7
45:2,23
46:3
69:19
70:4,12,
17 71:16
74:2
76:22
78:19
79:8
80:5,25
83:5

**19-year**
27:19

**1986**
6:12

**1st**
23:11,15
24:21
25:4

**2**

**20**
20:23
44:22

**2000**

```
10:5

2002
9:7,14
11:5,6

2005
47:4

2008
8:3 9:8
11:6 48:6

2009
9:14

2010
46:24,25
47:5,19,
24

2011
16:21
47:20,21,
22 48:9

2012
47:16

2013
12:21
30:16
51:3

2014
16:21
23:24
26:3 30:9
38:22
39:7 51:2

2015
12:21
13:11
15:14
16:8,12,
23 17:10,
13 19:18,
24 20:1
25:18
26:11
66:6,20
```

KEVIN  MILLS, CPA                                    April 25, 2017
FAULKENBERRY vs CALDWELL COUNTY            Index: 2016..advantage

67:3

**2016**
12:22,24
16:12,24
17:10
23:12
26:3
47:21,22
67:6

**2017**
23:8,11,
15 24:21
25:4 35:7

**25,650**
39:10

**27**
12:7 15:9
27:16

**28**
15:17

───────────
**3**
───────────

**30**
6:8 40:25
70:16,17

**30,000**
29:7
38:13
40:20

**31st**
23:24
55:17

───────────
**4**
───────────

**4,000**
36:17

**40**
42:18
51:25

**48**
26:25

**49**
27:5

───────────
**5**
───────────

**5,000**
36:15

**50**
20:17

**55**
42:18

**570**
41:3

**570,000**
29:8
37:19
40:21

**576**
53:6

**577**
39:3
54:15,17,
18

───────────
**6**
───────────

**60**
51:24

**67**
27:5
40:24
41:23
42:2,10,
11,12,15

───────────
**7**
───────────

**70**

**51:12**

**700**
30:17

───────────
**8**
───────────

**8**
28:25
38:2

**8,000**
29:7
38:12
39:14
40:19

**80,000**
37:5

**80s**
8:24

**8th**
55:19

───────────
**9**
───────────

**9**
48:5

**90,912**
16:24

**97**
10:4

───────────
**A**
───────────

**a.m.**
83:16

**abilities**
18:14

**ability**
18:23
19:3
24:25

67:21,22,
23

**absolutely**
81:7

**accelerated**
29:4
36:3,10,
18

**accept**
59:17

**accident**
18:1

**accompanyin**
**g**
53:9,15

**accordance**
53:12
54:4,23
55:24
56:2,10

**accountant**
19:17
46:21
48:14
56:22
69:17

**accountant'**
**s**
53:3

**accounting**
6:23,25
7:1,25
8:4 9:1,
4,20
10:5,16,
21 11:13
13:3,8
19:16
23:3
25:14
26:7,22
53:13
54:5,24

55:11,25
56:3,10
58:6
70:23

**accounts**
65:1

**accrual**
55:13,19

**accruing**
55:16

**accuracy**
57:17

**accurate**
56:19
57:15
81:5,12,
16

**acquired**
14:6
20:23

**actuarial**
42:22

**add**
24:16
28:1,18
29:6

**added**
28:1,6
38:6 80:5

**adding**
30:3

**additional**
39:19
42:8 65:8
82:15

**adjusting**
52:20

**admitted**
58:24

**advantage**



49:6

**advantages**
49:8
50:13

**affected**
19:7,11
43:22
68:12

**affects**
22:1

**affirmative
ly**
73:1

**age**
27:4,7
40:24
41:23
42:2,10,
11,12,19
70:12
79:8,15

**agencies**
18:3

**agree**
8:5 12:25
13:5 72:5

**ahead**
18:17
43:19

**alive**
42:2

**ambiguous**
52:15
62:25
81:1

**AMD**
9:17

**amount**
14:12
21:4,12,
18,20

24:15
40:4
51:23
68:3
76:25
79:12

**analysis**
15:15
41:5
45:18,21
46:2
65:23
71:15
72:8,25
73:8
81:24
82:18

**analyst**
9:19

**analyzing**
82:4,7

**annual**
73:24
75:18

**answering**
77:5

**answers**
32:5 79:2

**anticipate**
65:24

**apples**
64:24

**application**
10:14

**appraisal**
75:3,4

**approximate
ly**
14:2,3
24:10,17
31:22
52:13

76:14

**area**
14:13
31:21
34:10,11,
12 44:13
45:11,12
74:19
77:12
78:6
80:16

**argumentati
ve**
67:25
79:24
81:14
82:8

**Arnold**
18:15
19:21
20:2
31:15
32:14,18,
20 35:18
38:17
43:12
44:9,10
45:17
48:8
52:22
54:11
58:2
63:6,24
64:16
66:5
68:14
70:1,20
71:12,24
72:19
73:16
76:1,7,17
77:9 78:2
79:18
80:3,18,
23 81:9,

20 82:10
83:6,10

**assessment**
16:6
23:13
29:9

**asset**
36:22

**assets**
29:5
39:18

**assist**
57:5,13

**assume**
29:13
64:6
70:20
76:20

**assumes**
29:16
44:2 64:2

**assuming**
41:23
43:14
63:22
77:24

**assumption**
27:8
41:25
42:1,9,13
56:21,23

**assurance**
53:11
54:3 56:4
57:8,24

**attached**
54:14

**attention**
69:1

**attorney**
68:24

**attorneys**
77:25

**attributing**
39:25

**audit**
24:24
25:8
53:17,21
57:18,23
61:11,15

**audited**
53:8,15

**Austin**
6:9 9:2
10:22
31:23

**average**
20:16
29:17

**averaged**
16:22
53:1

**award**
70:21

**aware**
18:22
20:19,21
43:5
44:14

_____

**B**
_____

**bachelor's**
6:24 7:1,
5,7

**back**
8:24 9:2
14:15
17:20,24
18:8,25
19:1,2,15
21:22,25



23:20
24:16
28:17
30:3
33:12,14,
18 34:19
38:16,19
39:6
40:11
42:19
46:23
47:7,16
48:6,7,
14,17
52:18
68:17,18
69:11,13,
20 72:20
73:13,22,
23 79:5,
22 80:10
82:19

**background**
8:4

**backup**
65:12

**balance**
50:11
58:9

**bank**
60:10,11

**banks**
58:15
59:17

**base**
42:17
57:21
73:21

**based**
27:7,15
29:11
31:4
33:23
42:9

43:20
52:11
67:4
68:9,10
79:3,4,8
82:14

**baseline**
48:25

**basic**
7:24 58:8

**basically**
13:19
23:12
31:25
51:16
67:8
68:18

**basing**
42:7

**basis**
22:1
53:13
54:5,24
55:10,12,
13,19,20,
21,25
56:3,10
58:6 80:8

**Bates**
12:9
15:17
53:6
54:15,18

**beat**
81:25

**beating**
78:7

**before-and-
after**
8:10,13

**beginning**
7:25

58:12
66:25

**benefits**
41:18

**big**
22:8 67:3

**bike**
19:4

**bikes**
14:22

**bill**
55:17

**bit**
6:14 16:8
21:1
37:10
72:21
78:8 80:2

**blame**
71:24

**bled**
67:4

**borrow**
38:24

**bottom**
39:3

**bought**
13:19
14:14
29:6
39:18
68:5
75:5,8

**breaking**
68:4

**brick**
22:6,9,17

**Briefly**
8:25

**bring**

68:11

**bringing**
22:4

**broad**
8:1,4

**brought**
68:25

**built**
9:23
73:21

**bulk**
13:20
14:9,15

**bunch**
37:13

**business**
8:23
11:3,12
13:2,18
14:9
18:14
19:19
20:11,20
21:2,11
22:5,22,
24 23:14,
21 24:1,
24 25:1,
2,5,10
29:15,20
30:14,21
31:2,4
32:25
34:11,20
35:4,6,9,
19 40:4,
5,23
41:10
42:16
43:2,8
45:13
49:2,5,9
50:9
57:21

65:23
67:21
68:2
74:1,8,
10,23
75:10,21
76:3,5,6,
15 83:4

**business-
related**
27:23

**businesses**
17:7
73:19,25
75:5,8
81:21

**buy**
14:8,9
18:20
19:13
22:12,13,
14 26:14
31:6 32:1
36:4
37:5,6,8

**buying**
59:25
60:2
75:6,9

———————

**C**

———————

**calculate**
28:19
39:21
45:14,16,
17 46:13,
14 73:14

**calculated**
28:16
37:20
41:22
42:20
44:2 71:3



calculating
 8:6,9
 76:23
calculation
 29:10,14
 30:8 44:8
 45:4,5,15
 66:24
 77:3
 78:20
calculations
 45:11
calculator
 66:14
Caldwell
 70:24
call
 21:6 25:1
 58:9 65:5
called
 9:15
 10:22
 36:18
 54:16
 65:16
calls
 18:15
 19:21
 35:12
 43:10
 45:7 48:1
 63:17
 64:11
 70:6
 71:5,18
 72:11
 73:11
capacity
 44:12
capitalization
 74:15

careful
 63:3
case
 12:11
 15:11
 34:6
 60:9,14
 64:8
 68:15
 70:3,25
 71:1
 72:9,21
 73:3
 77:15
 78:12
 81:24
cash
 21:14
 22:1 41:4
 45:18,20
 46:1
 55:12,18,
 21 58:11,
 12,18
 59:5
 71:14,19
 72:8,16,
 24 73:8
 74:12
 75:10
cataloging
 68:7
categories
 58:14
caused
 17:14,24
 18:5,13
causing
 34:23
certainty
 13:3,8
 25:14
 26:7,22

change
 59:23
 60:2
 70:14
changed
 9:16
 59:25
charge
 31:2
 58:17
chart
 64:16,17
 65:5
charts
 42:5
Chop
 11:23
 12:1
 13:2,7,
 12,17,24
 14:6,19
 15:13,25
 16:7
 19:25
 24:2,20
 25:5,16
 26:9
 27:9,18
 29:10,20
 49:10,24
 50:19
 52:24
 61:5
circles
 79:2
clar
 54:25
clarifies
 53:19
clarify
 76:2
clarifying

55:4
classify
 28:4
clear
 9:10
 16:14,19
client
 32:23
 42:17
 57:21
 59:14
 80:6
clients
 20:7,14,
 15 22:11
 31:20
 32:21
 37:3
 60:11
close
 20:17
 31:25
 49:20
 50:10
closely
 29:19
code
 52:8
college
 6:14,15
 8:20,22
comfortable
 62:19,23
 75:1
 77:13
 78:23
 79:11
comment
 43:24
common
 37:2

community
 33:5
companies
 9:11 11:1
 32:13
 51:13
company
 9:1,6,13,
 16,18
 10:19,21
 11:8
 30:25
 31:1
 36:8,11
 60:1
comparable
 48:22
comparative
 15:5,10
 16:3
 21:16
 25:24,25
 27:15
 50:23
 54:13,22
 56:18
 62:4,7
 63:12
 64:19
 65:4,6,
 10,17
 66:6
 68:16,22
compare
 64:23
 68:19
compared
 64:17
 66:2 67:6
comparing
 15:8
compensate
 70:22



71:2
78:14

**compensated**
72:6 73:5
77:15,22
78:5

**compilation**
24:23
53:3 56:6
57:5 63:1

**compilations**
61:12

**compiled**
61:10

**compiling**
54:10

**complete**
16:20
24:11

**completely**
57:15

**complex**
79:17

**complicated**
79:15

**component**
78:3
79:20
83:8

**components**
26:16
29:24
51:9

**computer**
36:4,5

**computers**
29:5

**concept**
44:14,17,

18

**concern**
25:2,6,9
32:16

**concluded**
83:16

**concludes**
83:13

**conclusion**
19:22
63:18
70:6 71:5

**conclusions**
59:21

**configuring**
10:11

**connected**
34:1

**connection**
15:15,19
23:2

**conservative**
28:4,14
30:10
81:18
82:14

**considered**
48:20

**consistent**
77:7

**consistently**
77:6

**consult**
26:16

**consulting**
11:11

**consumer**
14:24

**containers**
29:5

**continue**
25:1,5

**continued**
27:9

**continuing**
40:23

**contract**
51:6,8

**control**
9:22
56:12

**copy**
12:13
15:20,24
38:23

**core**
34:11

**corp**
8:24
12:3,4
29:23
30:6
36:14
39:14
49:10,14,
15,16,18,
23 50:16,
17 51:23
52:9

**corporation**
29:19

**correct**
12:13
15:24
22:25
23:5,6
25:12
31:3 34:6
35:5
38:13

39:4
40:7,8
41:1,24
42:3,11
43:9
44:4,15
45:24
46:5,6
48:11
49:9,13
50:8,22,
24 51:21
54:5 55:9
56:14,20,
24 57:1,
10,11
61:19
63:23
64:3,21,
22 66:8,
11,12,20
69:20
72:25
73:3
74:15
76:3,8
81:12
82:2,5,
20,21,25

