IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

LAWRENCE FAULKENBERRY,
                    Plaintiff,

        -vs-                                           CAUSE NO.:
                                                       AU-15-CA-01089-SS
SERGEANT DUSTIN YOST, DEPUTY
MICHAEL TAYLOR, DEPUTY GALEN
HOUSETON, and CAPTAIN JESSE
HERNANDEZ,
                    Defendants.[1]


## ORDER

BE IT REMEMBERED on this day the Court reviewed the file in the above-styled cause, and specifically, Plaintiff Lawrence Faulkenberry's Motion for Entry of Judgment [#84], Defendant Sergeant Dustin Yost (Sergeant Yost)'s Response [#86] in opposition, and Faulkenberry's Reply [#88] in support, as well as Sergeant Yost's Renewed Motion for Judgment as a Matter of Law, or, Alternatively, Motion for New Trial or Remittitur [#85], Faulkenberry's Response [#87] in opposition, and Sergeant Yost's Reply [#89] in support. Having reviewed the documents, the governing law, and the file as a whole, the Court now enters the following opinion and orders.

### Background

On January 15, 2015, at approximately 6:30 p.m., Alexander Faulkenberry (Alexander) called 911 and claimed his father, Lawrence Faulkenberry (Faulkenberry), was intoxicated and brandishing a firearm. Alexander told the 911 dispatcher he feared for his safety. The dispatcher

---

[1] The revised case caption belatedly reflects the dismissal of the claims against Caldwell County, Texas. *See* Order of July 21, 2017 [#51].

relayed Alexander's account to Sergeant Yost, Deputy Michael Taylor, and Deputy Galen Houseton, who responded to the call. The dispatcher also informed the officers the property had been marked "dangerous" for an unknown reason.[2]

At trial, Faulkenberry denied he had been intoxicated or had brandished a gun at Alexander. Both Faulkenberry and Alexander testified that Alexander, who was 16 years old at the time, suffered from bipolar disorder and had not been taking his anti-psychotic medication for some time when he called the police. Earlier that day, Faulkenberry had grounded Alexander for his behavior at school. At trial, Alexander testified he had made up the accusations he conveyed to the 911 dispatcher because he was upset with his father and having a mental episode.[3]

The officers' arrival on the property was captured by Sergeant Yost's dash cam. Upon reaching Faulkenberry's property, the officers parked their cars at the entrance of a long, unlit driveway leading up to Faulkenberry's house. Because of the distance between the patrol cars and Faulkenberry's house, the video captured by the officers' dash cams does not clearly show what transpired after the officers arrived on the property. However, Faulkenberry had installed cameras on his property which captured the entirety of the following incident, and all officers were wearing body mics.

Alexander met the officers in the driveway as they approached the residence. The officers immediately frisked and secured Alexander near Sergeant Yost's patrol vehicle, briefly questioning him as to the location of Faulkenberry. Alexander indicated his father was in the office adjacent to the residence at the far end of the driveway.

---

[2] The testimony at trial was inconclusive as to why the property had been marked "dangerous."

[3] Alexander had previously called the police on his parents multiple times. Trial Tr. of Sept. 18, 2017 at 45.

As the officers—with guns drawn—resumed their approach towards Faulkenberry's residence, Sergeant Yost saw movement in the one of the buildings at the end of the driveway, at which point Faulkenberry walked outside with his hands in the air. Upon spotting Faulkenberry, Sergeant Yost immediately announced the officers' presence, stating, "Sheriff's Office. Keep your hands up!" Faulkenberry complied with the order to keep his hands above his head, but can also be heard profanely questioning the officers' presence on his property. Without responding to Faulkenberry's questions, Sergeant Yost again announced the officers' presence and repeatedly commanded Faulkenberry turn around and walk backwards towards the officers with his hands in the air. Faulkenberry refused these commands, instead choosing to demand an explanation as to the officers' presence and remain standing with his hands above his head. When the officers asked Faulkenberry whether he was armed, he emphatically responded, "No, I don't have a f—king gun on me." Faulkenberry, who appears to grow more agitated as the officers approach, continued shouting obscenities, at one point stating, "[f]—k all three of you." The officers' guns remained trained on Faulkenberry for the entirety of this exchange.

When the officers reached Faulkenberry, they pulled his hands behind his back to apply handcuffs. Sergeant Yost held Faulkenberry's left arm, while Deputy Taylor held Faulkenberry's right arm. As the officers were in the process of applying handcuffs but before they had finished doing so, Faulkenberry turned his head towards his right shoulder to ask Deputy Taylor whether the officers had a warrant. In response to this perceived pulling away, Sergeant Yost attempted to execute a takedown maneuver by performing a leg sweep on Faulkenberry. The maneuver was unsuccessful. Sergeant Yost tripped while performing his leg sweep and both Faulkenberry and the officers fell to the ground, where Faulkenberry's hands remained unsecured. Sergeant Yost then punched Faulkenberry in the face while the officers secured Faulkenberry's hands.

After the officers handcuffed Faulkenberry, they began to search his residence while Faulkenberry remained sitting on the ground. During this time, Faulkenberry continued to demand an explanation as to why the officers were on his property. Sergeant Yost eventually responded, "We're here because you pulled a gun on your son." Faulkenberry denied this allegation and accused the officers of being misled by a "manic child." When Faulkenberry asked Sergeant Yost why the officers did not question him about the incident before attempting the takedown, Sergeant Yost responded, "I did. You told us to 'f— off.' That's why you're on the ground right now."