**cost**
9:19
26:16
57:22
66:10,24

**costing**
67:8,10

**costs**
59:14

**count**
55:18,20

**country**
13:20
14:11,22
32:2

**County**
70:24

**couple**
9:17
10:22
15:21
23:23
36:22

**court**
32:6

**coverage**
8:2

**covers**
79:14

**CPA**
7:2,9,10,
11 9:5,8
58:1
61:21
72:22
73:6,23
75:3,17

**create**
65:4

**created**
68:15

**credits**
8:1

**crisis**
8:24

**crunch**
27:13

**current**
43:2,21
48:21

**customer**
73:21

**customers**
13:25
14:3,19
31:18



73:22

---

**D**

**daily**
21:23
22:1

**data**
9:23
29:11
47:17,20,
21,23
48:9
56:18
61:3
62:4,9
64:14

**daughters**
6:3

**day-to-day**
68:13

**days**
7:13

**dead**
78:7

**deal**
32:21
75:6

**dealings**
17:7

**dealt**
22:7

**debits**
8:1

**debt**
20:23,25
21:1,4

**December**
23:24
55:17

**decent**
66:23

**decide**
71:8

**decline**
19:18
20:10,19
26:1,10
34:20
65:22

**declined**
31:4 66:1

**deducting**
51:18

**deduction**
21:23
29:4
30:21

**deductions**
55:16

**deeper**
28:11
73:25
79:6

**Defendant**
70:25

**defendants**
70:25

**definition**
34:24
35:1

**degree**
6:24 7:1,
5,7 13:3,
7 25:14
26:7,22

**deliberations**
79:16

**demand**
22:19

**depending**
75:14

**deposition**
81:6
83:14,16

**depreciate**
36:6,21
49:12

**depreciation**
24:15
29:4
30:3,4
36:1,3,8,
10,16,18,
19,21
37:13
38:7
39:15,19
40:20
49:20
79:7

**depth**
57:14

**derive**
40:9

**derived**
40:4

**describe**
7:17 11:7
15:9

**designed**
60:19
61:1

**designing**
56:11

**detail**
24:19
38:20

**detailed**
9:24

**determine**
41:5,8
42:5,23
72:8 73:8
75:21
76:2

**determining**
29:22
82:18

**differently**
77:5

**dig**
79:6

**direction**
32:9

**directly**
6:14,15
21:25

**Disability**
40:15

**disclaimer**
57:20

**disclose**
61:13

**disclosures**
58:4,20
59:19

**discount**
45:18
77:3

**discounted**
41:4
45:20
46:1
71:14,19
72:8,16,
24 73:7
74:12

**discussions**
33:17
43:20

68:9

**distressed**
10:25

**distribution**
52:1

**divide**
74:18

**doctor**
18:9 19:1
34:3

**document**
15:15,19,
25 16:5
25:23
54:6
55:1,2
57:12

**document's**
15:17

**documents**
12:16,18

**dollars**
36:5,9,12
45:24

**door**
22:12

**downtown**
9:2 10:21

**drive**
17:19

**driving**
33:12

**drop**
16:25
17:12
76:14

**dropped**
16:12,23,
24



KEVIN MILLS, CPA
FAULKENBERRY vs CALDWELL COUNTY

April 25, 2017
Index: drove..extent

drove
17:19

due
17:20
18:21

dug
28:10

duties
9:5 10:8

dwindled
30:17

---
E
---

earlier
20:6
33:14
34:18
47:9,17

early
20:24
35:7,8
70:13

earn
44:24

easy
73:24

eat
30:23,24
31:9

ebay
13:23
21:24
22:3,4,
12,14,15,
19,23
23:2 32:3
68:8

elect
36:11

elected
58:3

election
36:25

Elgin
6:8

emergency-
based
21:7

employed
43:15

employees
11:15,16,
17 51:10

encompass
10:8

end
17:10
23:12,24
49:21,25
58:12
60:12
74:2

ending
67:1

enforcement
18:2

engage
43:1

engaged
42:15
72:12
73:12

engagement
41:11
79:3

enormous
21:20

entity
29:20

49:16

entity's
59:21

equipment
39:13

error
72:3

essentially
45:22

estate
9:1 10:21

estimate
38:11
39:23

ethical
61:20

event
8:17

eventually
9:21

evidence
29:21
63:16

exact
13:11
21:4,12

exam
7:2,11,
13,14,15

EXAMINATION
5:19
31:14

excerpt
15:24

excludes
27:25

exercise
38:21
42:24

exhibit
12:7
15:9,17
27:15
39:17

existing
32:22
67:2,6,16

expect
65:15
66:4
67:3,11

expectancy
42:5,21

expected
67:2

expense
12:20
30:22
31:2

expenses
21:15
26:2
27:23
30:13
41:14
51:20
52:3
55:21
59:22

experience
7:9 8:20
25:16
26:9
42:14
52:11
72:22

experienced
27:19

expert
12:9,13
65:22
74:8

expertise
19:16
34:10,12
44:13
45:12
74:19
77:12
78:6

explain
7:3 16:6
21:8 22:3
23:1
28:20
30:12
34:25
44:17
66:5,22

explaining
65:25

explanation
21:11
67:7

express
53:10
54:3

expresses
46:18

extensive
14:14

extent
35:11
43:12,18
44:7 45:6
47:25
52:14
57:20
63:17
64:10
65:21
69:22
70:5
71:4,17
72:10
73:10



76:9
77:17

**extra**
7:6

**extrapolate**
24:9

_____

**F**
_____

**facility**
31:23

**factor**
30:14
75:9
82:24

**factors**
45:21
75:9
81:19

**fair**
20:18
34:13
56:9,13
65:2
70:24

**falls**
19:14

**familiar**
32:24
80:6

**family**
6:1

**Faulkenberry**
11:19
12:4,10,
22 13:1,
6,14
15:18
17:15
20:22
21:8

26:25
27:8
31:19
33:15,21,
22,24
34:16
35:3,20
41:23
42:8,21
43:1,6
44:2 47:6
49:1,4
54:18
55:8
56:17
59:1
61:8,14
64:3
66:7,19,
23 69:2,
7,10,18
70:2,21
71:1
76:22,24
77:14
78:15
80:19,24

**Faulkenberry's**
17:24
19:19
20:11,20
22:5,20
23:7,13
24:1
29:14
30:13
34:14,19
40:1,6
44:11
46:18,21
50:1
52:12
69:13
75:21
76:3,8

**feed**
31:7

**feeds**
9:23

**feel**
66:14
77:5,13
79:1
81:10

**fees**
21:15,19
57:23

**fell**
33:10

**felt**
32:25
48:24

**field**
53:23

**fight**
82:17

**figure**
28:5 45:1
52:23
71:15
78:21

**filed**
65:13

**fill**
12:17

**final**
82:19

**finally**
61:4

**financial**
7:23 8:15
10:15
11:10
25:8,24
30:15
54:10

56:9,13
57:6,10
58:5,21,
23 59:4,
12,19
60:13,25
61:2,10
64:13

**financially**
23:14
24:2,20
25:11

**financials**
58:19

**financing**
58:13

**find**
31:6

**fits**
22:4

**five-year**
16:4 47:9

**flavor**
7:20

**flow**
22:1 30:2
41:4
45:18,20
46:1
71:14,19
72:8,25
73:8
74:12
75:10

**flow-through**
30:1
49:16

**flows**
36:13,14
49:17
50:3

58:11,18
59:5
72:16

**fly**
17:18
71:22

**focus**
19:15

**Foods**
9:3 10:3,
4 22:8

**form**
18:15
57:7
62:18

**forthcoming**
64:6

**forward**
74:1

**four-part**
7:12,13

**four-year**
16:11

**frame**
8:7
11:21,24
27:20
46:23

**frames**
15:12

**free**
66:15

**friendly**
32:11

**friends**
33:2

**fringe**
41:17

**front**
24:13



25:23
47:23
81:8

**full**
5:21
70:12

**full-blown**
57:23
59:3

**full-time**
9:8 11:6,
16

**future**
8:6 17:9
25:3,10
37:16,18
41:8
43:23
44:20
72:6
73:6,9

_____

**G**

_____

**garage**
14:25

**gas**
75:15

**gas-related**
30:19

**gathering**
65:15

**gave**
23:25
28:4

**general**
75:18

**generally**
36:9
50:16
58:18

59:16

**generate**
17:5
26:19

**generated**
23:20

**gentlemen**
7:4

**give**
7:20 8:19
9:10
15:14
17:11
29:3 32:5
39:5
45:22
62:18,24

**giving**
54:21
62:19,23
77:14

**glance**
15:20

**globally**
14:23

**good**
31:17
37:11
44:20
48:25

**goods**
66:8,10,
25

**Gotcha**
41:3

**graduate**
6:10

**grand**
70:17

**groceries**
31:6

**grocery**
22:8

**gross**
40:1
50:1,5
52:13,20
66:16
80:19
81:2

**ground**
18:7

**group**
9:22

**growth**
29:14

**guess**
42:19
43:3
52:21
53:20
61:20
62:10
63:11,20,
24 79:8

**guessing**
24:12

**guys**
14:21
33:1

_____

**H**

_____

**half**
36:9

**hand**
12:6

**handed**
16:5

**handing**
15:16

**happen**
17:10

**happened**
8:17
14:10
24:1 31:5
34:23

**head**
35:14
73:1

**health**
34:15

**heavy**
19:5

**held**
29:19

**helpful**
48:13

**Hey**
37:4

**high**
6:7,8,11,
13 28:13
57:24
70:16

**higher**
38:8
53:17
58:16
59:10,13

**highs**
72:14

**historical**
29:11
61:3

**historically**
17:6 38:1
39:17

**history**
16:4 47:9

**Hold**
65:20

**home**
14:25
18:2

**honest**
81:17

**horse**
78:8

**hotel**
30:18

**hour**
31:22

**house**
50:19
67:24

**household**
41:20

_____

**I**

_____

**idea**
50:9
69:4,6,9,
15

**identify**
70:9

**imagine**
19:6

**imbedded**
27:22
29:1

**immediately**
10:2
21:25

**impacted**
21:2

**impairs**
61:8



implementing
   56:11

improved
   69:14

in-depth
   81:24
   82:4,6,18

inability
   17:15
   26:14
   68:10

incident
   18:1
   19:17,24
   23:25

include
   27:22
   30:9
   41:14,17

included
   30:8
   31:11
   35:17
   58:5,21
   59:19
   64:18

includes
   51:13

including
   27:17

income
   7:19
   12:20
   15:5,7,10
   16:4,10
   21:16
   25:25
   27:15
   39:22
   40:1,4,7,
   9,13,14
   41:8

46:18
49:10
50:1,2,5,
7,14,23
52:13,17,
21 53:9,
11,12,16
54:4,5,
11,13,22,
23 55:10,
15,20,21,
24 56:3,
10,18
57:7
58:6,9
60:19
62:5,7
63:12
64:18,20
65:4,6,
10,17
66:6,16
68:16,20,
22 69:19
70:3,10
71:2 73:9
74:18
76:8
78:17,19
80:20,24

Incorporate
d
   49:24

independenc
e
   61:9,23

independent
   61:5,9

indirect
   17:25

individual
   13:22
   14:24
   15:3 19:6

individuall
y
   50:17

industries
   75:16

industry
   8:2 13:25
   14:4 20:9
   31:19
   43:21
   47:3

influence
   59:20

information
   12:18,20,
   22 57:2,6
   59:23
   60:1,16
   63:22
   64:2,7
   79:4

informed
   60:20

initially
   10:6

injured
   18:8
   66:19

injuries
   43:18

injury
   17:20,24
   18:5,21,
   25 19:1
   33:14,19
   34:19
   69:20

instruction
s
   68:14

insulting
   80:2,4

intangibles
   73:21

interacting
   10:10

interfaced
   10:16

intermediat
e
   7:25

internal
   56:12

interpret
   64:14

interpretin
g
   65:25
   72:17

interrupt
   16:15

intimately
   80:6

invades
   70:6
   77:18

inventory
   9:21 14:6
   16:25
   17:8,12,
   13,21
   18:21,24
   19:12
   26:10,15
   66:25
   67:1,2,4,
   7,8,9,16

inverse
   67:10

investigate
d
   42:25

investigati
on
   44:11

investing
   58:13

involved
   57:23

issue
   19:3 25:9
   30:11

issues
   34:15

issuing
   54:10

items
   67:23

─────────────

            J
─────────────

January
   13:11
   15:14
   16:7
   19:18,24
   23:11,15
   24:21
   25:4,17
   26:11
   35:8
   55:19
   66:20

job
   8:20
   10:8,18
   42:11
   43:6

jobs
   43:1

jump
   57:4

jury



KEVIN MILLS, CPA
FAULKENBERRY vs CALDWELL COUNTY

April 25, 2017
Index: jury's..loss

7:4 13:16
22:4
28:20
30:12
34:9
44:18
60:15
63:7,12,
15 64:9
70:7,21
71:7
77:18
78:13,14,
21,24