In December 2015, Faulkenberry filed the instant lawsuit. The Court denied Defendants' motion for summary judgment, finding there were material issues of fact as to whether the officers used excessive force against Faulkenberry and whether the officers were entitled to qualified immunity. At trial, a jury found Sergeant Yost violated Faulkenberry's Fourth Amendment right to be free from excessive force by intentionally using unreasonable and excessive force while subduing Faulkenberry. The jury awarded Faulkenberry $275,000 for physical pain and mental anguish sustained in the past; $74,804.64 for reasonable and necessary medical expenses incurred in the past; $55,989 for income lost in the past; $250,000 for physical pain and mental anguish Faulkenberry will in reasonable probability sustain in the future; $250,000 for income that in reasonable probability Faulkenberry will no longer be able to earn in the future; and $350,000 in punitive damages for harm resulting from the malice or reckless indifference of Sergeant Yost.[4]

---

[4] The jury also found Deputy Taylor liable for $100,000 in punitive damages. The jury's punitive damages award as to Deputy Taylor is inconsistent with its finding that Deputy Taylor did not violate Faulkenberry's Fourth Amendment right to be free from excessive force. Faulkenberry concedes the punitive damages award must be vacated as to Deputy Taylor because the jury did not find Taylor liable.

Sergeant Yost has now filed a renewed motion for judgment as a matter of law, asking this Court to find there was insufficient evidence to support the verdict against Sergeant Yost and to find Sergeant Yost was entitled to qualified immunity. In the alternative, Sergeant Yost requests a new trial. Faulkenberry, meanwhile, has moved for entry of judgment. These pending motions are now ripe for review.

## Analysis

### I. Renewed Rule 50(b) Motion

Sergeant Yost argues he is entitled to judgment as a matter of law on Faulkenberry's Fourth Amendment excessive force claim. Specifically, Sergeant Yost contends that he did not use excessive force against Faulkenberry, and that, in any event, he is entitled to qualified immunity because his actions were objectively reasonable in light of clearly established law. The Court first examines Sergeant Yost's argument he did not use excessive force as a matter of law. The Court then turns to Sergeant Yost's renewed contention he is entitled to qualified immunity. As explained below, the Court denies Sergeant Yost's renewed motion for judgment as a matter of law on both grounds.

#### A. Legal Standard

When ruling on a Rule 50(b) motion for judgment as a matter of law, "[a] jury verdict must stand unless there is a lack of substantial evidence, in the light most favorable to the successful party, to support the verdict." *Am. Home Assurance Co. v. United Space All., LLC*, 378 F.3d 482, 487 (5th Cir. 2004). Accordingly, the question for the court "is whether the state of proof is such that reasonable and impartial minds could reach the conclusion the jury expressed in its verdict." *Id.* (internal quotation marks omitted). "[A]lthough the court should review the record as a whole, it must disregard all evidence favorable to the moving party that

the jury is not required to believe." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000). In other words, "the court should give credence to the evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses." *Carroll v. Ellington*, 800 F.3d 154, 168 (5th Cir. 2015) (internal citation and quotation marks omitted).

### B.    Application

### 1. Excessive Force

The Fourth Amendment confers a right to be free from excessive force during an arrest. *Deville v. Marcantel*, 567 F.3d 156, 169 (5th Cir. 2009) (per curiam). To establish a claim of excessive force under the Fourth Amendment, a plaintiff must show "(1) an injury (2) which resulted directly and only from the use of force that was clearly excessive to the need and (3) the force used was objectively unreasonable." *Cass v. City of Abilene*, 814 F.3d 721, 731 (5th Cir. 2016) (citation and internal quotation marks omitted).

"Excessive force claims are necessarily fact-intensive; whether the force used is 'excessive' or 'unreasonable' depends on 'the facts and circumstances of each particular case.'" *Deville*, 567 F.3d at 167 (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). Guiding this inquiry, the Supreme Court has identified three sets of facts which deserve careful consideration in determining whether the force used is "excessive" or "unreasonable": (1) the severity of the crime at issue; (2) whether the suspect poses an immediate threat to the safety of the officers or others; and (3) whether the suspect is actively resisting arrest or attempting to evade arrest by flight. *Graham*, 490 U.S. at 396; *see also Griggs v. Brewer*, 841 F.3d 308, 313–14 (5th Cir.

2016) ("A court must measure the force used under the facts as a reasonable person would perceive them, not necessarily against the historical facts.").

Viewing the evidence in the light most favorable to Faulkenberry and disregarding all evidence favorable to the moving party that the jury is not required to believe, the Court finds there is sufficient evidence to support the jury's conclusion Sergeant Yost used excessive force in subduing Faulkenberry.

First, there is substantial evidence to indicate Faulkenberry sustained an injury. At trial, Dr. Robert Josey testified Faulkenberry suffered from disc herniation in his back, for which he eventually received surgery. Trial Tr. of Sept. 19, 2017 at 184–87. Faulkenberry was also treated for a laceration to his eye. Trial Tr. of Sept. 18, 2017 at 91.

Second, there is substantial evidence indicating Faulkenberry's injuries resulted directly and only from the force applied by Sergeant Yost. Sergeant Yost does not appear to dispute the laceration to Faulkenberry's eye was caused by Sergeant Yost punching Faulkenberry in the face. With respect to Faulkenberry's back injury, Faulkenberry testified at trial he had never injured his back or received treatment for back pain prior to the takedown by Sergeant Yost. Trial Tr. of Sept. 19, 2017 at 27. Following the takedown, Faulkenberry told officers he was "in a lot of pain" and had "broke" his back. *Id.* at 27. Faulkenberry was subsequently treated for back pain and eventually underwent surgery. *Id.* at 187. At trial, Dr. Josey testified the nature of Faulkenberry's injury was consistent with Faulkenberry's explanation that the injury was caused by Sergeant Yost's use of force. *Id.* at 157, 159–60. Examining this evidence as a whole, the Court finds reasonable and impartial minds could reach the jury's conclusion that Faulkenberry's injuries were caused by Sergeant Yost's takedown and subsequent punch to Faulkenberry's face.