**jury's**
11:25

————————————

**K**

————————————

**K1**
36:13,15
39:16

**Kevin**
5:23
83:14

**kiddos**
6:4

**kind**
7:4 9:3,
10,21
10:15
11:11,12
21:6 53:6
60:3
62:10,14,
17 63:25
64:23
74:5
75:13
79:21,22

**knew**
33:6

**knowledge**

31:5
33:16

————————————

**L**

————————————

**label**
54:15,18

**labeled**
12:9
15:17

**labor**
51:6,8

**lack**
17:12

**ladies**
7:3

**language**
54:8
60:4,22

**large**
11:1

**Larry**
11:18
14:8
17:24
18:18
19:19

**Larry's**
18:14

**late**
20:23

**law**
18:2

**Lawrence**
12:4
13:14
17:1
33:23
68:24

**laws**

70:14

**lawsuit**
12:14
23:25

**layperson**
18:12
56:1

**leads**
39:21
66:15

**leave**
71:7

**left**
28:23

**leftover**
30:1

**legacy**
10:12

**legal**
19:21
56:4,5
60:22
62:13
63:18
70:6 71:5

**legally**
52:8

**Legerity**
9:15

**legitimate**
30:20
31:1

**legitimatel
y**
49:6

**lending**
21:6,20

**letter**
54:12
58:1 60:8

63:14

**level**
17:5
24:17
28:13
43:2
53:20
57:24
58:16
59:10
62:20,22
70:16

**levels**
53:18
61:24

**life**
36:7
42:4,21

**lifetime**
19:2

**lift**
18:23
19:3 69:3

**lifting**
19:9

**limit**
70:18

**limitation**
18:23

**list**
8:19 9:11

**live**
5:24
31:20

**lives**
31:22,23
35:20,22

**living**
30:13

**LLC**
12:3

13:15
16:1
61:6,7
62:2

**loan**
7:10 8:23
10:19
21:19,21
60:12

**loans**
21:17,22
23:18,20

**local**
18:2
34:1,2
59:17

**Lockhart**
5:25 6:2
14:13
22:17
31:21,24,
25

**long**
11:18
17:16
37:17
46:20

**longer**
35:20
44:25
47:1

**looked**
47:21

**lose**
69:19

**losing**
50:10
76:22
78:18
80:19,24

**loss**
8:16 9:25



25:17
26:5
27:17
41:20
58:10
71:11
73:6
77:21
79:12

lost
8:6,9
9:24
19:25
29:10,22
41:8 44:7
46:18
65:23
70:3,9,21
71:2,10
72:7
77:15,20,
21 78:17
82:23
83:3,9

lot
11:9,10
30:18
37:12
57:25
70:11
73:25
74:22
75:9,11
77:23
79:9,17

lottery
44:20

loud
38:15

lower
38:8

lows
72:14

—————————
M
—————————

machine
37:5,6

made
32:25
57:10

maintaining
56:11

make
36:25
37:8 50:9
56:21

makes
49:9
52:12

making
30:6
43:7,8
56:17

management
55:5,6,7
56:8,16
57:6,13
58:3 62:8

management'
s
63:4

manager
9:1

Marcos
6:19,20

marked
12:7
15:16

market
9:3 10:4
20:12,13
22:16
58:15

59:15

match
12:23
64:19

material
57:9

math
37:21
66:13
79:16,22
80:10

matters
60:20,21

meals
27:24
30:20
31:12

meaning
25:2 61:6

means
34:21
55:15
56:16
57:12
59:24
61:7,14,
22 74:9

medical
18:12
34:3,5,8
41:14

meet
17:3 72:4

meetings
17:2

member
12:5
13:15

mentioned
17:12
20:6

method
8:9,10,13
36:21
52:2

methods
72:13
75:17

miles
6:8

million
36:9

Mills
5:20,23
6:7 12:6,
12 13:15
83:14

Mills'
12:9
65:22

mind
37:15

mine
79:19

mischaracte
rizes
44:7

missing
47:23

misstates
69:23
76:10
80:21

mixture
7:22

mobility
43:3

modificatio
ns
57:9

moment

17:11
24:19

money
43:7
44:15,19,
23 45:10
46:4
50:10
51:25

mortar
22:7,9,17

mortgage
10:25

motion
19:2

motorcycle
13:20
14:13,25
15:1
22:17
31:21
32:2,21
33:8,10
42:16
43:2 49:2
68:3 69:8

motorcycles
13:19
68:5

mouth
33:3

move
80:15

moved
35:24

movie
43:16

moving
74:4

multiple
7:13 15:6



74:9

**multiplied**
80:5

**multiyear**
15:6

—————————
        **N**
—————————

**names**
9:11

**napkin**
79:22
80:10

**narrative**
64:11

**nature**
13:17

**necessarily**
60:24

**needed**
21:9,10

**negotiations**
79:17

**net**
36:17
39:22
40:3
49:17
74:18
77:2 81:2

**news**
34:1,2

**nods**
73:1

**normal**
30:4
60:12

**notepad**
27:14

39:5

**notes**
58:22
59:2,3,5

**notice**
51:6

**November**
37:4

**number**
7:10
16:11,20
21:4
28:3,13,
16,20
29:2 36:6
37:19
38:7
39:3,18
40:22
41:5,15,
22 44:1
45:24
46:11,17
49:20
50:25
51:2,6
68:19
76:21
78:24
81:5,12,
16 82:14,
19

**number's**
39:15

**numbers**
16:9,16,
25 24:8,
11,13
25:21
27:13
28:17
32:12
33:18
43:22,23

59:22
64:17,19
65:9,12,
18,25
67:4
70:8,16
72:17
76:13
78:22
80:5,7
81:7 82:5

—————————
        **O**
—————————

**object**
35:11
44:6
57:19
63:17

**objection**
18:15
19:21
20:2
32:10
43:10
45:6
47:25
52:14
54:6
55:1,2
62:25
64:10
65:20
67:25
69:22
70:5
71:4,17
72:10
73:10
75:23
76:4,9
77:1,17
78:25
79:24
80:12,21

81:1,13
82:8 83:1

**objective**
57:5

**obtain**
21:21
46:5 57:8
60:11
76:25

**obtainable**
47:18

**obvious**
63:3

**occasionally**
17:18

**occurred**
19:17,24

**October**
37:4

**offer**
34:9

**offers**
11:8

**office**
9:7 11:5
22:13
24:14
28:17
32:24
38:20
49:12
50:18
51:17
58:19

**offset**
37:11

**offshore**
9:23

**omit**
58:3,18

59:3

**omits**
65:21

**omitted**
59:19

**online**
13:23
22:8
31:21
32:21

**open**
11:5
22:18

**opened**
9:7

**operating**
39:22
74:18

**operations**
68:13

**opinion**
19:16,23
24:19
25:13
26:6,21
53:10
54:3,22
59:24
60:2
63:15
64:8 73:6
77:14

**opinions**
12:17
13:6 34:8
65:22

**order**
46:5 71:2
76:24

**ordinarily**
58:4,20



original
  68:24

owned
  13:13
  38:3
  50:18

owner
  30:2,6
  36:15
  49:9
  51:24

owner's
  29:21,25

owners
  49:18

ownership
  9:16
  13:12

―――――――――

    P
―――――――――

P&l
  12:24
  15:7
  27:22
  38:22

paid
  9:25
  21:20,22,
  25 23:19
  24:9 29:1
  38:1,2,4
  39:14
  44:25
  51:7,8
  55:22
  70:2 71:9
  73:13
  76:24
  77:22

paper
  32:17

paragraph
  53:19
  55:5 56:7
  57:3 58:3

part
  7:23,24
  13:21
  18:8
  19:12
  27:25
  35:8,23
  39:9,16
  42:1,24
  49:4
  53:22
  54:9,20
  61:20
  78:20

part-time
  9:7 11:5,
  17

parted
  14:16

parting
  19:4

partnership
  49:17

parts
  13:20,22
  14:13,22
  22:18
  31:21
  32:2,21
  42:16
  43:8 49:2
  68:5,11
  74:4

pass
  31:13

passed
  7:15

past
  8:6

pattern
  26:1
  31:11
  48:18

pay
  22:15
  23:20
  49:11,19
  50:4,15
  51:23
  52:7
  55:19
  71:1
  82:23,24

paying
  27:18
  37:13
  50:13
  51:3,16,
  17 83:2

payments
  44:21

Paypal
  21:23
  22:15

payroll
  11:11,13
  24:10,12
  39:9
  50:25
  51:5,10,
  11,12,15

pays
  49:12
  51:1

peer
  59:11

pending
  12:14

people
  42:15
  51:3,5,7
  58:9

60:24
  72:2
  75:6,11

Peoplesoft
  10:12,15

percent
  20:17
  51:24
  52:1

percentage
  74:18

perform
  62:20

performance
  15:13
  16:7

performed
  10:1
  24:23
  79:3

period
  8:18 9:5
  16:12
  34:23
  44:25
  64:24
  66:1
  71:13
  76:13
  78:19

periodic
  44:21

person
  63:11

personal
  27:23
  30:22
  31:8
  34:15
  40:2,6
  50:7
  52:12,18

76:8

personally
  83:8

phrase
  34:18

physical
  18:14

physically
  42:10

pick
  22:14

picture
  30:5,15
  78:4

pieces
  19:6 30:7

places
  43:14

Plaintiff's
  15:19

planning
  37:9 52:6

plenty
  22:19

pocketbook
  31:8

point
  7:8,12
  10:17
  22:9
  23:21
  24:3 37:7
  64:14
  72:18
  78:13

pool
  59:13

portfolios
  11:1



portion
 30:19
 67:3 68:9

possibly
 43:8

post
 8:20

potential
 20:10,19

practice
 73:23
 75:17

practicing
 11:4

preceding
 63:14

predatory
 21:6,19

preparation
 56:8,12

prepare
 58:24
 59:6
 64:5,13

prepared
 12:21
 15:10,25
 23:8 58:5
 62:5

preparing
 7:19
 12:16
 22:21
 23:3

presence
 22:11

present
 11:6 20:1
 25:18
 26:11
 45:10

 72:9 73:8
 77:2
 82:20

presentatio
n
 56:9,13

presenting
 57:6 61:3

pretty
 8:3 16:10
 21:13
 43:15
 62:1,2
 73:24

previously
 12:11
 15:18

primarily
 19:11

printed
 47:15

prints
 47:8,13

prior
 8:3 15:13
 16:7
 20:16
 21:13
 23:5
 65:21
 69:23
 80:21

privacy
 32:16

problem
 78:12

procedures
 53:18,23
 57:16

proceeding
 71:23

process
 51:11
 72:16

processed
 21:24

procurement
 26:10

produced
 12:11
 15:18

product
 9:22 10:1
 13:21
 17:4,22
 26:19

production
 15:19

products
 14:20

profession
 44:12

professiona
l
 63:15

professiona
lly
 54:21
 62:16

profit
 8:16
 23:19
 24:16
 27:17
 28:24
 30:1,9
 36:13
 37:3,5,6,
 14 38:5
 40:3 44:7
 49:16,22,
 24 50:12
 58:10