Third, there was substantial evidence to indicate the takedown and punch which resulted in Faulkenberry's injuries were clearly excessive to the need and objectively unreasonable.[5] In assessing whether Sergeant Yost's use of force was clearly excessive and objectively unreasonable, the Court applies the *Graham* factors. *See Graham*, 490 U.S. at 396.

The only *Graham* factor to counsel in favor of Sergeant Yost's use of force is the severity of the crime at issue. The relevant inquiry is what a reasonable officer on the scene would have believed the crime at issue to be. The dispatcher conveyed to Sergeant Yost that Alexander Faulkenberry called 911 to report his father was intoxicated and had a gun, and Alexander feared for his safety. Based on this report, a reasonable officer would have suspected Faulkenberry of the serious crime of assaulting a family member.

The second and third *Graham* factors—whether Faulkenberry posed an immediate threat to the officers or others and whether Faulkenberry actively resisted arrest—counsel in favor of minimal force. Alexander, who made the 911 call, met the officers almost immediately upon their arrival and demonstrated no visible signs of harm. Trial Tr. of Sept. 19, 2017 at 224. As the officers approached the house with guns drawn, Faulkenberry can be heard denying being armed, and the surveillance video does not show Faulkenberry holding a gun or any other weapon. Pl.'s Tr. Ex. 1-A; Pl.'s Tr. Ex. 2-B. Belying the officers' claims they felt seriously threatened by Faulkenberry, the officers did not seek cover as they approached the house, instead walking steadily up the driveway towards Faulkenberry. *Id.* As the officers approached, Faulkenberry stood still with his hands over his head. *Id.* Though he failed to comply with the officers' orders that he walk backwards towards the officers, he did not attempt to flee. *Id.*

---

[5] *See Poole v. City of Shreveport*, 691 F.3d 624, 628 (5th Cir. 2012) (noting inquiries into whether force is clearly excessive and whether force is objectively unreasonable are "often intertwined").

According to Faulkenberry's testimony, Faulkenberry was not physically resisting the officer's attempts to handcuff him when Sergeant Yost attempted to perform a dangerous takedown maneuver. Trial Transcript of Sept. 18, 2017 at 55. The surveillance video does not clearly discredit Faulkenberry's version of the events and instead leaves open the possibility Faulkenberry exhibited little, if any, physical resistance prior to the takedown by Sergeant Yost. Pl.'s Tr. Ex. 1-A. It is undisputed that after Faulkenberry hit the ground, Deputy Taylor and Deputy Houseton pinned Faulkenberry to the ground while Sergeant Yost punched him in the face.[6] In light of Faulkenberry's testimony and the evidence adduced at trial, there is substantial evidence to support the conclusion that a reasonable person in Sergeant Yost's position would not have perceived Faulkenberry to be resisting arrest or to pose an immediate threat to the officers and that therefore Sergeant Yost's use of force was clearly excessive and objectively unreasonable.[7]

---

[6] Sergeant Yost contends Faulkenberry posed an immediate threat to the officers while on the ground because Faulkenberry's hands were underneath his body and he could have been reaching for a weapon. However, sufficient evidence exists for the jury to conclude Faulkenberry did not pose an immediate threat to the officers and to further conclude Sergeant Yost's punch was clearly excessive and objectively unreasonable. The Court also observes Faulkenberry's hands would not have been underneath his body in the first place if Sergeant Yost had not attempted a takedown and further observes it was reasonably foreseeable Faulkenberry's hands would end up underneath his body as he attempted to catch himself as he fell to the ground.

[7] Sergeant Yost relies primarily upon *Griggs v. Brewer* in arguing a reasonable officer would have perceived Faulkenberry to be resisting arrest. 841 F.3d 308 (5th Cir. 2016). As is frequently noted, however, "excessive force cases are necessarily fact-intensive," and *Griggs* is distinguishable here. In *Griggs*, the plaintiff was "lurching to the side and stating 'no, no,' *in the act* of being handcuffed . . . ." *Griggs*, 841 F.3d at 314 (emphasis in original). By contrast, Faulkenberry stood still with his hands over his head as the officers approached. Though Faulkenberry used colorful language in asking the officers why they were on his property, he did not say or do anything to indicate he would be resisting arrest, except to turn his head over his shoulder to ask Deputy Taylor if the officers had a warrant. Though Sergeant Yost testified he felt Faulkenberry pulling away while in the act of being handcuffed, the jury was entitled to weigh Sergeant Yost's credibility in light of his mischaracterizations of the incident to his superior and in his report. Thus, unlike in *Griggs*, a fact issue existed in this case as to whether a reasonable officer would have perceived Faulkenberry to be resisting arrest. *Cf. Trammel v. Fruge*, 868 F.3d 332, 342 (5th Cir. 2017) ("[A] reasonable jury could find that [plaintiff's] pulling his arms away from the officers, along with the other circumstances of [plaintiff's] arrest, did not justify the officers' decision to tackle [plaintiff] to the ground. Thus, there is a genuine dispute of material fact as to whether the officers' use of force was objectively reasonable.").

The Court finds this evidence taken as a whole is such that reasonable and substantial minds could reach the jury's conclusion Faulkenberry was entitled to recover on his excessive force claim. The Court therefore DENIES Sergeant Yost's renewed motion for judgment as a matter of law as to the excessive force claim.

## 2. Qualified Immunity

Qualified immunity protects public officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The qualified immunity analysis involves two considerations: "(1) whether facts alleged or shown by plaintiff make out the violation of a constitutional right, and (2) if so, whether that right was clearly established at the time of the defendant's alleged misconduct." *Pasco v. Knoblauch*, 566 F.3d 572, 579 (5th Cir. 2009). As applied in Fourth Amendment excessive force cases, "the second prong of the analysis is better understood as two separate inquiries: whether the allegedly violated constitutional rights were clearly established at the time of the incident; and if so, whether the conduct of the defendants was objectively unreasonable in light of that then clearly established law." *Griggs v. Brewer*, 841 F.3d 308, 313 (5th Cir. 2016) (citation and quotation marks omitted); *see also Saucier v. Katz*, 533 U.S. 194, 205 (2001) ("If the officer's mistake as to what the law requires is reasonable . . . the officer is entitled to the immunity defense."). For purposes of determining whether a right is clearly established, courts should "not require a case directly on point," so long as existing precedent "place[s] the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011); *see also Hope v. Pelzer*, 536 U.S. 730, 739 (2002).