 65:23
 71:10
 76:15
 77:21
 79:12

profit's
 49:25

profitabili
ty
 26:4

profitably
 67:21

profits
 8:6,10
 20:1
 25:17
 26:6
 29:10,22
 36:16
 37:11,12

prohibitive
 57:22

project
 10:13
 27:16

projected
 40:22

projecting
 71:10

proper
 72:7 73:7
 76:23

properties
 50:16

property
 35:17,18,
 19,21,23
 38:4
 49:13

prove
 57:17

provide
 53:11
 54:3 56:4
 57:8

provided
 12:22

providing
 57:1 62:9

province
 70:7
 77:18

proximate
 34:19,21
 35:1

proximately
 19:18,25

pull
 40:11
 42:22
 52:18
 65:14

purchase
 26:17

purchased
 17:5
 67:19

purchases
 17:22
 26:2,17,
 18 67:1

purely
 25:21
 27:25
 70:15

put
 19:9,12
 23:21
 54:9 56:5
 60:4,5,23
 62:7,15
 65:10
 68:19,21



puts
    59:13
    64:22

putting
    68:7

———————————
        Q

qualificati
ons
    63:13

qualified
    72:24

question
    5:20
    43:13
    44:1 63:5
    69:17,25
    77:5
    80:13,16

questions
    31:15
    53:7 74:5
    83:11,12

quick
    8:19 32:8
    37:21

Quickbooks
    11:10,14
    45:13

quickly
    18:7

———————————
        R

ran
    9:21
    29:11

range
    19:2,10
    35:15,16

79:13

rate
    74:15

reach
    12:17

read
    10:14
    53:6 61:2

reading
    60:25

real
    9:1 10:21
    32:8
    37:21

realize
    16:18
    18:9

realm
    34:12

reason
    34:22
    52:9 60:5

reasonable
    13:2,7
    25:13
    26:6,21
    27:11
    50:15
    51:23

reasons
    52:10
    63:3

receive
    55:16,18

received
    63:23

reconciles
    58:11

record
    5:22 9:10

12:8
83:14

record's
    16:14,19

recorded
    55:22

records
    22:21
    26:24
    34:6
    51:11

reduction
    31:10

refer
    60:7

referred
    28:7
    32:22,23

referring
    25:22
    54:12
    61:1

reflected
    21:16

reflects
    65:18

related
    67:22

relation
    18:1

relationshi
p
    67:10

relevant
    29:21
    48:20
    56:12

reliable
    62:5,6
    63:14

78:22,24
79:3

rely
    60:16
    63:7,12

remained
    35:24

remember
    48:3 51:9
    68:25

rent
    27:17
    29:1 30:3
    38:3,4
    39:12,13,
    14 40:19
    49:12,19
    50:13,15,
    17,22
    51:17

rented
    38:4
    50:20

repairs
    15:1

repeat
    69:25

rephrase
    43:25

rephrased
    77:6,7

replacing
    10:13,14

replenish
    17:8

report
    12:9,13
    13:1 53:3
    56:6 63:2

reporter
    32:6

require
    53:22
    58:16

required
    60:5,23
    63:22

requirement
    61:21

requirement
s
    54:9 55:6
    61:23

Resolution
    8:23

respect
    61:5

responsibil
ities
    53:18

responsibil
ity
    53:20
    63:2,4

responsible
    56:8,17

rest
    19:13
    47:17

restriction
s
    18:13

results
    20:15

retire
    41:23
    42:9,12
    70:13

retirement
    27:4,7
    40:23
    70:12



79:8,15

**return**
12:23
36:17
40:2,11,
17 47:5
51:14
65:10,13,
18

**returns**
7:19,24
11:9
22:21
23:4,8
48:15
52:12,18
64:5,21
72:1,2

**revenue**
16:23
26:1,20
34:20
73:24
74:3

**revenues**
59:21

**reverse**
46:2

**review**
12:17,19
57:17
59:11
61:11
71:22

**reviewed**
34:5
53:9,15
59:11

**reviewing**
22:20
53:17

**rewind**
23:23

**Richardson**
11:23
12:1
13:2,7,
12,17,24
14:6,19
15:13,25
16:7
19:25
24:2,20
25:5,16
26:9
27:9,18
29:9,20
49:10,24
50:19
52:24
61:5

**ride**
33:8

**rides**
69:8

**rigorous**
7:14

**rise**
23:25

**risk**
59:13

**road**
30:20

**robbing**
37:16

**role**
9:18
53:19
55:4,5,6

**roles**
8:3 10:9

**rolled**
10:12

**room**
60:10

72:3

**rough**
38:9,11
39:23

**roughly**
9:12

**round**
80:5

**run**
27:9
40:23
67:21
77:2

**running**
11:3
18:14
21:11
29:13
30:13
43:8

────────────

**S**

────────────

**S&l**
8:24

**sake**
11:25

**salary**
27:17
28:25
29:21,25
30:1
37:25
40:19
49:11,19
51:24

**sales**
11:11
17:5,9
20:17
67:5
75:18

**San**
6:19,20

**sat**
7:2

**savings**
7:10 8:22
10:19

**schedule**
36:14,15
39:16

**school**
6:7,8,11,
13

**Section**
24:15
29:3 30:4
36:1,8,19
38:6

**security**
27:4
40:14
70:15

**Seelbach**
5:20
12:8,12
18:18
19:23
20:3
31:13
32:8,15,
19 35:11
38:15
43:10
44:6 45:6
47:25
52:14
54:6 55:1
57:19
62:25
63:17
64:10
65:20
67:25
69:22

70:5
71:4,17
72:10
73:10
75:23
76:4,9
77:1,17
78:25
79:24
80:12,21
81:1,13
82:8
83:1,12

**self-employment**
50:14

**self-funded**
21:14

**sell**
13:22
26:19
31:21
32:2
67:9,23

**selling**
14:20
17:8
67:6,15,
16 75:6

**semiconductor**
9:6,16

**send**
33:1

**sense**
33:1 37:8

**sentence**
53:8 57:4
59:18

**separate**
19:5

**service**



KEVIN MILLS, CPA
FAULKENBERRY vs CALDWELL COUNTY

April 25, 2017
Index: services..statements

10:25
58:17
59:10
61:24
62:20

**services**
11:7,13
41:20

**set**
52:9 59:4
61:7,10
62:2

**sheet**
50:11
58:9

**shelf**
19:9,13

**shelving**
19:8

**ship**
22:15

**shipped**
14:15

**shop**
11:23
12:1,2
13:2,7,
12,24
14:6
15:1,13
16:1
24:2,20
25:5,16
26:9
27:9,18
29:20
49:10,24
50:19
52:24
61:5

**Shop's**
13:17
14:19

16:7
19:25
29:10

**shops**
14:9,13

**short**
17:17

**shoulder**
33:11

**showing**
67:5

**side**
16:5
28:14
30:10

**sign**
56:25

**signed**
64:5

**significant**
21:3,18
24:14
25:17
26:5,10
30:19
31:10
68:8
79:12

**similar**
20:9,14

**simply**
71:9
72:16

**sit**
7:11
71:15

**sitting**
72:2

**sixteen**
6:5

**size**
57:22

**skin**
33:11

**small**
11:12
17:7 19:6
33:5
34:11
45:12
49:8

**social**
27:4
40:14
70:15

**software**
10:11
15:22
47:8,15

**sold**
23:22
35:3,6,9
66:7,25
67:2 74:3
75:5
83:4,5

**sole**
12:4
13:14

**sort**
79:22

**sound**
26:25

**Sounds**
27:2

**source**
40:10

**southeast**
6:9

**Southwest**
6:17

**space**
20:13,14
49:13
51:18

**speaks**
54:6 55:2
57:20

**specific**
9:9

**specificall
y**
15:11
17:22

**specifics**
20:25

**speculation**
18:16
35:12
43:11
45:7 48:1
71:6,18
72:11
73:11

**spinoff**
9:17

**standard**
54:8 58:1
60:4

**standpoint**
8:15,16
9:8,20
26:4
36:13
43:22
49:17
62:7,8
70:24

**started**
48:4

**state**
5:21
6:17,18

8:25 12:8
16:20
17:17
32:10
82:12

**stated**
76:11
77:2

**statement**
8:15
15:5,7,10
16:4
21:16
25:25
27:15
50:23
53:9,12,
16 54:4,
12,13,23
56:18
58:9,10,
11,18
59:4
60:19
62:5,8
63:12
64:20
65:4,7,
11,17
66:7
68:16,22

**statements**
7:20,23
11:10
25:8
54:10
56:9,13
57:7,10
58:5,8,
21,23
59:4,13,
20 60:13,
25 61:3,
10 64:14,
18 68:20



station
  75:15

stayed
  8:24
  29:17

steady
  16:10

stem
  34:15

step
  9:25
  63:21
  73:13

stick
  34:10
  61:11
  74:25

store
  13:23
  22:7,18

storefront
  22:10,11,
  23

straight
  36:20

strategy
  52:7

strictly
  45:15

strip
  13:21

stripped
  14:15,16

stripping
  68:7

stuff
  17:19
  18:12
  67:13
  68:8

74:13

subsequentl
y
  12:23

substantial
  39:18

substantial
ly
  58:4

support
  11:14
  65:12

surgery
  69:11

sustained
  18:1
  33:15

swing
  26:3

system
  10:12,15,
  17

systems
  9:4,19,20
  10:5,6,13

─────────
      T
─────────

tables
  42:23

tailored
  15:3

takes
  49:5

taking
  15:6
  43:16
  45:22
  82:18

talk

15:12
  16:8
  46:16
  82:1

talked
  17:1 22:3
  33:14
  75:11

talking
  23:2

target
  11:12
  14:19

task
  70:8
  76:12

tax
  7:19,23
  11:9,11
  12:21,23
  15:22
  16:4
  22:21
  23:4,8
  36:17
  40:2
  47:5,8
  48:15
  49:8 50:7
  52:6,8,12
  53:12
  54:5,23
  55:10,24
  56:3,10
  58:6
  64:5,18,
  21 65:10,
  13,18
  72:1

tax-related
  15:24

taxable
  40:13,17

taxed
  12:3
  50:1,2,14

taxes
  34:11
  37:13
  38:6 40:7
  45:13
  50:14

taxpayer
  55:13

teach
  61:2

team
  10:6,7

technical
  34:24
  35:1 61:6

telephone
  51:18

telling
  78:23

ten
  48:15,18
  80:16

tend
  70:14

term
  56:5

testify
  64:9
  65:15
  70:19

testifying
  18:11

testimony
  20:7
  47:20
  48:11
  63:8
  65:21

69:18,23
  70:2
  76:7,10
  78:18
  80:22

testing
  53:24

Texas
  5:25
  6:17,18,
  19,20
  22:17

theater
  43:16

there'd
  83:7

thing
  22:9 32:1
  60:3
  75:3,14

things
  19:10
  23:4
  24:22
  27:22
  28:7,15
  29:6,17
  53:24
  59:16
  62:13
  66:1
  67:18
  68:12
  73:20
  77:23
  78:15
  82:15

Thirty
  41:2

thought
  15:2
  48:19
  72:15



KEVIN MILLS, CPA                                        April 25, 2017
FAULKENBERRY vs CALDWELL COUNTY          Index: thousand..verification

thousand
    36:5,12,
    16

tickets
    43:16

time
    8:7,18
    9:5
    11:21,24
    15:12
    22:3 24:3
    27:19,20
    30:25
    33:9
    34:23
    36:7 42:8
    44:14
    45:9
    46:12,14,
    23 64:24
    71:23
    81:21
    83:15

times
    9:17 17:3
    29:8 36:2
    40:25
    41:2
    70:17
    73:23
    75:13
    76:12
    80:17

today
    13:5
    38:21
    45:2,23
    46:4,12,
    15,17
    47:20
    48:11
    66:3
    71:1,15,
    16 76:24
    81:6 82:1

told
    18:18
    33:24
    34:16

toner
    22:13

tool
    37:2,11
    38:5

top
    35:14

total
    27:17
    38:13
    40:4
    76:25

tracked
    9:22

tracking
    9:24

traditional
    22:6

trained
    8:5

training
    6:21
    7:17,18,
    21

transaction
    35:23

transactions
    21:24

transitioned
    9:3

translating
    82:19

travel
    14:8,14

17:16,21
18:20
26:14
27:24
30:17,18
31:11
67:22
68:10

traveling
    30:21
    31:1

tremendous
    14:12

trend
    8:14,17
    64:25
    68:20
    76:13

trends
    70:9

trial
    65:16

trips
    17:16,17

true
    12:13
    15:23
    30:5

trust
    8:23
    63:15
    66:14

truthful
    63:10

Twenty-one
    6:5

type
    7:18,20
    12:18
    42:25

─────────────

─────────────
        U
─────────────

Uh-huh
    20:8
    38:14
    44:16
    45:25
    49:7
    56:15
    60:17
    63:9
    66:9,21
    78:16