As to the first step of the qualified immunity analysis, the Court's analysis above has already found Faulkenberry put forward sufficient evidence to support a finding Sergeant Yost violated Faulkenberry's Fourth Amendment right to be free from excessive force. It follows that Faulkenberry has made out a violation of a constitutional right. The only remaining question is whether Sergeant Yost's conduct was objectively unreasonable in light of clearly established law. *See Griggs*, 841 F.3d at 313.

With respect to the second step of the qualified immunity analysis, the Court finds there is substantial evidence to support the conclusion Sergeant Yost's conduct was objectively unreasonable in light of clearly established law.[8] At the time of Faulkenberry's arrest, the law clearly established it was objectively unreasonable to attempt to tackle and then punch—with little if any attempted negotiation—"an individual who was not fleeing, not violent, not aggressive, and only resisted by pulling his arm away from an officer's grasp." *Trammel v. Fruge*, 868 F.3d 332, 342–43 (5th Cir. 2017) (emphasizing "the speed with which an officer resorts to force is relevant in determining whether that force was excessive to the need").[9] Viewing the evidence in the light most favorable to Faulkenberry and disregarding all evidence favorable to the moving party that the jury is not required to believe, the Court finds there is substantial evidence to support the conclusion Sergeant Yost was not entitled to qualified

---

[8] The parties primarily rely on two cases in arguing whether the law was clearly established, *Griggs* and *Trammel*. *See Trammel v. Fruge*, 868 F.3d 332, 342–43 (5th Cir. 2017); *Griggs*, 841 F.3d at 313. Though both cases evaluate the law as it existed prior to Faulkenberry's arrest, neither case was decided until this year. Thus, while the cases may reflect whether relevant law was clearly established as of Faulkenberry's arrest, neither case can itself be used to establish law for qualified immunity purposes because neither case had been decided when the events here transpired.

[9] There are some factual differences between this case and the factual scenario analyzed in *Trammel*. For example, in *Trammel*, the plaintiff drunkenly told the officer he was "not going to jail" and failed to comply with the officer's orders, but was otherwise quite amiable. *Trammel*, 868 F.3d at 336–38. In this case, by contrast, Faulkenberry volubly cursed at the officers when they failed to explain why they were on his property, but remained stationary with his arms above his head and gave no verbal or physical indication he would resist arrest. In spite of these factual differences the Court finds that, as *Trammel* recognized, the law clearly established at the time of Faulkenberry's arrest that the use of force alleged here was objectively unreasonable.

immunity because his conduct was objectively unreasonable. The Court therefore DENIES Sergeant Yost's renewed motion for judgment as a matter of law with respect to the issue of qualified immunity.[10]

## II.    Motion for a New Trial

A motion for new trial may be granted if the jury's verdict was against the great weight of the evidence, the trial was unfair, or some prejudicial error was committed during the trial. FED. R. CIV. P. 59(a); *Smith v. Transworld Drilling Co.*, 773 F.2d 610, 613 (5th Cir. 1985); *Conway v. Chem. Leaman Tank Lines, Inc.*, 610 F.2d 360, 363 (5th Cir. 1980). As with a Rule 50(b) motion, the Court views the evidence "in the light most favorable to the jury verdict." *Seidman v. Am. Airlines, Inc.*, 923 F.2d 1134, 1140 (5th Cir. 1991).

Sergeant Yost argues he is entitled to a new trial because (1) there was an absence of evidence to support the jury's finding that Sergeant Yost used excessive force; (2) the jury's verdict was inconsistent; and (3) this Court erred in allowing testimony and evidence concerning the prosecution of criminal charges against Faulkenberry. The Court considers and rejects each of these arguments in turn.

The Court turns first to Sergeant Yost's argument there was an absence of evidence to support the jury's finding that Sergeant Yost used excessive force. In consideration of the evidence and for the reasons previously stated in this opinion, the Court rejects this argument. *See supra* Section I.

---

[10] Relying largely on Judge Southwick's dissent in *Trammel*, Sergeant Yost argues the law does not clearly establish whether a takedown and subsequent "compliance punch" constitute excessive force when used against an individual actively resisting arrest. *See Trammel*, 868 F.3d at 345–46 (Southwick J., dissenting) (citing *Griggs*, 841 F.3d at 313–14) (evaluating state of the law as of 2013). However, Faulkenberry's passive resistance to the officers' commands in this case does not rise to the level of resistance present in either *Griggs* or *Trammel*. *See Griggs*, 841 F.3d at 313–14 (suggesting a reasonable police officer would perceive an individual lurching to the side and saying "no, no" while in the process of being handcuffed to be resisting arrest); *Trammel*, 868 F.3d at 347 (Southwick J., dissenting) (emphasizing law did not clearly established whether use of takedown and "non-deadly punches" against plaintiff "actively pull[ing] away from police officers" was objectively unreasonable).

The Court next turns to Sergeant Yost's contention a new trial is merited because the verdict was inconsistent. Sergeant Yost is correct the jury's verdict was inconsistent, in that it awarded punitive damages against Deputy Taylor but did not find Deputy Taylor liable for use of excessive force. However, both parties have already conceded the punitive damages award against Deputy Taylor must be vacated, and Sergeant Yost does not otherwise explain how he might be prejudiced by a vacated award of punitive damages against another officer. In these circumstances, the Court declines to grant a new trial on the basis of an inconsistent verdict.