ultimately
    7:15

Ultra
    10:22

unable
    17:20
    18:20

undergraduate
    6:21

understand
    20:5,22
    22:23
    37:23
    40:18
    66:19
    78:20

understanding
    13:10
    14:5,10
    17:14,23,
    25 18:13
    27:3

undertaking
    57:8 59:6

unexpectedly
    18:7

University
    6:18

untaxed
    49:22

upfront
    21:20
    44:22,23

user
    60:7,9,12

user's
    59:20,24

users
    10:10

utilized
    22:23

─────────────
        V
─────────────

vague
    52:15
    62:25
    81:1

valuation
    75:18
    76:5

valuations
    74:9,23

variables
    70:11
    73:15
    79:5,9

variances
    9:22

vendor
    9:25

verbal
    32:5

verification
    62:19,22



KEVIN MILLS, CPA
FAULKENBERRY vs CALDWELL COUNTY

April 25, 2017
Index: versed..Zarlink

**versed**
  60:25

**version**
  47:10

**versus**
  20:16
  44:24
  55:13,16
  83:5

**viable**
  23:14
  24:2,21
  25:11

**viewing**
  64:21

—————

**W**

**W-2**
  52:17,24

**wages**
  70:22
  72:7
  77:16
  82:23
  83:3,9

**walk**
  22:12

**wanted**
  23:1
  30:10
  45:1
  61:15
  73:5

**warehouse**
  10:6,13,
  16

**warehouses**
  67:13

**warehousing**
  19:8

**watching**
  72:2

**ways**
  41:9
  45:16
  73:14,17,
  18 74:5,
  10,14

**wayside**
  19:14

**weight**
  69:5

**Wendy's**
  75:15

**wife**
  6:3

**winner**
  44:20

**word**
  33:2

**words**
  28:8
  30:23

**work**
  6:14
  33:19
  42:8,21
  44:3,12
  47:3 51:8
  53:22
  57:25
  59:7,12
  65:3
  68:3,6
  70:23

**worked**
  7:9 8:2,
  21,22,25
  9:6,12,13
  10:4
  11:18,22
  22:7

**working**
  7:9

**works**
  7:4

**world**
  75:4

**worldwide**
  22:18

**worth**
  44:19
  45:2,24
  66:7
  71:16
  75:22
  76:3

**wrong**
  15:4
  52:4,5

**wrote**
  37:20

—————

**Y**

**year**
  6:10 15:8
  17:3 23:5
  24:17
  26:17
  28:25
  36:12,23,
  24,25
  37:8,9,
  12,14,16
  38:3
  39:22
  47:17,23
  49:21,25
  51:1
  52:13,25
  66:18,22,
  23 69:14
  70:10,17
  79:13

  80:8

**years**
  7:8,10
  9:2,12
  10:22
  11:2,21,
  22 12:21
  15:7,21
  19:2
  20:16
  21:13
  22:22
  23:23
  26:25
  27:10,16
  29:8,18
  33:10
  36:6,22
  37:18
  39:7,19
  40:22
  41:2
  42:7,15
  44:22
  45:2,23
  46:3,22
  47:12
  48:15,16,
  19 51:4
  59:12
  66:2
  68:19
  69:19
  70:4,12,
  13,14,17
  71:16
  74:2
  76:22
  78:19
  79:8,14
  80:25
  83:5

**yield**
  9:24

**York**

  11:1

—————

**Z**

**Zarlink**
  9:14



# EXHIBIT C

January 10, 2017

Lawrence Faulkenberry
P.O. Box 1501
Lockhart, TX  78644

Lawrence,
I have extracted data from your 2013-2015 Federal Income Tax Returns and also Compiled the 2016
Profit and Loss statement for Richardson Chop Shop, LLC.  This data is in the Comparative Income
Statement format attached.

Richardson Chop Shop, LLC is an S-Corp for Federal Income Tax purposes and Lawrence Faulkenberry
has a W2 in each of the aforementioned years.  I have prepared and filed the 1120S returns since 2011
for Richardson Chop Shop, LLC.

Beginning in 2015 there were significant declines in Sales and Purchases (See Comparative Income
Statement) due to Lawrence's inability to travel.  His E-Bay business buys motorcycle's and "parts them
out" and sells them online.  Supply constraints in the local area require that new inventory be sourced
nationally.  As in any business new inventory is essential for future sales.

In my opinion there is a substantial doubt about the ability for Richardson Chop Shop to continue as a
going concern, due to two primary factors.

1. Lack of available inventory and more specifically new purchases.
2. Debt acquired in 2015 and 2016 to keep the doors open.

Kevin Mills, CPA

**Kevin Mills CPA**
**1015 West San Antonio St, Suite A**
**Lockhart, TX  78644**
**512-376-4212**


Lawrence Faulkenberry
Managing Member
Richardson Chop Shop, LLC


ACCOUNTANTS COMPILATION REPORT


I have compiled the accompanying Statement of Income- income tax basis of Richardson Chop Shop LLC (S-Corp) as of December 31, 2016.  I have not audited or reviewed the accompanying Statement of Income and, accordingly, do not express an opinion or provide any assurance about whether the Income Statement is in accordance with the income tax basis of accounting.

Management is responsible for the preparation and fair presentation of the financial statements in accordance with the income tax basis of accounting and for designing, implementing, and maintaining internal control relevant to the preparation and fair presentation of the financial statements.

My responsibility is to conduct the compilation in accordance with Statements for Accounting and Review Services issued by the American Institute of Certified Public Accountants.  The objective of a compilation is to assist management in presenting financial information in the form of the Income Statements without undertaking to obtain or provide any assurance that there are no material modifications that should be made to the financial statements.

Management has elected to omit substantially all of the disclosures ordinarily included in financial statements prepared on the income tax basis of accounting. If the omitted disclosures were included in the financial statements, they might influence the user's conclusions about the entity's revenues and expenses. Accordingly, This Income Statement is not designed for those who are not informed about such matters.

I am not independent with respect to Richardson Chop Shop LLC.


Kevin Mills, CPA


January 10, 2017

**Richardson Chop Shop**
**Comparative Income Statement**
**For Tax years 2013-2016**

|  | | 2,016 | | 2015 | | 2014 | | 2013 |
|---|---|---|---|---|---|---|---|---|
| Sales | $ | 90,912 | $ | 144,792 | $ | 170,990 | $ | 186,264 |
| Cost of Good Sold | $ | 58,979 | $ | 76,460 | $ | 63,889 | $ | 124,402 |
| **Expenses** | | | | | | | | |
| Accounting | $ | 1,055 | $ | 959 | $ | 1,021 | $ | 872 |
| Auto Expense | $ | 4,322 | $ | 8,749 | | | $ | 12,597 |
| Contract Labor | $ | 1,300 | $ | 28,975 | $ | 45,824 | | |
| Interest Expense | $ | 1,749 | | | | | | |
| Insurance | $ | 1,224 | | | | | | |
| Legal Fees | $ | 254 | | | $ | 3,000 | | |
| Loan Fees | $ | 6,379 | | | | | | |
| Miscellaneous | | | $ | 6,609 | | | | |
| Payroll | $ | 12,000 | $ | 10,000 | $ | 25,650 | $ | 30,200 |
| Rent | $ | 4,139 | $ | 4,080 | $ | 12,848 | | |
| Repairs | $ | 1,896 | | | $ | 4,000 | | |
| Supplies | $ | 1,200 | | | | | | |
| Taxes & Licenses | $ | 1,091 | $ | 849 | $ | 2,138 | $ | 2,880 |
| Telephone | $ | 2,412 | $ | 1,704 | | | | |
| Tools | | | | | | | $ | 1,575 |
| Travel | $ | 700 | $ | 2,500 | $ | 5,012 | $ | 11,951 |
| Uniforms | | | | | | | $ | 600 |
| Utilities | $ | 2,088 | $ | 1,470 | | | | |
| **Total** | $ | 41,808 | $ | 65,895 | $ | 99,493 | $ | 60,675 |
| Depreciation | $ | 2,301 | $ | 2,254 | $ | 2,841 | $ | 1,697 |
| Net Income | $ | (12,177) | $ | 183 | $ | 4,767 | $ | (510) |

**(See Accountants Compilation Report)**

**Faulkenberry 000577**

Form **1120S**

Department of the Treasury
Internal Revenue Service

## U.S. Income Tax Return for an S Corporation

► Do not file this form unless the corporation has filed or is
attaching Form 2553 to elect to be an S corporation.
► Information about Form 1120S and its separate instructions is at *www.irs.gov/form1120s.*

OMB No. 1545-0123

**2015**

For calendar year 2015 or tax year beginning , 2015, ending .

| | | | |
|---|---|---|---|
| **A** S election effective date 01/03/11 | **TYPE** | **Name** Richardson Chop Shop, LLC | **D** Employer identification number 27-4432071 |
| **B** Business activity code number (see instrs) 441300 | **OR** | **Number, street, and room or suite no. If a P.O. box, see instructions.** P O Box 1501 | **E** Date incorporated 01/03/11 |
| **C** Check if Schedule M-3 attached ☐ | **PRINT** | **City or town, state or province, country, and ZIP or foreign postal code** Lockhart   TX 78644 | **F** Total assets (see instructions) 28,750. |

**G** Is the corporation electing to be an S corporation beginning with this tax year? ☐ Yes ☒ No   If 'Yes,' attach Form 2553 if not already filed

**H** Check if: **(1)** ☐ Final return **(2)** ☐ Name change **(3)** ☐ Address change
**(4)** ☐ Amended return **(5)** ☐ S election termination or revocation

**I** Enter the number of shareholders who were shareholders during any part of the tax year . . . . . . . . . . . . . . . ► 1

**Caution.** Include **only** trade or business income and expenses on lines 1a through 21. See the instructions for more information.

| | | | | |
|---|---|---|---|---|
| **I N C O M E** | **1a** Gross receipts or sales . . . . . . . . . . | **1a** 144,792. | | |
| | **b** Returns and allowances . . . . . . . . . | **1b** 0. | | |
| | **c** Balance. Subtract line 1b from line 1a . . . . . . . . . . . . . . . . . . . . . . . . . | | **1c** | 144,792. |
| | **2** Cost of goods sold (attach Form 1125-A) . . . . . . . . . . . . . . . . . . . . . . | | **2** | 76,460. |
| | **3** Gross profit. Subtract line 2 from line 1c . . . . . . . . . . . . . . . . . . . . . . | | **3** | 68,332. |
| | **4** Net gain (loss) from Form 4797, line 17 (attach Form 4797) . . . . . . . . . . . . . . . | | **4** | |
| | **5** Other income (loss) (see instrs — att statement) . . . . . . . . . . . . . . . . . . . | | **5** | |
| | **6** **Total income (loss).** Add lines 3 through 5 . . . . . . . . . . . . . . . . . . ► | | **6** | 68,332. |
| **D E D U C T I O N S   S E E   I N S T R S** | **7** Compensation of officers (see instructions - attach Form 1125-E) . . . . . . . . . . | | **7** | 10,000. |
| | **8** Salaries and wages (less employment credits) . . . . . . . . . . . . . . . . . . . | | **8** | |
| | **9** Repairs and maintenance . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | **9** | |
| | **10** Bad debts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | **10** | |
| | **11** Rents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | **11** | 4,080. |
| | **12** Taxes and licenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | **12** | 849. |
| | **13** Interest . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | **13** | |
| | **14** Depreciation not claimed on Form 1125-A or elsewhere on return (attach Form 4562) . . . | | **14** | 2,254. |
| | **15** Depletion (**Do not deduct oil and gas depletion.**) . . . . . . . . . . . . . . . . . | | **15** | |
| | **16** Advertising . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | **16** | |
| | **17** Pension, profit-sharing, etc, plans . . . . . . . . . . . . . . . . . . . . . . . | | **17** | |
| | **18** Employee benefit programs . . . . . . . . . . . . . . . . . . . . . . . . . . . | | **18** | |
| | **19** Other deductions (attach statement) . . . . . **STMT** . . . . . . . . . . . . . . | | **19** | 50,966. |
| | **20** **Total deductions.** Add lines 7 through 19 . . . . . . . . . . . . . . . . . . ► | | **20** | 68,149. |
| | **21** Ordinary business income (loss). Subtract line 20 from line 6 . . . . . . . . . . . . | | **21** | 183. |
| **T A X   A N D   P A Y M E N T S** | **22a** Excess net passive income or LIFO recapture tax (see instructions) . . . . . . . . . | **22a** | | |
| | **b** Tax from Schedule D (Form 1120S) . . . . . . . | **22b** | | |
| | **c** Add lines 22a and 22b (see instructions for additional taxes) . . . . . . . . . . . . | | **22c** | |
| | **23a** 2015 estimated tax payments and 2014 overpayment credited to 2015 . . | **23a** | | |
| | **b** Tax deposited with Form 7004 . . . . . . . . | **23b** 0. | | |
| | **c** Credit for federal tax paid on fuels (attach Form 4136) . | **23c** | | |
| | **d** Add lines 23a through 23c . . . . . . . . . . . . . . . . . . . . . . . . . . | | **23d** | 0. |
| | **24** Estimated tax penalty (see instructions). Check if Form 2220 is attached . . . . . ► ☐ | | **24** | |
| | **25** Amount owed. If line 23d is smaller than the total of lines 22c and 24, enter amount owed . | | **25** | 0. |
| | **26** Overpayment. If line 23d is larger than the total of lines 22c and 24, enter amount overpaid | | **26** | |
| | **27** Enter amount from line 26 Credited to 2016 estimated tax ► Refunded ► | | **27** | |

| **Sign Here** | Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge. | | May the IRS discuss this return with the preparer shown below (see instructions)? ☒ Yes ☐ No |
|---|---|---|---|
| | ► Signature of officer        Date | ► LLC Manager Title | |

| **Paid Preparer Use Only** | Print/Type preparer's name Kevin Mills | Preparer's signature | Date 01/10/17 | Check ☒ if self-employed | PTIN P00274659 |
|---|---|---|---|---|---|
| | Firm's name ► Kevin Mills, CPA | | | Firm's EIN ► 75-2991066 | |
| | Firm's address ► 1015 West San Antonio St, Suite A Lockhart        TX 78644 | | | Phone no. (512) 376-4212 | |