Finally, the Court turns to Sergeant Yost's argument the Court erred in allowing testimony and evidence concerning the prosecutor's charging decisions in the aftermath of Faulkenberry's arrest. Sergeant Yost argues the inclusion of testimony and evidence related to the criminal charges filed against Faulkenberry and the prosecutor's decision to decline prosecution "led to an inconsistent verdict" because the jury awarded punitive damages against Deputy Taylor. Sergeant Yost does not explain how this evidence relates to the punitive damages awarded against Deputy Taylor, and in any event, the punitive damages award as to Deputy Taylor is vacated by this order. Absent any explanation as to how this alleged error prejudiced Sergeant Yost and having carefully considered these evidentiary rulings at trial, the Court declines to revisit them today.

## III.   Remittitur

### A.      Legal Standard

A court may order a remittitur where the jury's damages award "is entirely disproportionate to the injury sustained." *Caldarera v. E. Airlines, Inc.*, 705 F.2d 778, 784 (5th Cir. 1983). An award is "entirely disproportionate" when it is "so large as to shock the judicial conscience, so gross or inordinately large as to be contrary to right reason, so exaggerated as to

indicate bias, passion, prejudice, corruption, or other improper motive," or one which "clearly exceed[s] that amount that any reasonable man could feel the claimant is entitled to." *Id.* (internal citations and quotation marks omitted). A verdict is excessive as a matter of law if it exceeds "any rational appraisal or estimate of the damages that could be based upon the evidence before the jury." *Brunnemann v. Terra Int'l, Inc.*, 975 F.2d 175, 178 (5th Cir. 1992) (internal quotation marks omitted). "It is a basic concept of damages that they must be proved by the party seeking them." *Servicios–Expoarma, C.A. v. Indus. Mar. Carriers, Inc.*, 135 F.3d 984, 995 (5th Cir. 1998).

Where a damages award is excessive, the court "may either order a new trial on damages or may give the plaintiff the option of avoiding a new trial by agreeing to a remittitur of the excessive portion of the award." *Hernandez v. M/V Rajaan*, 841 F.2d 582, 587 (5th Cir. 1988) (citing *Osburn v. Anchor Labs, Inc.*, 825 F.2d 908, 919 (5th Cir. 1987)). The size of the remittitur is determined in accord with the "maximum recovery rule," under which the verdict must be reduced to the maximum amount the jury could properly have awarded. *See Naquin v. Elevating Boats, LLC*, 744 F.3d 927, 940 n.67 (5th Cir. 2014) ("Under this circuit's 'maximum recovery rule,' we will uphold a jury award if there is a damage award in at least one 'factually similar case from the relevant jurisdiction' that, when increased by 50%, equals or exceeds the challenged jury award." (quoting *Moore v. M/V ANGELA*, 353 F.3d 376, 384 (5th Cir. 2003)). "'Of course, [the court's] reassessment of the damages cannot be supported entirely by rational analysis, but involves an inherently subjective component.'" *Giles v. Gen. Elec. Co.*, 245 F.3d 474, 489 (5th Cir. 2001) (quoting *Eiland v. Westinghouse Elec. Corp.*, 58 F.3d 176, 183 (5th Cir. 1995)).

### B.   Application

As previously noted, the jury awarded a total of $1,355,793.64 in damages to Faulkenberry; $275,000 for past physical pain and mental anguish; $74,804.64 for past medical expenses; $55,989 for past lost income; $250,000 for future physical pain and mental anguish; $250,000 for future lost income; and $450,000 in punitive damages.[11] However, the Court finds the jury's award of damages for past lost income, future physical pain and mental anguish, and future lost income are excessive and not supported by the evidence. The Court also finds the punitive damages awarded against Sergeant Yost are excessive and not supported by the evidence. Accordingly, the Court remits these portions of the jury's award as described below. Alternatively, if Faulkenberry chooses not to accept the award as remitted, the Court grants Sergeant Yost's motion for new trial on the issue of damages.

### 1.  Past Physical Pain and Mental Anguish

Sergeant Yost first challenges the jury's award of $275,000 for past physical pain and mental anguish. At trial, Faulkenberry testified extensively regarding the pain and suffering he experienced as a result of Sergeant Yost's use of force.[12] According to Faulkenberry, Sergeant Yost's takedown resulted in a painful back injury necessitating subsequent medical treatment and, eventually, surgery. Trial Tr. of Sept. 19, 2017 at 25, 187. Further, Faulkenberry testified he experienced considerable mental anguish and emotional trauma stemming from Sergeant Yost's use of force, for which Faulkenberry attended roughly forty therapy sessions. In light of this

---

[11] The jury found Sergeant Yost liable for $350,000 in punitive damages and found Deputy Taylor liable for $100,000 in punitive damages. As previously noted, the punitive damages award must be vacated as to Deputy Taylor. See supra note 4.

[12] Incredibly, Sergeant Yost suggests there was "no evidence" submitted at trial of past pain and suffering. See Mot. J. Matter Law [#85] at 13.

testimony, the Court finds the jury's award of damages for past pain and suffering was not entirely disproportionate to the injury sustained.

### 2.  Past Medical Expenses

Sergeant Yost next challenges the jury's award of $74,804.64 for past medical expenses and argues the Court erred in admitting several of Faulkenberry's medical bills at trial. While Sergeant Yost suggests these medical bills were hearsay and lacked foundation, he does not present any further explanation as to why the bills should have been excluded. Having already considered these evidentiary rulings at trial, the Court declines to revisit them today. The Court concludes the jury's award for past medical expenses was a rational appraisal of the evidence offered at trial.