**BAA For Paperwork Reduction Act Notice, see separate instructions.** SPSA0112 08/13/15   Form **1120S** (2015)

Faulkenberry 000578

Form **1120S** (2015)   Richardson Chop Shop, LLC                                                27-4432071                Page **2**

| **Schedule B** | **Other Information** (see instructions) | Yes | No |
|---|---|---|---|

**1** Check accounting method:   **a** [X] Cash   **b** [ ] Accrual   **c** [ ] Other (specify) ▶ _ _ _ _ _ _ _ _ _ _ _ _ _ _

**2** See the instructions and enter the:

**a** Business activity. ▶ Online Retail_ _ _ _ _ _ _ _ _   **b** Product or service. . ▶ Motorcycle Parts_ _ _ _

**3** At any time during the tax year, was any shareholder of the corporation a disregarded entity, a trust, an estate, or a nominee or similar person? If "Yes," attach Schedule B-1, Information on Certain Shareholders of an S Corporation . . | | | X

**4** At the end of the tax year, did the corporation:

**a** Own directly 20% or more, or own, directly or indirectly, 50% or more of the total stock issued and outstanding of any foreign or domestic corporation? For rules of constructive ownership, see instructions. If 'Yes,' complete (i) through (v) below . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | X

| (i) Name of Corporation | (ii) Employer Identification Number (if any) | (iii) Country of Incorporation | (iv) Percentage of Stock Owned | (v) If Percentage in (iv) is 100%, Enter the Date (if any) a Qualified Subchapter S Subsidiary Election Was Made |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |

**b** Own directly an interest of 20% or more, or own, directly or indirectly, an interest of 50% or more in the profit, loss, or capital in any foreign or domestic partnership (including an entity treated as a partnership) or in the beneficial interest of a trust? For rules of constructive ownership, see instructions. If 'Yes,' complete (i) through (v) below . . . | | | X

| (i) Name of Entity | (ii) Employer Identification Number (if any) | (iii) Type of Entity | (iv) Country of Organization | (v) Maximum % Owned in Profit, Loss, or Capital |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |

**5a** At the end of the tax year, did the corporation have any outstanding shares of restricted stock? . . . . . . . . . . . . . . | | | X

If 'Yes,' complete lines (i) and (ii) below.

**(i)** Total shares of restricted stock . . . . . . . . . . . . . . . . . ▶ _ _ _ _ _ _ _ _ _

**(ii)** Total shares of non-restricted stock . . . . . . . . . . . . . ▶ _ _ _ _ _ _ _ _ _

**b** At the end of the tax year, did the corporation have any outstanding stock options, warrants, or similar instruments? . . . . . . | | | X

If 'Yes,' complete lines (i) and (ii) below.

**(i)** Total shares of stock outstanding at the end of the tax year . . . . . . . . . ▶ _ _ _ _ _ _ _ _ _

**(ii)** Total shares of stock outstanding if all instruments were executed . . . . . ▶ _ _ _ _ _ _ _ _ _

**6** Has this corporation filed, or is it required to file, **Form 8918**, Material Advisor Disclosure Statement, to provide information on any reportable transaction? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | X

**7** Check this box if the corporation issued publicly offered debt instruments with original issue discount . . . . . . . . . ▶ [ ]

If checked, the corporation may have to file **Form 8281**, Information Return for Publicly Offered Original Issue Discount Instruments.

**8** If the corporation: **(a)** was a C corporation before it elected to be an S corporation **or** the corporation acquired an asset with a basis determined by reference to the basis of the asset (or the basis of any other property) in the hands of a C corporation **and (b)** has net unrealized built-in gain in excess of the net recognized built-in gain from prior years, enter the net unrealized built-in gain reduced by net recognized built-in gain from prior years (see instructions) . . . . . . . . ▶$ _ _ _ _ _ _ _ _ _

**9** Enter the accumulated earnings and profits of the corporation at the end of the tax year. . . . . . . $ _ _ _ _ _ _ _ _ _

**10** Does the corporation satisfy **both** of the following conditions?

**a** The corporation's total receipts (see instructions) for the tax year were less than $250,000 . . . . . . . . . . . . . . . |

**b** The corporation's total assets at the end of the tax year were less than $250,000 . . . . . . . . . . . . . . . | X |

If 'Yes,' the corporation is not required to complete Schedules L and M-1.

**11** During the tax year, did the corporation have any non-shareholder debt that was canceled, was forgiven, or had the terms modified so as to reduce the principal amount of the debt? . . . . . . . . . . . . . . . . . . . . . . | | | X

If 'Yes,' enter the amount of principal reduction . . . . . . . . . . . . . . $ |

**12** During the tax year, was a qualified subchapter S subsidiary election terminated or revoked? If 'Yes', see instructions . . | | | X

**13 a** Did the corporation make any payments in 2015 that would require it to file Form(s) 1099? . . . . . . . . . | X |

**b** If 'Yes,' did the corporation file or will it file required Forms 1099? . . . . . . . . . . . . . . . . . . | X |

Form **1120S** (2015)

**Faulkenberry 000579**

**Form 1120S**
**Page 1, Line 19**

# Other Deductions Worksheet
► Keep for your records

**2015**

Name
Richardson Chop Shop, LLC

Employer Identification No.
27-4432071

| | | | |
|---|---|---|---|
| 1 | Accounting | 1 | 959. |
| 2 | Amortization | 2 | |
| 3 | Automobile and truck expense | 3 | 8,749. |
| 4 | Bank charges | 4 | |
| 5 | Cleaning | 5 | |
| 6 | Commissions | 6 | |
| 7 | Computer services and supplies | 7 | |
| 8 | Credit and collection costs | 8 | |
| 9 | Delivery and freight | 9 | |
| 10 | Discounts | 10 | |
| 11 | Dues and subscriptions | 11 | |
| 12 | Equipment rent | 12 | |
| 13 | Gifts | 13 | |
| 14 | Insurance | 14 | |
| 15 | Janitorial | 15 | |
| 16 | Laundry and cleaning | 16 | |
| 17 | Legal and professional | 17 | |
| 18 a | Meals and entertainment, subject to 50% limit | 18a | |
| b | Meals and entertainment, subject to 80% limit | b | |
| c | Meals and entertainment, allowed at 100% | c | |
| d | Less disallowed | d | |
| e | Meals and entertainment, net | 18 e | |
| 19 | Miscellaneous | 19 | 6,609. |
| 20 | Office expense | 20 | |
| 21 | Outside services/independent contractors | 21 | 28,975. |
| 22 | Parking fees and tolls | 22 | |
| 23 | Permits and fees | 23 | |
| 24 | Postage | 24 | |
| 25 | Printing | 25 | |
| 26 | Security | 26 | |
| 27 | Supplies | 27 | |
| 28 | Telephone | 28 | 1,704. |
| 29 | Tools | 29 | |
| 30 | Training/continuing education | 30 | |
| 31 | Travel | 31 | 2,500. |
| 32 | Uniforms | 32 | |
| 33 | Utilities | 33 | 1,470. |
| 34 | Total farm expenses (Schedule F, Line 33) | 34 | |
| 35 | Other (itemize): | 35 | |
| 36 | Total to Form 1120S, page 1, line 19 | 36 | 50,966. |

spsw9001.SCR   09/18/15

**Faulkenberry 000580**

Form **1120S**

Department of the Treasury
Internal Revenue Service

## U.S. Income Tax Return for an S Corporation

▶ Do not file this form unless the corporation has filed or is attaching Form 2553 to elect to be an S corporation.
▶ Information about Form 1120S and its separate instructions is at www.irs.gov/form1120s.

OMB No. 1545-0123

**2014**

For calendar year 2014 or tax year beginning _____ , 2014, ending _____ ,

| | | |
|---|---|---|
| **A** S election effective date 01/03/11 | **TYPE OR PRINT** | Name Richardson Chop Shop, LLC |
| **B** Business activity code number (see instrs) 441300 | | Number, street, and room or suite no. If a P.O. box, see instructions. P O Box 1501 |
| **C** Check if Schedule M-3 attached ☐ | | City or town, state or province, country, and ZIP or foreign postal code Lockhart                    TX  78644 |

**D** Employer identification number 27-4432071

**E** Date incorporated 01/03/11

**F** Total assets (see instructions) $ 40,400.

**G** Is the corporation electing to be an S corporation beginning with this tax year?  ☐ Yes  ☒ No  If 'Yes,' attach Form 2553 if not already filed

**H** Check if: **(1)** ☐ Final return  **(2)** ☐ Name change  **(3)** ☐ Address change
**(4)** ☐ Amended return  **(5)** ☐ S election termination or revocation

**I** Enter the number of shareholders who were shareholders during any part of the tax year ▶ 2

**Caution.** Include **only** trade or business income and expenses on lines 1a through 21. See the instructions for more information.

**INCOME**

| | | | |
|---|---|---|---|
| 1 a | Gross receipts or sales | 1a | 179,819. |
| b | Returns and allowances | 1b | 8,829. |
| c | Balance. Subtract line 1b from line 1a | 1c | 170,990. |
| 2 | Cost of goods sold (attach Form 1125-A) | 2 | 63,889. |
| 3 | Gross profit. Subtract line 2 from line 1c | 3 | 107,101. |
| 4 | Net gain (loss) from Form 4797, line 17 (attach Form 4797) | 4 | |
| 5 | Other income (loss) (see instrs — att statement) | 5 | |
| 6 | **Total income (loss).** Add lines 3 through 5 | 6 | 107,101. |

**DEDUCTIONS (SEE INSTRS)**

| | | | |
|---|---|---|---|
| 7 | Compensation of officers (see instructions - attach Form 1125-E) | 7 | 25,650. |
| 8 | Salaries and wages (less employment credits) | 8 | |
| 9 | Repairs and maintenance | 9 | 4,000. |
| 10 | Bad debts | 10 | |
| 11 | Rents | 11 | 12,848. |
| 12 | Taxes and licenses | 12 | 2,138. |
| 13 | Interest | 13 | |
| 14 | Depreciation not claimed on Form 1125-A or elsewhere on return (attach Form 4562) | 14 | 2,841. |
| 15 | Depletion (**Do not deduct oil and gas depletion.**) | 15 | |
| 16 | Advertising | 16 | |
| 17 | Pension, profit-sharing, etc, plans | 17 | |
| 18 | Employee benefit programs | 18 | |
| 19 | Other deductions (attach statement) . . . . .STMT | 19 | 54,857. |
| 20 | **Total deductions.** Add lines 7 through 19 | 20 | 102,334. |
| 21 | **Ordinary business income (loss).** Subtract line 20 from line 6 | 21 | 4,767. |

**TAX AND PAYMENTS**

| | | | |
|---|---|---|---|
| 22 a | Excess net passive income or LIFO recapture tax (see instructions) | 22a | |
| b | Tax from Schedule D (Form 1120S) | 22b | |
| c | Add lines 22a and 22b (see instructions for additional taxes) | 22c | |
| 23 a | 2014 estimated tax payments and 2013 overpayment credited to 2014 | 23a | |
| b | Tax deposited with Form 7004 | 23b | 0. |
| c | Credit for federal tax paid on fuels (attach Form 4136) | 23c | |
| d | Add lines 23a through 23c | 23d | 0. |
| 24 | Estimated tax penalty (see instructions). Check if Form 2220 is attached ▶ ☐ | 24 | |
| 25 | Amount owed. If line 23d is smaller than the total of lines 22c and 24, enter amount owed | 25 | 0. |
| 26 | Overpayment. If line 23d is larger than the total of lines 22c and 24, enter amount overpaid | 26 | |
| 27 | Enter amount from line 26 Credited to 2015 estimated tax _____ Refunded ▶ | 27 | |

**Sign Here**

Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge.