### 3.  Past Lost Wages

Sergeant Yost next argues Faulkenberry presented no evidence to support the jury's award of $55,989 in past lost wages. At trial, the Court admitted the tax returns for Faulkenberry's small business, Richardson Chop Shop. This small business was Faulkenberry's sole reported source of income. From 2013 to 2015, Faulkenberry collected an annual salary of $10,000 to $12,000 from Richardson Chop Shop. Though Faulkenberry's presentation of evidence on the issue of lost wages left much to be desired, the Court cannot say the jury's award clearly exceeds the amount a reasonable man could feel Faulkenberry is entitled to. Accordingly, the Court upholds the jury's award of $55,989 in past lost wages.

### 4.  Future Physical Pain or Mental Anguish

The jury awarded Faulkenberry $250,000 for future physical pain or mental anguish. Faulkenberry testified at trial he continues to experience lower back pain and a "burning, numb sensation" in his legs. Trial Tr. of Sept. 18, 2017 at 90. Faulkenberry did not testify as to whether

he currently experienced mental anguish or expected to experience mental anguish in the future.[14] There was no expert testimony at trial as to Faulkenberry's expected physical pain in the future.

In light of the evidence presented at trial, the Court concludes the jury's award of $250,000 is disproportionate to the injury sustained. Although damages for future pain, suffering, and mental anguish are not susceptible to an exact calculation or prediction, the evidence Faulkenberry presented at trial is insufficient to support an award of $250,000 for future physical pain and mental anguish. The Court therefore remits the jury's award for future physical pain and suffering to $50,000.

### 5. Future Lost Wages

To support an award of damages for loss of future earning capacity, the plaintiff must introduce evidence sufficient to allow the fact-finder to reasonably measure earning capacity in monetary terms. From 2013 to 2015, Faulkenberry paid himself an annual salary of $10,000 to $12,000 for his work at Richardson Chop Shop.[15] Trial Tr. of Sept. 18, 2017 at 105, 109. Faulkenberry also claims to have received rental income from the property, although it is not clear why rental income should be reflected in lost earning capacity.[16] In addition, Faulkenberry received an annual business income distribution corresponding to his share of ownership in

---

[14] In fact, none of Faulkenberry's postjudgment filings point to any evidence supporting an award of damages for future mental anguish.

[15] As operator of Richardson Chop Shop, Faulkenberry determined his own nominal income, which he manipulated in order to maintain his eligibility for Medicare. *See* Trial Tr. of Sept. 19, 2017 at 37. The only evidence presented to establish Faulkenberry's income was (1) the business tax returns of Richardson Chop Shop, and (2) Faulkenberry's own testimony. The jury was unable to consider Faulkenberry's personal income tax returns, which were excluded at trial after counsel failed to produce them in a timely fashion.

[16] Although Faulkenberry's personal income tax returns were produced late and excluded at trial on that basis, Faulkenberry's personal tax returns appear to suggest Faulkenberry's actual rental income after expenses was substantially less than the figure presented to the jury. *Compare* Trial Tr. of Sept. 18, 2007 at 106 (suggesting Faulkenberry earned $27,000 in 2014), *with* Pl.'s Tr. Ex. 14 (reporting total income of $15,994 in 2014).

Richardson Chop Shop. This business income distribution ranged from $0 in 2013 to $2,431 in 2014.[17] Trial Tr. of Sept. 18, 2017 at 106, 163.

At trial, Faulkenberry produced no evidence as to work-life expectancy, except to testify he hoped to work until age 65. Trial Tr. of Sept. 18, 2017 at 114. He did not offer expert testimony as to his work-life expectancy, nor did he provide testimony or evidence as to the average statistical work-life expectancy of someone in his line of work. *See* Trial Tr. of Sept. 18, 2017 at 43 (testifying work at the chop shop required substantial "physical strength" because inventory pieces weighed 25 to 50 pounds on average); *cf. Barto v. Shore Constr., LLC*, 801 F.3d 465, 475 (5th Cir. 2015) (holding testimony plaintiff wants to work until a particular age is insufficient to rebut presumption the average work-life expectancy should apply). Finally, Faulkenberry presented no evidence of applicable discount rates to allow the jury to properly discount the award to present value.

The Court concludes the evidence presented at trial is not sufficient to support an award of $250,000 for lost wages. The Court concludes an award greater than $50,000 would be excessive and remits the jury's award accordingly.

### 6. Punitive Damages

"A jury may assess punitive damages in a § 1983 suit 'when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others.'" *Heaney v. Roberts*, 846 F.3d 795, 803 (5th Cir. 2017) (citing *Smith v. Wade*, 461 U.S. 30, 56 (1983)). Reckless indifference is a

---

[17] Faulkenberry presented no evidence of Richardson Chop Shop's performance in prior years, though he founded the business in 2008. Faulkenberry owned 51% of Richardson Chop Shop as of 2014, but bought out his co-owner at some point in late 2014 or 2015. Trial Tr. of Sept. 18, 2017 at 106, 109 ("[As of] 2015, I owned 100 percent."). At trial, there was no expert testimony as to how Richardson Chop Shop conducted its accounting, and Faulkenberry himself seemed confused as to the trajectory of his own business. *Compare id.* at 103 (stating Richardson Chop Shop had a "slightly down" year in 2014 but still made money), *with id.* at 163 (stating Richardson Chop Shop lost $510 in 2013). Faulkenberry declined to include a rate of growth for his business in the calculations he presented to the jury during closing arguments.

"subjective consciousness of a risk of injury or illegality and a criminal indifference to civil obligations." *Id.* (citing *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 536 (1999)).

Though both parties have devoted their attention to the constitutional limits on punitive damages, federal courts first test punitive damages awarded under federal law against statutory and common law principles. *See Perez v. Z Frank Oldsmobile, Inc.*, 223 F.3d 617, 625 (7th Cir. 2000) (citing *Donovan v. Penn Shipping Co.*, 429 U.S. 648, 649 (1977)). Therefore, if the award is excessive as a matter of federal or statutory law, it is unnecessary for the Court to assess whether the punitive damages award is so "grossly excessive" as to violate due process. *See id.* at 99–100 ("Federal judges may, and should, insist that the award be sensible and justified by a sound theory of deterrence.").