▶ _____ Signature of officer    Date

▶ LLC Manager    Title

May the IRS discuss this return with the preparer shown below (see instructions)?  ☐ Yes  ☐ No

**Paid Preparer Use Only**

| | | | |
|---|---|---|---|
| Print/Type preparer's name Kevin Mills CPA | Preparer's signature | Date 01/10/17 | Check ☒ if self-employed   PTIN P00274659 |
| Firm's name ▶ Kevin Mills, CPA | | | Firm's EIN ▶ 75-2991066 |
| Firm's address ▶ 1015 West San Antonio St, Suite A Lockhart                    TX  78644 | | | Phone no. |

**BAA  For Paperwork Reduction Act Notice, see separate instructions.**    SPSA0112  08/06/14    Form **1120S** (2014)

Form **1120S** (2014)  Richardson Chop Shop, LLC                                    27-4432071                  Page **2**

| **Schedule B** | **Other Information** (see instructions) | | | | Yes | No |
|---|---|---|---|---|---|---|

**1** Check accounting method:  **a** ☒ Cash  **b** ☐ Accrual  **c** ☐ Other (specify) ► _ _ _ _ _ _ _ _ _ _ _ _ _ _

**2** See the instructions and enter the:

  **a** Business activity. ► Online Retail _ _ _ _ _ _ _ _ _  **b** Product or service. . ► Motorcycle Parts _ _ _ _ _ _

**3** At any time during the tax year, was any shareholder of the corporation a disregarded entity, a trust, an estate, or a
  nominee or similar person? If "Yes," attach Schedule B-1, Information on Certain Shareholders of an S Corporation . . . . . . . | | | | | | X

**4** At the end of the tax year, did the corporation:

  **a** Own directly 20% or more, or own, directly or indirectly, 50% or more of the total stock issued and outstanding of
  any foreign or domestic corporation? For rules of constructive ownership, see instructions. If 'Yes,' complete (i)
  through (v) below . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | | | | X

| (i) Name of Corporation | (ii) Employer Identification Number (if any) | (iii) Country of Incorporation | (iv) Percentage of Stock Owned | (v) If Percentage in (iv) is 100%, Enter the Date (if any) a Qualified Subchapter S Subsidiary Election Was Made |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |

  **b** Own directly an interest of 20% or more, or own, directly or indirectly, an interest of 50% or more in the profit, loss, or
  capital in any foreign or domestic partnership (including an entity treated as a partnership) or in the beneficial interest
  of a trust? For rules of constructive ownership, see instructions. If 'Yes,' complete (i) through (v) below . . . . . . . . . | | | | | | X

| (i) Name of Entity | (ii) Employer Identification Number (if any) | (iii) Type of Entity | (iv) Country of Organization | (v) Maximum % Owned in Profit, Loss, or Capital |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |

**5a** At the end of the tax year, did the corporation have any outstanding shares of restricted stock? . . . . . . . . . . . . . . . | | X

  If 'Yes,' complete lines (i) and (ii) below.

  **(i)** Total shares of restricted stock . . . . . . . . . . . . . . . . . . . . . . ► _ _ _ _ _ _ _ _ _ _ _

  **(ii)** Total shares of non-restricted stock . . . . . . . . . . . . . . . . . . . ► _ _ _ _ _ _ _ _ _ _ _

  **b** At the end of the tax year, did the corporation have any outstanding stock options, warrants, or similar instruments? . . . . . | | X

  If 'Yes,' complete lines (i) and (ii) below.

  **(i)** Total shares of stock outstanding at the end of the tax year . . . . . . . . . . ► _ _ _ _ _ _ _ _ _ _ _

  **(ii)** Total shares of stock outstanding if all instruments were executed . . . . . . . ► _ _ _ _ _ _ _ _ _ _ _

**6** Has this corporation filed, or is it required to file, **Form 8918**, Material Advisor Disclosure Statement, to provide
  information on any reportable transaction? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | X

**7** Check this box if the corporation issued publicly offered debt instruments with original issue discount . . . . . . . . . . . . ► ☐
  If checked, the corporation may have to file **Form 8281**, Information Return for Publicly Offered Original Issue
  Discount Instruments.

**8** If the corporation: **(a)** was a C corporation before it elected to be an S corporation **or** the corporation acquired
  an asset with a basis determined by reference to the basis of the asset (or the basis of any other property) in
  the hands of a C corporation **and (b)** has net unrealized built-in gain in excess of the net recognized built-in gain
  from prior years, enter the net unrealized built-in gain reduced by net recognized
  built-in gain from prior years (see instructions) ► $ _ _ _ _ _ _ _ _ _ _ _ _

**9** Enter the accumulated earnings and profits of the corporation at the end of the tax year . . . . . ► $ _ _ _ _ _ _ _ _ _ _ _ _

**10** Does the corporation satisfy **both** of the following conditions?

  **a** The corporation's total receipts (see instructions) for the tax year were less than $250,000 . . . . . . . . . . . . . . . | |

  **b** The corporation's total assets at the end of the tax year were less than $250,000 . . . . . . . . . . . . . . . . . . . . | X |

  If 'Yes,' the corporation is not required to complete Schedules L and M-1.

**11** During the tax year, did the corporation have any non-shareholder debt that was canceled, was forgiven, or had the
  terms modified so as to reduce the principal amount of the debt? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | X

  If 'Yes,' enter the amount of principal reduction . . . . . . . . . . . . . . . . $ _ _ _ _ _ _ _ _ _ _ _

**12** During the tax year, was a qualified subchapter S subsidiary election terminated or revoked? If 'Yes,' see instructions . . . . . | | X

**13a** Did the corporation make any payments in 2014 that would require it to file Form(s) 1099? . . . . . . . . . . . . . . . | X |

  **b** If 'Yes,' did the corporation file or will it file required Forms 1099? . . . . . . . . . . . . . . . . . . . . . . . . . . | X |

Form **1120S** (2014)

**Faulkenberry 000582**

**Form 1120S**
**Page 1, Line 19**

**Other Deductions Worksheet**
► Keep for your records

**2014**

| Name | Employer Identification No. |
|---|---|
| Richardson Chop Shop, LLC | 27-4432071 |

| | | | |
|---|---|---|---|
| 1 | Accounting | 1 | 1,021. |
| 2 | Amortization | 2 | |
| 3 | Automobile and truck expense | 3 | |
| 4 | Bank charges | 4 | |
| 5 | Cleaning | 5 | |
| 6 | Commissions | 6 | |
| 7 | Computer services and supplies | 7 | |
| 8 | Credit and collection costs | 8 | |
| 9 | Delivery and freight | 9 | |
| 10 | Discounts | 10 | |
| 11 | Dues and subscriptions | 11 | |
| 12 | Equipment rent | 12 | |
| 13 | Gifts | 13 | |
| 14 | Insurance | 14 | |
| 15 | Janitorial | 15 | |
| 16 | Laundry and cleaning | 16 | |
| 17 | Legal and professional | 17 | 3,000. |
| 18 a | Meals and entertainment, subject to 50% limit | 18a | |
| b | Meals and entertainment, subject to 80% limit | b | |
| c | Meals and entertainment, allowed at 100% | c | |
| d | Less disallowed | d | |
| e | Meals and entertainment, net | 18 e | |
| 19 | Miscellaneous | 19 | |
| 20 | Office expense | 20 | |
| 21 | Outside services/independent contractors | 21 | 45,824. |
| 22 | Parking fees and tolls | 22 | |
| 23 | Permits and fees | 23 | |
| 24 | Postage | 24 | |
| 25 | Printing | 25 | |
| 26 | Security | 26 | |
| 27 | Supplies | 27 | |
| 28 | Telephone | 28 | |
| 29 | Tools | 29 | |
| 30 | Training/continuing education | 30 | |
| 31 | Travel | 31 | 5,012. |
| 32 | Uniforms | 32 | |
| 33 | Utilities | 33 | |
| 34 | Total farm expenses (Schedule F, Line 33) | 34 | |
| 35 | Other (itemize): | 35 | |
| 36 | Total to Form 1120S, page 1, line 19 | 36 | 54,857. |

SPSW9001.SCR  04/30/15

**Faulkenberry 000583**

Form **1120S**

Department of the Treasury
Internal Revenue Service

## U.S. Income Tax Return for an S Corporation

► Do not file this form unless the corporation has filed or is attaching Form 2553 to elect to be an S corporation.
► Information about Form 1120S and its separate instructions is at www.irs.gov/form1120s.

OMB No. 1545-0130

**2013**

For calendar year 2013 or tax year beginning _____, 2013, ending _____ , _____

| | | |
|---|---|---|
| **A** S election effective date<br>01/03/11 | **TYPE**<br>**OR**<br>**PRINT** | Name<br>Richardson Chop Shop, LLC |
| **B** Business activity code<br>number (see instrs)<br>441300 | | Number, street, and room or suite no. If a P.O. box, see instructions.<br>P O Box 1501 |
| **C** Check if Schedule<br>M-3 attached ☐ | | City or town, state or province, country, and ZIP or foreign postal code<br>Lockhart                         TX  78644 |

**D** Employer identification number
27-4432071

**E** Date incorporated
01/03/11

**F** Total assets (see instructions)
$              38,933.

**G** Is the corporation electing to be an S corporation beginning with this tax year?  ☐ Yes  ☒ No  If 'Yes,' attach Form 2553 if not already filed

**H** Check if:  **(1)** ☐ Final return  **(2)** ☐ Name change  **(3)** ☐ Address change
**(4)** ☐ Amended return  **(5)** ☐ S election termination or revocation

**I** Enter the number of shareholders who were shareholders during any part of the tax year . . . . . . . . . . . . . . . . . . . . . ► 2

**Caution.** Include **only** trade or business income and expenses on lines 1a through 21. See the instructions for more information.

| | | | |
|---|---|---|---:|
| **I N C O M E** | **1 a** Gross receipts or sales . . . . . . . . . . . | **1a** 195,809. | |
| | **b** Returns and allowances . . . . . . . . | **1b** 9,545. | |
| | **c** Balance. Subtract line 1b from line 1a . . . . . . . . . . . . . . . . . . . . . . . . | **1c** | 186,264. |
| | **2** Cost of goods sold (attach Form 1125-A). . . . . . . . . . . . . . . . . . . . . | **2** | 124,402. |
| | **3** Gross profit. Subtract line 2 from line 1c . . . . . . . . . . . . . . . . . . . . . | **3** | 61,862. |
| | **4** Net gain (loss) from Form 4797, line 17 (attach Form 4797). . . . . . . . . . . . | **4** | |
| | **5** Other income (loss) (see instrs — att statement) . . . . . . . . . . . . . . . . . | **5** | |
| | **6** Total income (loss). Add lines 3 through 5. . . . . . . . . . . . . . . . . . . . ► | **6** | 61,862. |

| | | | |
|---|---|---|---:|
| **D E D U C T I O N S  (SEE INSTRS)** | **7** Compensation of officers (see instructions - attach Form 1125-E). . . . . . . . . | **7** | 30,200. |
| | **8** Salaries and wages (less employment credits) . . . . . . . . . . . . . . . . . . | **8** | |
| | **9** Repairs and maintenance . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **9** | |
| | **10** Bad debts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **10** | |
| | **11** Rents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **11** | |
| | **12** Taxes and licenses. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **12** | 2,880. |
| | **13** Interest. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **13** | |
| | **14** Depreciation not claimed on Form 1125-A or elsewhere on return (attach Form 4562) | **14** | 1,697. |
| | **15** Depletion (**Do not deduct oil and gas depletion.**) . . . . . . . . . . . . . . . | **15** | |
| | **16** Advertising. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **16** | |
| | **17** Pension, profit-sharing, etc, plans . . . . . . . . . . . . . . . . . . . . . . | **17** | |
| | **18** Employee benefit programs . . . . . . . . . . . . . . . . . . . . . . . . . . | **18** | |
| | **19** Other deductions (attach statement) . . . . . . .STMT . . . . . . . . . . . . | **19** | 27,595. |
| | **20** Total deductions. Add lines 7 through 19 . . . . . . . . . . . . . . . . . . ► | **20** | 62,372. |
| | **21** Ordinary business income (loss). Subtract line 20 from line 6 . . . . . . . . . | **21** | -510. |

| | | | |
|---|---|---|---:|
| **T A X  A N D  P A Y M E N T S** | **22 a** Excess net passive income or LIFO recapture<br>tax (see instructions) . . . . . . . . . . . | **22a** | |
| | **b** Tax from Schedule D (Form 1120S) . . . . . | **22b** | |
| | **c** Add lines 22a and 22b (see instructions for additional taxes). . . . . . . . . . | **22c** | |
| | **23 a** 2013 estimated tax payments and 2012 overpayment credited to 2013 . . . . . | **23a** | |
| | **b** Tax deposited with Form 7004 . . . . . . . | **23b** 0. | |
| | **c** Credit for federal tax paid on fuels (attach Form 4136) . . | **23c** | |
| | **d** Add lines 23a through 23c . . . . . . . . . . . . . . . . . . . . . . . . . . | **23d** | 0. |
| | **24** Estimated tax penalty (see instructions). Check if Form 2220 is attached . . . . ► ☐ | **24** | |
| | **25** Amount owed. If line 23d is smaller than the total of lines 22c and 24, enter amount owed | **25** | 0. |
| | **26** Overpayment. If line 23d is larger than the total of lines 22c and 24, enter amount overpaid . . . . . | **26** | |
| | **27** Enter amount from line 26 Credited to 2014 estimated tax ► _____ Refunded ► | **27** | |