In assessing whether a punitive damage award is excessive under federal law, courts look to the three *Gore* factors: (1) the degree of reprehensibility of the defendant's conduct; (2) the relationship between the harm and the punitive damages award; and (3) the existence of state civil and criminal sanctions for comparable misconduct. *Cooper v. Morales*, 535 Fed. App'x 425, 431–36 (5th Cir. 2013) (per curiam) (citing *Gore*, 517 U.S. 559).

The first *Gore* factor—reprehensibility—is the "most important indicium of the reasonableness of the punitive damages award. *Gore*, 517 U.S. at 575. Courts evaluating reprehensibility consider whether (1) the harm was physical or merely economic; (2) the conduct evinced a reckless disregard for the health or safety of others; (3) the plaintiff was vulnerable; (4) the conduct involved repeated actions or was an isolated incident; and (5) the harm was the result of intentional malice, trickery, or deceit. *Cooper*, 525 Fed. App'x at 432 (citing *State Farm Mut. Auto Ins. Co. v. Campbell*, 538 U.S. 408 (2003)).

First, the harm to Faulkenberry was both physical and economic. Faulkenberry suffered a back injury as a result of Sergeant Yost's takedown and a facial contusion as a result of being punched in the face. He incurred substantial medical costs and lost income as a result of these injuries.

Second, Sergeant Yost's conduct evinced a reckless disregard for the health and safety of others. In a recorded conversation with Deputy Taylor following the takedown, Sergeant Yost explained he had tripped during his attempted takedown, but "it's okay, though, [because] I got him back." Trial Tr. of Sept. 18, 2017 at 91–93. A reasonably juror could conclude Sergeant Yost "got back" at Faulkenberry by punching him in the face and could further conclude punching Faulkenberry in retribution evinced a reckless disregard for Faulkenberry's safety. A reasonable juror could also conclude Sergeant Yost acted with reckless disregard for Faulkenberry's safety when he attempted to execute a dangerous takedown on Faulkenberry even though Faulkenberry was not resisting arrest.[18]

Third, Faulkenberry was relatively vulnerable. When Sergeant Yost attempted the takedown without warning, Faulkenberry had submitted to the officers' control and was being restrained by all three officers. When Sergeant Yost punched Faulkenberry in the face, both Deputy Houseton and Deputy Taylor were pinning Faulkenberry to the ground.

Fourth, Sergeant Yost's conduct was an isolated incident, but it also involved multiple actions. Sergeant Yost attempted to execute an unprovoked and potentially dangerous takedown on Faulkenberry. Then, when Faulkenberry was on the ground, Sergeant Yost punched him in the face. However, both of these actions occurred within a short span of time on the same night.

Fifth, Sergeant Yost's conduct was arguably the result of some degree of intentional malice. The jury could have reasonably concluded Sergeant Yost attempted the takedown on

---

[18] *See supra* Section I.

Faulkenberry because Faulkenberry had cursed at the officers. The jury could have also reasonably concluded Sergeant Yost punched Faulkenberry in the face as retribution for Sergeant Yost's own failed takedown.

However, the Court observes there are also mitigating factors. Sergeant Yost was not entirely unprovoked, because Faulkenberry cursed prolifically at the officers during the entire course of their interactions. *See Cooper*, 535 Fed. App'x at 432–33 (concluding first *Gore* factor inconclusive where incident was brief in duration, isolated, and partially provoked by plaintiff); *Payne*, 711 F.3d at 101 (noting that while the officer's conduct was reprehensible, "it was provoked, and that diminishes the degree of reprehensibility"). In this context, the Court finds the first *Gore* factor is inconclusive in determining whether the damages awarded are excessive in relation to the reprehensibility of the conduct at issue.

The second *Gore* factor is the relationship between the harm sustained and the punitive damages awarded. The jury awarded $905,793.64 in compensatory damages. The acceptable ratio of punitive to compensatory damages is generally much smaller where substantial compensatory damages have been awarded. *See State Farm*, 538 U.S. at 425 ("When compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit."). The punitive damages award is not clearly disproportionate relative to the compensatory damages awarded here, although the Court has remitted these damages to some degree.

The third *Gore* factor is the existence of state civil and criminal sanctions for comparable misconduct. Neither party managed to successfully brief the Court as to the third *Gore* factor. Sergeant Yost argues the punitive damages award "fails part three of the *Gore* test because in similar cases a plaintiff is not awarded over $1.3 million for a cut above one eye"—an asinine

21

mischaracterization which both misunderstands the focus of the third *Gore* factor and reductively misstates the evidence presented at trial. For his part, Faulkenberry points out the evidence viewed in the light most favorable to the plaintiff would be sufficient to convict Sergeant Yost of aggravated assault; however, Faulkenberry fails to inform the Court of the accompanying civil or criminal sanctions which might apply. Even viewing the facts in the light most favorable to Faulkenberry, the Court believes it is exceedingly unlikely Sergeant Yost would have faced any significant jail time as a result of his conduct here. *See Payne*, 711 F.3d at 104 (considering likelihood available criminal sanctions would actually be imposed). And in any event, the relationship between this sanction and the punitive damage award is "less probative than it otherwise would be because it is criminal, not civil, in nature." *Cooper*, 535 Fed. App'x at 433–34; *see also Payne*, 711 F.3d at 103 (noting the fact the officer's conduct could have warranted criminal prosecution "tends to confirm the appropriateness of the imposition of a punitive award . . . but tells little about the appropriateness of the amount of the award.").