**Sign Here**

Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge.

| ► Signature of officer | Date | ► Title  LLC Manager |
|---|---|---|

May the IRS discuss this return with the preparer shown below (see instructions)?  ☐ Yes  ☐ No

**Paid Preparer Use Only**

| Print/Type preparer's name<br>Kevin Mills CPA | Preparer's signature | Date | Check ☒ if self-employed | PTIN<br>P00274659 |
|---|---|---|---|---|
| Firm's name ► Kevin Mills, CPA | | | Firm's EIN ► 75-2991066 | |
| Firm's address ► 1015 West San Antonio St, Suite A<br>Lockhart                         TX  78644 | | | Phone no. | |

**BAA  For Paperwork Reduction Act Notice, see separate instructions.**            SPSA0112  01/15/14                            Form **1120S** (2013)

Faulkenberry 000584

Form **1120S** (2013)   Richardson Chop Shop, LLC                                           27-4432071                    Page **2**

| Schedule B | Other Information (see instructions) | Yes | No |
|---|---|---|---|

**1** Check accounting method:  **a** [X] Cash   **b** [ ] Accrual   **c** [ ] Other (specify) ► _ _ _ _ _ _ _ _ _ _

**2** See the instructions and enter the:

**a** Business activity. ► Online Retail _ _ _ _ _ _ _ _ _ _ _   **b** Product or service. . ► Motorcycle Parts _ _ _ _ _ _

**3** At any time during the tax year, was any shareholder of the corporation a disregarded entity, a trust, an estate, or a nominee or similar person? If "Yes," attach Schedule B-1, Information on Certain Shareholders of an S Corporation . . . . . . . .    | | X

**4a** At the end of the tax year, did the corporation:
Own directly 20% or more, or own, directly or indirectly, 50% or more of the total stock issued and outstanding of any foreign or domestic corporation? For rules of constructive ownership, see instructions. If 'Yes,' complete (i) through (v) below . . . . . . . . . .    | | X

| (i) Name of Corporation | (ii) Employer Identification Number (if any) | (iii) Country of Incorporation | (iv) Percentage of Stock Owned | (v) If Percentage in (iv) is 100%, Enter the Date (if any) a Qualified Subchapter S Subsidiary Election Was Made |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |

**b** Own directly an interest of 20% or more, or own, directly or indirectly, an interest of 50% or more in the profit, loss, or capital in any foreign or domestic partnership (including an entity treated as a partnership) or in the beneficial interest of a trust? For rules of constructive ownership, see instructions. If 'Yes,' complete (i) through (v) below . . . . .    | | X

| (i) Name of Entity | (ii) Employer Identification Number (if any) | (iii) Type of Entity | (iv) Country of Organization | (v) Maximum % Owned in Profit, Loss, or Capital |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |

**5a** At the end of the tax year, did the corporation have any outstanding shares of restricted stock? . . . . . . . . . . . . .    | | X
If 'Yes,' complete lines (i) and (ii) below.
  (i) Total shares of restricted stock . . . . . . . . . . . . . . . . . . . . . . . . . ► _ _ _ _ _ _ _ _ _ _
  (ii) Total shares of non-restricted stock . . . . . . . . . . . . . . . . . . . . . . . ► _ _ _ _ _ _ _ _ _ _

**b** At the end of the tax year, did the corporation have any outstanding stock options, warrants, or similar instruments? . . . .    | | X
If 'Yes,' complete lines (i) and (ii) below.
  (i) Total shares of stock outstanding at the end of the tax year . . . . . . . . . . . ► _ _ _ _ _ _ _ _ _ _
  (ii) Total shares of stock oustanding if all instruments were executed . . . . . . . . ► _ _ _ _ _ _ _ _ _ _

**6** Has this corporation filed, or is it required to file, **Form 8918**, Material Advisor Disclosure Statement, to provide information on any reportable transaction? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    | | X

**7** Check this box if the corporation issued publicly offered debt instruments with original issue discount . . . . . . . ► [ ]
If checked, the corporation may have to file **Form 8281**, Information Return for Publicly Offered Original Issue Discount Instruments.

**8** If the corporation: **(a)** was a C corporation before it elected to be an S corporation **or** the corporation acquired an asset with a basis determined by reference to the basis of the asset (or the basis of any other property) in the hands of a C corporation **and (b)** has net unrealized built-in gain in excess of the net recognized built-in gain from prior years, enter the net unrealized built-in gain reduced by net recognized
built-in gain from prior years (see instructions) . . . . . . . ►$ _ _ _ _ _ _ _ _ _ _ _

**9** Enter the accumulated earnings and profits of the corporation at the end of the tax year. . . . . . . $ _ _ _ _ _ _ _ _ _ _

**10** Does the corporation satisfy **both** of the following conditions?
**a** The corporation's total receipts (see instructions) for the tax year were less than $250,000 . . . . . . . . . . . . . . . .    | |
**b** The corporation's total assets at the end of the tax year were less than $250,000 . . . . . . . . . . . . . . . . . . .    | X |
If 'Yes,' the corporation is not required to complete Schedules L and M-1.

**11** During the tax year, did the corporation have any non-shareholder debt that was canceled, was forgiven, or had the terms modified so as to reduce the principal amount of the debt? . . . . . . . . . . . . . . . . . . . . . . . . . . . .    | | X
If 'Yes,' enter the amount of principal reduction _ _ _ _ _ _ _ _ _ _ $ _ _ _ _ _ _ _ _ _ _

**12** During the tax year, was a qualified subchapter S subsidiary election terminated or revoked? If 'Yes,' see instructions . . . . . . .    | | X

**13 a** Did the corporation make any payments in 2013 that would require it to file Form(s) 1099? . . . . . . . . . . . .    | X |
**b** If 'Yes,' did the corporation file or will it file required Forms 1099? . . . . . . . . . . . . . . . . . . . . . . . . . . .    | X |

Form **1120S** (2013)

**Faulkenberry 000585**

**Form 1120S**
**Page 1, Line 19**

**Other Deductions Worksheet**
► Keep for your records

**2013**

| Name | Employer Identification No. |
|---|---|
| Richardson Chop Shop, LLC | 27-4432071 |

| | | | |
|---|---|---|---:|
| 1 | Accounting | 1 | 872. |
| 2 | Amortization | 2 | |
| 3 | Automobile and truck expense | 3 | 12,597. |
| 4 | Bank charges | 4 | |
| 5 | Cleaning | 5 | |
| 6 | Commissions | 6 | |
| 7 | Computer services and supplies | 7 | |
| 8 | Credit and collection costs | 8 | |
| 9 | Delivery and freight | 9 | |
| 10 | Discounts | 10 | |
| 11 | Dues and subscriptions | 11 | |
| 12 | Equipment rent | 12 | |
| 13 | Gifts | 13 | |
| 14 | Insurance | 14 | |
| 15 | Janitorial | 15 | |
| 16 | Laundry and cleaning | 16 | |
| 17 | Legal and professional | 17 | |
| 18 a | Meals and entertainment, subject to 50% limit   **18a** | | |
| b | Meals and entertainment, subject to 80% limit   **b** | | |
| c | Meals and entertainment, allowed at 100%   **c** | | |
| d | Less disallowed   **d** | | |
| e | Meals and entertainment, net | 18 e | |
| 19 | Miscellaneous | 19 | |
| 20 | Office expense | 20 | |
| 21 | Outside services/independent contractors | 21 | |
| 22 | Parking fees and tolls | 22 | |
| 23 | Permits and fees | 23 | |
| 24 | Postage | 24 | |
| 25 | Printing | 25 | |
| 26 | Security | 26 | |
| 27 | Supplies | 27 | |
| 28 | Telephone | 28 | |
| 29 | Tools | 29 | 1,575. |
| 30 | Training/continuing education | 30 | |
| 31 | Travel | 31 | 11,951. |
| 32 | Uniforms | 32 | 600. |
| 33 | Utilities | 33 | |
| 34 | Total farm expenses (Schedule F, Line 33) | 34 | |
| 35 | Other (itemize): | 35 | |
| | Ebay/Paypal Fees | | |
| | Contract Labor | | |
| 36 | Total to Form 1120S, page 1, line 19 | 36 | 27,595. |

**Faulkenberry 000586**

# Kevin Mills, CPA
## 1015 West Antonio St, Ste A
## Lockhart, TX  78644

**Professional Experience:**

Bachelors in Business Administration at Southwest Texas State University 12/90.
Certified Public Accountant 2/12/2001.

I opened my office part-time in Lockhart in 2002 and full-time in 2008.

1990-1997 I worked at the Resolution Trust Corporation, State of Texas an Ontra Inc.

1997-2007 I worked in industry as a Systems Analyst on Oracle and Peoplesoft software at Legerity and Whole Foods Market.

**Tax Practice:**

I prepare over 500 individual income tax returns and over 110 Corporate, Partnership, Estate and Non-Profit tax returns.

**Software:**

Certified QuickBooks Pro Advisor

**Accounting:**

-Sales Tax Returns
-Payroll Processing
-Controllership services
-Compilation of Financial Statements
-Business Formation Services

**Boards Served on:**

Bomber Fastpitch Inc.- Youth Athletic Organization for Girls Fastpitch Softball
4the Heroes- Military Support and Recognition

**Faulkenberry 000587**



# Texas State Board of Public Accountancy

## William Treacy, Executive Director

# Office - KEVIN MILLS, CPA

Search Help | Status Values | Terms of Use

**Firm License ID**
T07024

**Firm name**
KEVIN MILLS, CPA

**Resident manager**
Mr. MILLS

**Contact Information (most recent)**
1015 WEST SAN ANTONIO ST STE A
LOCKHART TX 78644

Phone: (512)376-4212

Fax:     (512)376-2926

Email:   kevin@kevinmillscpa.com

**Texas County**
CALDWELL

**Date registered**
03/28/2002

**License expiration date**
03/31/2017

Status

## Issued (Current)

**History of disciplinary actions**
NO DISCIPLINARY HISTORY

Back to Selection          TSBPA Home



# Texas State Board of Public Accountancy

### William Treacy, Executive Director

## Individual Licensee - MILLS, KEVIN D

Search Help | Status Values | Terms of Use

**Certificate last name**
  MILLS

**Contact Information (most recent)**
  1015 W SAN ANTONIO ST STE A
  LOCKHART TX 78644

**Date certified/registered**
  02/12/2001

**License expiration date**
  09/30/2017

**Status**
## Issued (Current)

**Employment areas most recently reported**
  **Full time**
  SOLE PROPRIETOR - IN TEXAS
  **Part time**
  NONE REPORTED

**Firms in which the individual is a partner, shareholder, owner, officer, director, or resident manager**
  Association with the firm KEVIN MILLS, CPA (License ID = T07024) began on 02/01/2002.

**History of Board actions**
    NO DISCIPLINARY HISTORY

Back to Selection     TSBPA Home