Where, as here, consideration of the *Gore* factors is inconclusive, courts compare the award in question with awards approved in similar cases. *See Cooper*, 535 Fed. App'x at 434–35. There is a relative paucity of punitive damage awards in excessive force cases. *See id.* The most recent and instructive case addressing the issue of punitive damages in excessive force cases is *Payne*, a Second Circuit decision which has been cited with approval by the Fifth Circuit. *See Cooper*, 535 Fed. App'x at 434–35. In *Payne*, the Second Circuit noted it had never approved a $300,000 punitive damage award against an individual police officer, while describing awards ranging from $125,000 to $175,000 as "substantial." *Payne*, 711 F.3d at 105. The cases in which the Second Circuit had approved punitive damages awards above $100,000 exhibited conduct substantially more reprehensible than Sergeant Yost's conduct in this case. *See*

*Ismail v. Cohen*, 899 F.2d 183, 186 (2d Cir. 1990) (affirming award of $150,000 where police officer knocked plaintiff unconscious with a blow to the back of the head following argument over a parking citation and plaintiff then awoke to officer kneeling on his back and pressing a gun to his head); *O'Neill v. Krzeminski*, 839 F.2d 9, 10 (2d Cir. 1988) (affirming awards of $125,000 and $60,000 against two officers who attacked handcuffed plaintiff in a police station with a blackjack and then dragged plaintiff by the throat across the detention area). In *Payne*, the Court concluded a punitive damages award of $300,000 was excessive where the officer physically beat a handcuffed Vietnam War veteran suffering from post-traumatic stress disorder after the plaintiff, verbally provoked by the officer, had kicked the officer in the groin. *Id.* at 88 (reducing award to $100,000).

The Court concludes the punitive damages award is impermissibly excessive. While Sergeant Yost's conduct may have been reprehensible, it was not so egregious as to warrant imposition of a $350,000 punitive damages award. Upon consideration of the *Gore* factors and in comparison with past awards upheld in comparable cases, the Court finds the highest level of punitive damages that can be properly upheld is $100,000 and remits the jury's award accordingly.[19]

## IV.   Faulkenberry's Motion for Entry of Judgment

The parties' filings regarding the motion for entry of judgment primarily dispute whether there is sufficient evidence to support the damages found by the jury. The Court has already addressed the matter of damages above. As a result, the only remaining issue raised in the motion for entry of judgment is whether Faulkenberry is entitled to prejudgment and postjudgment interest.

---

[19] As already noted, the Court finds there is no basis for the punitive damages awarded against Deputy Taylor and correspondingly vacates that portion of the damages award.

The award of prejudgment interest lies within the sound discretion of the district court in § 1983 cases. *See San Jacinto Savings & Loan v. Kacal*, 8 F.3d 21 (5th Cir. 1993) (per curiam). The Court awards Faulkenberry prejudgment interest of 5% on past damages awarded, accruing annually from the date the suit was filed until the day before this judgment is entered.

Postjudgment interest is a matter of federal law and is awarded as a matter of course under 28 U.S.C. § 1961. Such interest is calculated at the time the judgment is entered and is based on the weekly average Treasury yield. 28 U.S.C. § 1961(a). In this case, the Court awards postjudgment interest of 1.61% per annum until the entire amount of the final judgment, including damages, prejudgment interest, and attorneys' fees, is fully paid. *See, e.g., Fuchs v. Lifetime Doors, Inc.*, 939 F.2d 1275, 1280 (5th Cir. 1991).

## Conclusion

While the record supports the jury's findings regarding Sergeant Yost's liability and lack of entitlement to qualified immunity, the jury's award is clearly excessive in light of the evidence presented. On the present record, a total award of no more than $615,793.64 is warranted as described in this opinion, and judgment will be entered in this case for that amount unless Faulkenberry opts for a new trial on the issue of damages. The Court advises Faulkenberry he has fourteen days to consider whether doing so would ultimately produce a more fulsome record.

Accordingly:

IT IS ORDERED that Defendant Sergeant Dustin Yost's Renewed Motion for Judgment as a Matter of Law, or, Alternatively, Motion for New Trial or Remittitur [#85] is GRANTED IN PART and DENIED IN PART as described in this opinion;

IT IS FURTHER ORDERED that the jury's award of damages as to Defendant Sergeant Dustin Yost is REMITTED to a total of SIX HUNDRED AND FIFTEEN

THOUSAND, SEVEN HUNDRED AND NINETY-THREE AND 64/100 DOLLARS ($615,793.64), comprised of an award of TWO HUNDRED AND SEVENTY-FIVE THOUSAND AND 00/100 DOLLARS ($275,000) for past physical pain and mental anguish; SEVENTY-FOUR THOUSAND, EIGHT HUNDRED AND FOUR AND 64/100 DOLLARS ($74,804.64 ) for past medical expenses; FIFTY-FIVE THOUSAND, NINE HUNDRED AND EIGHTY-NINE AND 00/100 DOLLARS ($35,000) for past lost wages; FIFTY THOUSAND AND 00/100 DOLLARS ($50,000) for future physical pain and mental anguish; FIFTY THOUSAND AND 00/100 DOLLARS ($50,000) for future lost wages; and ONE HUNDRED THOUSAND AND 00/100 DOLLARS ($100,000) in punitive damages.

IT IS FURTHER ORDERED that the jury's award of damages as to Defendant Michael Taylor is REMITTED IN FULL based on the jury's verdict;

IT IS FURTHER ORDERED that within fourteen (14) days from date of entry of this order, Plaintiff Lawrence Faulkenberry must either file in the record of this case an acceptance of the remittitur or a notice of his intent to retry the issue of damages; and

IT IS FINALLY ORDERED that Plaintiff Lawrence Faulkenberry's Motion for Entry of Judgment [#84] is HELD IN ABEYANCE pending his above-described choice.

SIGNED this the 30th day of Novemb 2017.

SAM SPARKS
UNITED STATES DISTRICT JUDGE

25